UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| MMR CONSTRUCTORS, INC., | : | CIV. NO. 22-267 |
| | : | |
| Plaintiff, | : | |
| | : | |
| VERSUS | : | JUDGE BRIAN A. JACKSON |
| | : | |
| JB GROUP OF LA, LLC D/B/A | : | |
| INFRASTRUCTURE SOLUTIONS GROUP | : | |
| and DAVID HEROMAN, | : | MAGISTRATE JUDGE RICHARD L. |
| | : | BOURGEOIS, JR. |
| Defendants. | | |

## MEMORANDUM IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND TO SET PRELIMINARY INJUNCTION HEARING

Plaintiff MMR Constructors, Inc. ("MMR") respectfully submits this memorandum in support of its Motion for Temporary Restraining Order and to Set Preliminary Injunction Hearing. An on-going forensic investigation, coupled with MMR's data loss prevention software, have conclusively demonstrated that, shortly before the termination of his employment with MMR, Defendant David Heroman transferred MMR's trade secret information to external storage devices and also uploaded information to a cloud-based storage platform. Shortly thereafter, he began working for MMR's direct competitor, Defendant JB Group of LA, LLC, d/b/a Infrastructure Solutions Group ("ISG") and, based on the computing activity, are using that information to compete unfairly and illegally.

MMR faces irreparable harm from ISG and Heroman's continued possession of its trade secrets. The Court should therefore enter a temporary restraining order to preserve the *status quo* by restraining ISG and Heroman from disclosing, using, or accessing the misappropriated information and ensuring — through a thorough forensic examination — that such information is remediated from ISG's and Heroman's computing devices, network, and accounts.

1

# FACTUAL BACKGROUND[1]

### *MMR Takes Significant Measures to Protect Its Confidential Business Information*

MMR is a leading specialty contractor that provides instrumentation and technical services, electrical construction services, telecommunications and security services, power development and distribution services, facility maintenance services, and other industrial electrical and instrumentation services to public- and private-sector clients in the United States and abroad. MMR's contracts with its customers can run into the millions of dollars and span multiple years. Securing one contract positions MMR to have the ability to win repeat business on that same project or other future projects with the customer.

Cultivating customer relationships is essential to MMR's business. develop and maintain customer relationships, MMR invests significant time, money, and energy into researching customer needs, developing marketing strategies, creating financial forecasts and business forecasts, and developing its pricing structures and estimating tools. These efforts, which are dependent on the accumulation, application, and secrecy of MMR's confidential business information, are crucial to MMR's success in the competitive market. For this reason, MMR's confidential information, identifying customers, and customer pricing information (including costs and labor rates) has substantial value to MMR. MMR's competitive position largely rests on protecting its confidential business information in this highly competitive field, and MMR takes substantial care to keep its information out of its competitors' hands. This information is not

---

[1] The following facts are set forth and verified under oath in MMR's *Verified Complaint* (R. Doc. 1). MMR is prepared to present witnesses to testify as to the allegations in the *Verified Complaint* upon the Court's setting of this matter for a preliminary injunction hearing.

generally known outside of MMR, and MMR only shares it with employees who need to know the information to perform their jobs.

MMR takes significant steps and has developed a system to protect its confidential business information and keep its and its customers' data secret. MMR requires its employees to sign and agree to various employment policies and procedures designed to protect the confidentiality of its information. For instance, MMR requires employees to sign and acknowledge its Business Code of Ethics, which requires employees to "protect not only the assets of MMR, but also its clients, vendors, suppliers and other third parties[,]" including "tangible assets and intangible assets, such as confidential and proprietary information." MMR also requires employees to sign and acknowledge its Rules of Conduct, which prohibits employees from "Theft or unauthorized removal of any property belonging to (i) MMR, (ii) the workplace, (iii) the job site, (iv) fellow employees, or (v) clients, contractors, suppliers, or vendors of MMR." Further, MMR requires employees to sign and abide by its "Employer Loyalty/Confidentiality/Trade Secrets/Conflict of Interest Agreement." Through this agreement, employees agree that:

> [d]uring and after the term of his employment, the EMPLOYEE agrees to hold as confidential all knowledge and information he has acquired in connection with his/her employment with MMR, and which is not otherwise generally available to the public or third parties, including but not limited to customer lists, financial information, pricing information, marketing material, technical data, drawings, memoranda, notes, programs, electronic gear, personnel records, policies, other items, and papers and reproductions (all of which is deemed "Confidential" and a trade secret) thereof relating the business of MMR.

ISG, and the former MMR employees working for ISG, are well aware of these steps taken by MMR to protect the confidentiality of its business information. Jason Yates, Travis Dardenne, Walter Huffman, Tiffany Medine, Kasey Kraft, and Heroman, each a former MMR employee who now works for ISG, signed these agreements during their employment with MMR.

3

In addition to requiring employees with access to confidential business information to sign agreements and acknowledgements obligating them to safeguard that information, MMR protects its confidential business information on password-protected internal computer servers that can only be accessed by select employees who have a valid reason to review or use the information. Several of its documents are further protected such that only certain management-level employees have the ability to modify sensitive data points within the documents. MMR also trains its employees, including all new hires, with access to confidential business information that the documents are confidential and valuable to MMR and should not be disclosed to anyone outside of MMR. Additionally, MMR utilizes Trend Micro Apex Central data loss prevention software to track employee computing activity. Employee transfer of MMR information to external cloud-based storage accounts and physical external storage devices is monitored and tracked using this software, allowing MMR's Information Technology personnel to review and run reports concerning employee computing activity and access to confidential business information.

MMR's confidential business information, such as customer-specific financial information, its cost-estimating tools, its employee data and records, and its proposals and draft proposals to customers for certain work on which MMR is bidding, is valuable because it is kept secret. In the hands of a competitor like ISG, the information can be used, for instance, to review, compare, and undercut MMR's pricing on competitive bids, substantially harming MMR's business prospects.

### ISG Tries to Replicate MMR, But Does So Unlawfully

ISG was formed in Gonzales, Louisiana and now provides industrial electrical and instrumentation services to public and private customers in direct competition with MMR. However, ISG was not a direct competitor of MMR until launching a concerted effort to poach

4

MMR personnel. This started with Jason Yates, who was an MMR Project Manager and had been with MMR since 2003, and Travis Dardenne, who was also an MMR Project Manager and had been with MMR since 2004.

On July 29, 2021, Yates resigned from MMR to, he said, help his friend with a construction company that would be pursuing public works projects, primarily contractor services relating to traffic lights and associated equipment. The company that Yates went to work for was ISG, which brought Yates on to assume a key management role, with an ownership stake in the company. He is currently listed as a member/manager of ISG on the Louisiana Secretary of State's website. Around the same time, Dardenne resigned from MMR to join ISG. After bringing Yates and Dardenne on board, ISG started to expand its scope into industrial electrical and instrumentation services — that is, attempting to compete within the space that is MMR's bread and butter.

In the last two months, Yates and ISG have ramped up their targeting of MMR personnel. On March 4, 2022, Walter Huffman, who was a Project Controls Manager and had been with MMR since 2013, informed MMR that he was leaving to accept another job. Huffman subsequently commenced employment with ISG. And on March 22, 2022, Tiffany Medine, who was Human Resources Coordinator and had been with MMR since 2007, left for a position with ISG.

While MMR was concerned about its employees departing to go work for a direct competitor, these employees were free to do so, provided they had not breached their fiduciary duties before leaving and had not misappropriated MMR's confidential business information. Each of these individuals — Yates, Dardenne, Huffman, and Medine — had signed and agreed to abide by the obligations to safeguard MMR's confidential business information, and MMR did not have hard evidence that these individuals had compromised its information.

5

Things changed, however, with ISG's most recent targeting of MMR personnel. In late March, 2022, MMR began to uncover evidence that ISG was recruiting MMR employees who were willing to bring MMR's trade secrets and confidential business information to ISG.

On March 31, 2022, MMR Project Engineer Kasey Kraft terminated his employment with MMR to accept a position at ISG. On Kraft's last day, an MMR employee witnessed Kraft transferring a large number of documents from his MMR work computer to an external storage device. When confronted about the file transfer, Kraft falsely claimed he was merely transferring personal information, *i.e.,* not MMR's trade secrets and confidential business information. Review of the external storage device told the truth — Kraft had attempted to steal trade secrets but was thwarted when caught in the act.

Unfortunately, for MMR, it was not so lucky when Heroman resigned days later to likewise work for ISG.

### *Computer Forensic Investigation Points to Massive Theft*

Heroman commenced his employment with MMR on or around December 6, 2012, as a communications technician in the Greater Baton Rouge area. Before joining MMR, Heroman worked in law enforcement, focusing on computer forensics. After over nearly a decade of working for MMR, Heroman rose through the ranks of the company, ultimately becoming an MMR telecommunications Project Manager, managing multiple MMR projects in Orlando, Florida. Through the course of his employment, and particularly after being promoted to Project Manager, Heroman had access to significant amounts of MMR's trade secrets and confidential business information. Specifically, Heroman had access to financial information concerning MMR's business and its operations in the regions he worked; access to employee databases containing detailed information about MMR's employees, their specializations, and their rates; customer-

specific proposals, both submitted and in preparation; contracts with MMR's vendors and suppliers; MMR's cost estimating tools; and more.

After Heroman's abrupt resignation on April 8, 2022, MMR engaged a firm with expertise in computer forensics to determine whether there was evidence suggesting the potential theft of information. The computer forensic analysis, in combination with MMR's internal data loss prevention software, determined that, in the month leading up to his resignation, Heroman began transferring large swaths of this information to electronic storage devices and some to a cloud-based storage platform.

In the month leading up to his resignation on April 8, 2022, Heroman downloaded over *1,500 files* from MMR's computer systems to several electronic storage devices and at least one Google Drive account. In total, the initial forensic analysis identified *14 external storage devices* that were plugged into Heroman's work computer during this March-April 2022 timeframe. They include the following listed in the chart below by description and correlating serial number, and the chart is color coordinated to reflect the *10 external storage devices* that were not returned at the time of his resignation (green) and 4 external storage devices that were returned (yellow and red).

| Serial Number | Description |
|---|---|
| 511200204140FF2E0039 | Corsair Voyager GTX SCI Disk Device |
| 511200204140FF2E004B | Corsair Voyager GTX SCSI Disk Device |
| 9300E2FF041402002115 | Corsair Voyager GTX |
| 07A2010019637923 | Patriot Memory USB Device |
| 4C530199950720118525 | SanDisk Cruzer Glide USB Device |
| AABB0B2300001162 | PNY USB 2.0 FD USB Device |

| | |
|---|---|
| 0123456789ABCDEF | SanDisk Firebird USB Device |
| 070002AD3466C733 | USB DISK 2.0 USB Device |
| AA00000000000485 | Lexar USB Flash Drive |
| 08759313E642982B | SanDisk Cruzer USB Device |
| 4C530000100611113593 | SanDisk Ultra USB 3.0 USB Device |
| AA7KZLFL2I2Y9R2B | Lexar USB Flash Drive USB Device |
| 07A201003A50607D | Patriot Memory USB Device |
| 12081390120047 | Verbatim USB Device |

It is clear that Heroman was transferring MMR's trade secrets for ISG's use, and that he was trying to hide his tracks when doing so. For instance, on Sunday, April 3, 2022 — just five days before he unexpectedly resigned — the "SanDisk Ultra USB 3.0" (yellow) was plugged into Heroman's MMR work computer. The forensic evidence establishes that the user "dheroman" accessed a folder entitled **"Estimating"** and a subfolder entitled **"2021 Estimates"** from the "SanDisk Ultra USB 3.0" while it was plugged into Heroman's MMR computer. A check of Heroman's MMR computer identified folders bearing the same names within a primary folder named "OneDrive – MMR Group, Inc." Further, the forensics establishes that the "**2021 Estimates**" subfolder was transferred to the "SanDisk Ultra USB 3.0" on that Sunday, April 3, 2022. This is also confirmed by the report generated by the Trend Micro Apex Central data loss prevention software. Both a check of Heroman's MMR computer and a review of the data loss prevention report confirm that these folders contain over 500 files that include customer-specific pricing and bids and MMR's estimates and estimating tools.

8

That is, on a Sunday, just days before resigning, Heroman ensured that he had transferred a library of MMR's highly confidential bids, pricing, and estimating tools onto a portable medium that would allow the data to make its way to ISG. There was no legitimate business reason for him to do so on the Sunday before he resigned.

The "SanDisk Ultra USB 3.0," moreover, was not the only external storage device connected to Heroman's MMR computer on Sunday, April 3, 2022. Three other external storage devices were also connected to that computer:

- Lexar USB Flash Drive, Serial No. AA00000000000485 (**unreturned**)

- PNY USB 2.0 FD USB Device, Serial No. AABB0B2300001162 (**unreturned**)

- Verbatim USB Device, Serial No. 12081390120047 (returned)

While those devices were in use, a number of folders that contained trade secrets and confidential business information were accessed on the Heroman MMR computer by the "dheroman" user.

This was not the first time external storage devices had been connected to Heroman's MMR computer and MMR data was accessed by the "dheroman" user shortly before Heroman resigned. Just two days before, on Friday, April 1, 2022, the same "SanDisk Ultra USB 3.0" was plugged into Heroman's MMR computer, and a folder named "**Banana**" was accessed by the "dheroman" user from the "SanDisk Ultra USB 3.0."  A check of Heroman's MMR computer identified a folder bearing the same name within a primary folder named "OneDrive – MMR Group, Inc." This folder was found to contain subfolders, such as "**Price Lists**," "**New Hires and Employees**," "**Proposal Documents**," "**Rates**," "**Quality**" "**QAQC**," "**A Orlando Projections and Overhead**," "**A Daily Notes**," and "**A Bckup**" and contains *over 800 files*. This was also confirmed by the report generated by the Trend Micro Apex Central data loss prevention software.

9

A review of these folders on Heroman's MMR computer identified over 800 files within the "**Banana**" folder (and its various subfolders) that contain MMR's highly valuable trade secrets and confidential business information, including operational information regarding work performed for MMR customers; proposals and draft proposals to actual and prospective customers; MMR pricing information and price lists, including customer specific price books and information about year-over-year trends in MMR's pricing; product descriptions and specifications; data concerning MMR's new hires and employees, including employee pay information and employee training materials; and MMR's projections regarding each ongoing and prospective project in the Orlando area. In fact, included in these files was a "**Master Job Sheet – Bible"** that is exactly what the name implies: a document that is a veritable bible for completing work according to MMR's standards. This was also confirmed by the report generated by the Trend Micro Apex Central data loss prevention software.

The "SanDisk Ultra USB 3.0," moreover, was not the only external storage device connected to Heroman's MMR computer on April 1, 2022. Four other external storage devices were connected:

- Lexar USB Flash Drive, Serial No. AA00000000000485 (**unreturned**)

- SanDisk Cruzer USB Device, Serial No. 08759313E642982B (**unreturned**)

- Lexar USB Flash Drive USB Device, Serial No. AA7KZLFL2I2Y9R2B (returned)

- Patriot Memory USB Device, Serial No. 07A2010019637923 (returned)

While those devices were in use, folders were being accessed by the "dheroman" user on Heroman's MMR computer that contained trade secrets and confidential business information. While those devices were in use, Heroman was accessing folders from his MMR work computer that contained trade secrets and confidential business information.

10

As his final day approached, Heroman continued to ensure that he had the trade secrets and confidential business information that ISG would need to unfairly compete with MMR. On April 4, 2021, Heroman was accessing MMR's trade secrets while the Patriot Memory USB Device was plugged into his MMR computer. On April 5, 2021, just three days before Heroman's resignation, three external storage devices were plugged into his MMR work computer:

- Lexar USB Flash Drive, Serial No. AA00000000000485 (**unreturned**)

- Corsair Voyager GTX SCSI Disk Device, Serial No. 511200204140FF2E004B (**unreturned**)

- Lexar USB Flash Drive USB Device, Serial No. AA7KZLFL2I2Y9R2B (returned)

Just before these devices had been connected, MMR's trade secrets and confidential business information were being accessed by the "dheroman" user, including an apparent contact list entitled "**contacts.CSV**."

In fact, around this same time on April 5, 2021, a Google Drive account was being accessed, and the report from MMR's data loss prevention software indicates that the file "**contacts.CSV**" was uploaded to the Google Drive account. With Heroman's MMR contact list in his personal Google Drive account, this file can be accessed from any device and shared with anyone he chooses, including ISG.

On April 8, 2022, several more external storage devices were connected to Heroman's MMR work computer. These included the following:

- Lexar USB Flash Drive, Serial No. AA00000000000485 (**unreturned**)

- Corsair Voyager GTX SCSI Disk Device, Serial No. 511200204140FF2E004B (**unreturned**)

- SanDisk Ultra USB 3.0, Serial No. 4C530000100611113593, (returned)

- Patriot Memory USB Device, Serial No. 07A201003A50607D (returned)

- Lexar USB Flash Drive USB Device, Serial No. AA7KZLFL2I2Y9R2B (returned)
- Verbatim USB Device, Serial No. 12081390120047 (returned)

In other words, Heroman plugged in six external storage devices on his last day with MMR, yet chose to return only four of the six that he plugged in that day.

Further, Heroman returned the "San Disk Ultra USB 3.0" with *zero files on it*. This is particularly troubling because the forensic analysis and data loss prevention report showed that the "**2021 Estimates**" subfolder, which was within the "**Estimates**" folder and contained numerous documents, was transferred to the device on Sunday, April 3, 2022, just five days before. Being a sophisticated computer user, with a background in computer forensics, Heroman knew exactly what he was doing — that is, he was trying to hide his tracks so that MMR would not be alerted to his highly suspicious computing activity.

There is simply no valid or innocent excuse for Heroman's use of and failure to return the external storage devices and to attempt to cover up the fact that he had transferred a treasure trove of MMR's confidential business information in the days leading up to his resignation. Heroman's activity was intentional, and likely directed by ISG, Heroman took the information on the external storage devices to assist ISG in unfairly competing against MMR.

### *ISG now has MMR's playbook and is competing unfairly*

Taken together, the misappropriated information essentially provides a competitor with the blueprints to replicate MMR's business, without investing any of the substantial time, money, effort, and manpower needed to create the information. In the hands of a direct competitor, this information could be devastating to MMR. Since his resignation from MMR on April 8, 2022, ISG has employed Heroman who continues to have the trade secrets and confidential business information taken from MMR on electronic storage devices and on at least one Google Drive

account. Upon information and belief, the misappropriated trade secrets and confidential business information have been accessed on or from ISG's computing system and have been disclosed to ISG and/or stored within ISG's computing network.

ISG has already started to benefit from the use of these trade secrets and confidential business information, as ISG is targeting MMR customers with whom ISG had no previous relationships and projects about which it had no previous knowledge. ISG and all of its employees, including Heroman, must be enjoined from retaining, using, and disclosing MMR's trade secrets and confidential business information, and must submit to a <u>thorough computer forensic examination</u> to ensure that MMR's information is permanently removed from ISG's and its employees' computing devices and computing network.

## LAW AND ARGUMENT

### I.    The Standard for Injunctive Relief and Temporary Restraining Order

The same legal standard applies to a motion for a temporary restraining order and a motion for preliminary injunction. *See Havlik v. United States*, No. 18-cv-0692, 2018 U.S. Dist. LEXIS 180193, at *2 (W.D. La. Oct. 19, 2018); *see also Garza v. Starr Cty.*, 309 F. Supp. 3d 454, 456 (S.D. Tex. 2018) ("A TRO is simply a highly accelerated and temporary form of preliminary injunctive relief, requiring that movant establish the same four elements for obtaining preliminary injunction."); *Palmer v. Fox Broad. Corp.*, No. 02-0108, 2002 U.S. Dist. LEXIS 20301, at *3 (E.D. La. Jan. 15, 2002). To obtain a preliminary injunction, the moving party must establish four elements: "[i] A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, [ii] that he is likely to suffer irreparable harm in the absence of preliminary relief, [iii] that the balance of equities tips in his favor, and [iv] that an injunction is in the public interest." *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008); Fed. R. Civ. P. 65.

## II.    The Requested Relief Is Warranted.

MMR requires a temporary restraining order and preliminary injunction preventing ISG and Heroman from using, disclosing, accessing, and retaining the information misappropriated from MMR to gain an unjust and unlawful competitive advantage. MMR can satisfy the four required elements for the relief it requests. *First*, the evidence demonstrates that MMR is likely to succeed on the merits of its trade secret claims against the Defendants — MMR took reasonable steps to protect the confidentiality of its information, and the information has economic value because it is secret. Further, forensic evidence, coupled with MMR's data loss prevention software, demonstrate that ISG and Heroman misappropriated this information mere days before Heroman resigned from MMR to go work for ISG. *Second*, MMR is suffering and will continue to suffer substantial irreparable harm due to the nature of the misappropriated trade secret information in the hands of its competitor. *Third*, the balance of the equities weighs heavily in favor of MMR. And *fourth*, granting the requested relief best serves the public interest by promoting fair competition and business practices.

### A.    MMR is likely to succeed on the merits of its trade secret claims.

To establish a likelihood of success on the merits, a plaintiff "need not show that success is an absolute certainty a plaintiff need only make a showing the probability of her prevailing is better than fifty percent." *Eng v. Smith*, 849 F.2d 80, 82 (2d Cir. 1988). MMR can satisfy this burden for its claims under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, *et seq.*, and Louisiana Uniform Trade Secret Act ("LUTSA"), La. Rev. Stat. § 53:1431, *et seq.*, because the evidence shows that ISG and Heroman misappropriated MMR's trade secrets.

The DTSA states that an "owner of a trade secret that is misappropriated may bring a civil action" in federal court "if the trade secret is related to a product or service used in, or intended for

use in, interstate or foreign commerce." 18 U.S.C. § 1836(b). The DTSA defines "misappropriation" as "(A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (B) disclosure or use of a trade secret of another without express or implied consent by a person who," among other things, "used improper means to acquire knowledge of the trade secret." 18 U.S.C. § 1839(5)(A)-(B). Under the DTSA, prohibited "misappropriation" includes the acquisition of a trade secret by improper means, as well as its use or disclosure. *See Id.* at § 1839(5)(A)-(B). The DTSA defines "improper means" as including "theft bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." *Id.* at § 1839(6)(A). "[T]he definitional sections of the DTSA and [the LUTSA] are very similar." *Source Prod. & Equip. Co. v. Schehr*, No. 16-17528, 2017 WL 3721543, at *2 (E.D. La. Aug. 29, 2017) (comparing 18 U.S.C. §§ 1836, 1839, with LUTSA § 1).[2]

The DTSA, moreover, defines a "trade secret" as:

all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if — (A) the owner thereof has taken reasonable measures to keep such information secret; and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily available through proper means by, another person who can obtain economic value from the disclosure or use of the information.

---

[2] The DTSA defines "misappropriation" as "(A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (B) disclosure or use of a trade secret of another without express or implied consent by a person who," among other things, "used improper means to acquire knowledge of the trade secret." 18 U.S.C. § 1839(5)(A)-(B). The LUTSA defines "misappropriation" similarly. La. Rev. Stat. § 53:1431(2). The DTSA defines "improper means" as including "theft bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." *Id.* at § 1839(6)(A). The LUTSA defines "improper means" similarly. La. Rev. Stat. § 53:1431(1).

18 U.S.C. §1839(3).[3]

Evidence demonstrates that Heroman's actions shortly before leaving MMR qualify as a "misappropriation" that was achieved through "improper means." Specifically, with knowledge that MMR's customer pricing, financial, estimating, and employee information was confidential and not to be disseminated other than to authorized employees of MMR, Heroman transferred this information to external storage devices and his personal cloud-based storage account and then took steps to hide this activity. *See AUA Private Equity Partners, LLC v. Soto*, No. 17-8035, 2018 WL 1684339, at *7 (S.D.N.Y. Apr. 5, 2018) (explaining that, like here, improper acquisition through downloading information establishes liability and collecting cases where "[m]isappropriation by acquisition has been found under other state UTSAs in similar circumstances"). Further, Heroman now has this information as an employee of ISG and, upon information and belief, is using and disclosing these trade secrets on behalf of ISG in competition with MMR.

The misappropriated information, moreover, qualifies as trade secret under the DTSA and LUTSA. MMR has reviewed the names of the files and folders identified through preliminary forensic investigation and confirmed that they contain highly sensitive business information that is not generally known and gives MMR a competitive edge. Further, MMR took reasonable efforts to maintain the secrecy of this information by requiring employees to sign agreements and acknowledging policies protecting the confidentiality of the information; by limiting employee access to certain confidential business information and password protecting that information; and by monitoring transfer of confidential information through data loss prevention software. *See* Unif. Trade Secrets Act § 1(4)(ii) cmts. (drafters of Uniform Trade Secret Act, on which the LUTSA is

---

[3] The LUTSA defines the term "Trade Secret" similarly. La. Rev. Stat. 53:1431(4).

based, explain that "reasonable efforts to maintain secrecy" may include advising employees of the existence of a trade secret or limiting access to a trade secret on a "need to know basis").

MMR's efforts to maintain the confidentiality of this information gives it "independent economic value." A direct competitor would benefit greatly if it had access to the information that Heroman misappropriated, particularly with respect to customer-specific pricing information and estimating tools. With this type of information and the other misappropriated information, ISG, for instance, is immediately put in a position to provide identical services to customers at a lesser price than MMR. Further, ISG unfairly has this information without having to purchase it or devote the time and resources that were necessary for MMR to develop the information.

In sum, MMR can establish that it will likely prevail on the merits of its DTSA and LUTSA claims because Heroman misappropriated, by improper means, MMR's information and data, which qualify as trade secrets.

**B.      MMR will suffer irreparable harm in the absence of a temporary restraining order.**

MMR has suffered, and will continue to suffer, irreparable harm if the requested relief is not granted. Irreparable injury is harm that "cannot be undone through monetary damages" — that is, harm for which money damages are inadequate or for which money damages are "especially difficult" to compute.  *Deerfield Med. Ctr. v. City of Deerfield Beach,* 661 F.2d 328, 338 (5th Cir. 1981); *Allied Marketing Group, Inc. v. CDL Marketing, Inc.,* 878 F.2d 806, 810 n.1 (5th Cir. 1989).

The U.S. Fifth Circuit recognizes that irreparable harm can be established where "the rights are economic, but because of their nature or the circumstances of the case, establishment of the dollar value of the loss is especially difficult or speculative." *Mississippi Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 630 n. 12 (5th Cir. 1985) (citing *State of Texas v. Seatrain Int'l, S.A.*, 518 F.2d 175, 179 (5th Cir. 1975)).

17

Both the United States Congress and the Louisiana legislature recognize that irreparable injury arises from the misappropriation of trade secrets. It is clear in the DTSA and LUTSA that even the *threat* of misappropriation may be enjoined. 18 U.S.C. § 1836 (b)(3)(A)(i); La. Rev. Stat. § 51:1432(A).

Accordingly, MMR need only show that the "defendant possesses the trade secrets and is in a position to use them." *WorldVentures Mktg., LLC v. Rogers*, 2018 U.S. Dist. LEXIS 148434, at *21 (E.D. Tex. Aug. 30, 2018) (applying TUTSA and quoting *First Command Fin. Planning, Inc. v. Velez*, 2017 U.S. Dist. LEXIS 221757, 2017 WL 2999405, at *6 (N.D. Tex. 2017)); *see also Newsouth Commc'ns Corp. v. Universal Tel. Co.*, No. 02-2722, 2002 WL 31246558, at *21 (E.D. La. Oct. 4, 2002) (citing *Union Carbide Corp. v. UGI Corp.*, 731 F.2d 1186, 1191–92 (5th Cir. 1984) and *FMC Corp. v. Varco Int'l, Inc.*, 677 F.2d 500, 503 (5th Cir. 1982)) (recognizing that using or disclosing *even one* trade secret to a competitor of the employee's former employer may create a substantial threat of irreparable injury)*; Picker Int'l, Inc. v. Blanton*, 756 F. Supp. 971, 983 (N.D. Tex. 1990) (injunctive relief is the "only way use of the [trade] secret by the former employee can be prevented"); *Computer Mgmt. Assistance v. Robert F. deCastro, Inc.*, 220 F.3d 396, 403 (5th Cir. 2000); *Reingold v. Swiftships, Inc.*, 126 F.3d 645, 648 (5th Cir. 1997)); *Am. Express Fin. Advisors, Inc. v. Scott*, 955 F. Supp. 688, 693 (N.D. Tex. 1996) (when, as in this action, "trade secrets and goodwill are involved, the threat is significant that the harm experienced by the misappropriation or misuse of trade secrets will be irreparable"); *Leslie*, 594 F. Supp. 2d at 757 ("The use of an employer's confidential information and the possible loss of customers is sufficient to establish irreparable harm.") (citing *Unisource Worldwide, Inc. v. Valenti*, 196 F. Supp. 2d 269, 280 (E.D.N.Y. 2002); *Ecolab Inc. v. Paolo*, 753 F. Supp. 1100, 1110 (E.D.N.Y. 1991)); *see also Daniels*, 812 F. Supp. 2d at 787 (recognizing that "a loss of prospective goodwill

can constitute irreparable harm") (citing *Tom Doherty Assocs. v. Saban Entm't, Inc.*, 60 F.3d 27, 38 (2d Cir. 1995)).

Here, MMR faces real threats and actual irreparable harm if the Court does not enter a temporary restraining order. Heroman improperly took and retained MMR's trade secrets, at the very least, on external storage devices and through a cloud-based storage platform, shortly before terminating his employment. ISG is now in a position to use the trade secrets to MMR's detriment. With MMR's trade secrets and proprietary information readily accessible, ISG and Heroman can unlawfully compete against and harm MMR, resulting in injuries that will prove difficult to measure with monetary precision.

### C.    MMR's injury outweighs any harm to ISG or Heroman.

Next, the Court must determine whether the threatened injury outweighs any damage that an injunction might cause. *See Sugar Busters LLC v. Brennan*, 177 F.3d 258, 265 (5th Cir. 1999). MMR seeks narrowly tailored relief designed to protect its legitimate business interests and to ensure misappropriated information cannot be used further to unfairly compete. If the Court does not intervene, MMR stands to lose its value in intellectual property to ISG. In contrast, ISG and Heroman will suffer no undue hardship, as they merely need to comply with his contractual obligations not to disclose MMR's confidential information and to comply with trade secret law. *See Dish Network L.L.C. v. Ramirez*, No. 15-04712, 2016 WL 3092184, at *7 (N.D. Cal. Jun. 2, 2016) (balance of hardships tips in favor of plaintiff seeking injunction when it would "do no more than require Defendant to comply with federal and state laws"). The Court should therefore find that the equities favor issuing the requested relief. Further, the requested forensic examinations will merely allow the trade secrets and confidential business information that are unlawfully within

ISG and Heroman's possession to be remediated permanently from their computing devices, network, and accounts.

**D.      Injunctive relief will not disserve the public interest.**

Finally, enjoining ISG and Heroman from using MMR's trade secrets and requiring the forensic examinations will not disserve the public interest. Instead, the requested relief will promote fair competition, ethical behavior, honest work, and innovation. *Bank of Am., N.A. v. Lee,* No. 08–5546, 2008 WL 4351348, at *7 (C.D. Cal. Sept. 22, 2008) (finding that public interest is served by enabling the protection of trade secrets). Indeed, without a robust ability to protect trade secrets and other proprietary and confidential information, businesses will not be able to hire high-level employees and engage in fair and legitimate competition for fear of losing information to a competitor, as MMR did when Heroman and potentially others joined ISG.

**III.    The Court Should Set A Preliminary Injunction Hearing And Grant Expedited Discovery Including A Forensic Examination Of ISG's Computing Devices And Networks.**

An evidentiary hearing on MMR's request for preliminary injunction is required. *See, e.g. Kaepa, Inc. v. Achilles Corp.,* 76 F.3d 624, 628 (5th Cir. 1996) (citation omitted) (interpreting Rule 65(a)(1) to require that, where factual disputes are presented, the parties must have a fair opportunity and a meaningful hearing to present their differing versions of the facts). During the evidentiary hearing, MMR will present evidence demonstrating why the Court should issue the requested preliminary injunction. Further, as explained in detail in MMR's motion to expedite discovery, which is being filed concurrently with this motion, expedited discovery is appropriate to give the Court a more complete record to conduct a preliminary evaluation of the merits of MMR's claims and to allow MMR to ascertain the extent of ISG and Heroman's unlawful misappropriation.

Additionally, in order to maintain the *status quo* before ISG and Heroman's misappropriation of MMR's trade secret information, MMR must be allowed to commence expedited discovery immediately, conducting a forensic analysis of ISG and Heroman's computing devices, networks, and accounts to determine the extent of the misappropriation and begin to remediate that information.

## CONCLUSION

For the foregoing reasons, MMR respectfully requests the Court grant the motion, enter the proposed temporary restraining order, and set an evidentiary hearing on MMR's request for a preliminary injunction.

Respectfully submitted:

*/s/ P.J. Kee*
P.J. KEE  (La. Bar No. 34860)
THOMAS P. HUBERT (La. Bar No. 19625)
JACOB J. PRITT (La. Bar No. 38872)
MICHAEL A. FOLEY (La. Bar No. 35774)
JONES WALKER, LLP
201 St. Charles Avenue - 50th Floor
New Orleans, Louisiana  70170-5100
Telephone:  (504) 582-8000
Facsimile:  (504) 589-8230
Email:  pkee@joneswalker.com

***Counsel for MMR Constructors, Inc.***

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing was served on Defendants by email on April 25, 2022.

*/s/ P.J. Kee*
P.J. KEE
