UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| MMR CONSTRUCTORS, INC., | : | CIV. NO. 22-267 |
| Plaintiff, | : | |
| | : | |
| VERSUS | : | JUDGE BRIAN A. JACKSON |
| | : | |
| JB GROUP OF LA, LLC D/B/A | : | |
| INFRASTRUCTURE SOLUTIONS GROUP, | : | MAGISTRATE JUDGE RICHARD L. |
| DAVID HEROMAN, and KASEY KRAFT. | : | BOURGEOIS, JR. |
| | : | |
| Defendants. | | |

**FIRST AMENDED COMPLAINT FOR DAMAGES,
TEMPORARY RESTRAINING ORDER, AND INJUNCTIVE RELIEF**

Plaintiff MMR Constructors, Inc. ("MMR") respectfully files this *First Amended Verified Complaint for Damages, Temporary Restraining Order, and Injunctive Relief*. This action arises out of the theft of MMR's trades secrets and confidential business information by Defendants, JB Group of LA, LLC d/b/a Infrastructure Solutions Group ("ISG") and former MMR employees David Heroman and Kasey Kraft. MMR brings this action under the Defend Trade Secrets Act, 18 U.S.C. § 1125 *et seq.* ("DTSA"), the Louisiana Uniform Trade Secrets Act, La. Rev. Stat. 51:1431 *et seq.* ("LUTSA"), the Louisiana Unfair Trade Practice Act, La. Rev. Stat. 51:1401 *et seq.* ("LUTPA"), and various business tort-based causes of action under Louisiana law.

## NATURE OF THE CASE

1.    MMR started from a single office in Baton Rouge and, through substantial investments and experience, has grown into one of the largest electrical and instrumentation contractors in the United States. ISG is now one of MMR's direct competitors. This lawsuit exposes, and seeks to stop, an orchestrated effort by ISG to steal MMR's trade secrets and confidential business information in order to unfairly compete in the highly competitive market in which MMR has spent years becoming a market leader.

2.      Each project that MMR wins can generate millions of dollars in revenue. Since recruiting and offering an ownership stake to a former MMR employee, ISG has sought to penetrate the market for these projects by, in large part, replicating MMR. ISG has poached MMR employees who themselves gained valuable know-how across various sectors of MMR's business, from project controls and human resources to operations and business development. While MMR had worries about fair competition as employees left to join ISG, these concerns came to head in the last month.

3.      ISG poached Kasey Kraft in March 2022, and on his last day of employment, Kraft was caught attempting to transfer a significant amount of MMR's trade secrets and confidential business information to an external storage device. MMR initially believed he had been thwarted in his attempts at stealing that information, but MMR now has reason to believe that Kraft retained MMR's trade secrets and confidential business information, allowing ISG to receive a highly valuable, yet unfair, competitive advantage.

4.      Despite this Kraft being caught in the act, this did not prevent ISG from continuing to target MMR's employees and trade secrets. The hiring of David Heroman was the latest iteration. Heroman resigned unexpectedly from MMR on April 8, 2022 — just days after his colleague was caught attempting to steal trade secrets — to work for ISG. Given the recent history with employee poaching and potential misappropriation, MMR hired an expert forensic examiner to assess whether there was any evidence of theft on Heroman's MMR-issued work computer.

5.      The results of that forensic analysis were staggering. Heroman plugged in at least **_14 external storage devices_** just prior to his resignation and transferred nearly 1,500 files to these devices, the vast majority of which contain MMR's trade secrets and confidential business information. Included were customer and contact lists; an "Estimating" folder that contained

MMR's estimating tools and customer-related bids for 2020 and 2021; a "Price Lists" folder that included customer-specific pricing; and numerous documents relating to MMR employees and staffing strategy. He even transferred a file entitled "Master Job Sheet - BIBLE (ORLANDO).xlsx," as well as numerous documents relating to customer-specific projects within MMR active or prospective pipeline.

6.      To make matters worse, Heroman tried to hide his tracks by returning four of the external storage devices he used in March and April, with a substantial amount of evidence deleted. Fortunately, computer forensics, coupled with MMR's internal data loss prevention software, allowed MMR to uncover the trade secrets and confidential business information that have been misappropriated, as well as the ***10 external storage devices*** that were not returned.

7.      ISG now has improper access to a library of MMR's trade secrets and confidential business information and, on information and belief, is using that stolen information to compete unfairly. MMR understands that ISG and Heroman have started targeting an MMR customer whose past, present, and future project data comprises a significant amount of the stolen information.

8.      ISG's disregard for fair business practices is allowing ISG to profit unjustly and threatens to continue to cause damages to MMR. If the Defendants are not immediately enjoined — and, most critically, required to submit to forensic examinations to purge their computing devices, networks, and accounts of stolen information — MMR will face the threat of irreparable harm, as ISG will continue to engage in unlawful competition with impunity.

## PARTIES

9.      Plaintiff MMR Constructors, Inc. is a corporation organized under the laws of the State of Louisiana, with its principal place of business in Baton Rouge, Louisiana.

10.     Defendant JB Group of LA, LLC is a limited liability company organized under the laws of the State of Louisiana, with its principal place of business in Gonzales, Louisiana. JB Group of LA, LLC does business under the trade name "Infrastructure Solutions Group."

11.     Defendant David Heroman is an individual domiciled, upon information and belief, in East Baton Rouge or Ascension Parish, Louisiana, but currently living in Orange County, Florida.

12.     Defendant Kasey Kraft is an individual domiciled, upon information and belief, in Baton Rouge, Louisiana.

## JURISDICTION AND VENUE

13.     The Court has subject matter jurisdiction over this matter under 28 U.S.C. § 1331 and § 1367. This case presents a claim arising under the laws of the United States, specifically the DTSA. The remaining state law claims are part of the same case and controversy as the DTSA claim.

14.     The Court may exercise personal jurisdiction over ISG because its principal place of business is in the State of Louisiana, it is licensed to do business in Louisiana, and its registered office is within the Middle District of Louisiana. The Court may exercise personal jurisdiction over Heroman as he is (or at the very least, was recently) domiciled in the State of Louisiana. Additionally, these causes of action arise specifically out of his contacts with his former Louisiana-based employer and current Louisiana-based employer.

15.     Venue is proper in the Middle District of Louisiana under 28 U.S.C. § 1391, as a substantial part of the events giving rise to these claims occurred in this district.

## FACTUAL BACKGROUND

### *MMR's Business and Its Trade Secrets*

16.    MMR is a leading specialty contractor that provides instrumentation and technical services, electrical construction services, telecommunications and security services, power development and distribution services, facility maintenance services, and other industrial electrical and instrumentation services to public- and private-sector clients in the United States and abroad. MMR's contracts with its customers can run into the millions of dollars and span multiple years. Securing one contract positions MMR to have the ability to win repeat business on that same project or other future projects with the customer. Cultivating customer relationships is essential to MMR's business.

17.    To develop and maintain customer relationships, MMR invests significant time, money, and energy into researching customer needs, developing marketing strategies, creating financial forecasts and business forecasts, and developing its pricing structures and estimating tools. These efforts, which are dependent on the accumulation, application, and secrecy of MMR's confidential business information, are crucial to MMR's success in the competitive market. For this reason, MMR's confidential information, identifying customers, and customer pricing information (including costs and labor rates) has substantial value to MMR.

18.    MMR's competitive position largely rests on protecting its confidential business information in this highly competitive field, and MMR takes substantial care to keep its information out of its competitors' hands. This information is not generally known outside of MMR, and MMR only shares it with employees who need to know the information to perform their jobs.

19.     To protect its information, MMR requires its employees to sign and agree to various employment policies and procedures designed to protect the confidentiality of its information. For instance, MMR requires employees to sign and acknowledge its Business Code of Ethics, which requires employees to "protect not only the assets of MMR, but also its clients, vendors, suppliers and other third parties[,]" including "tangible assets and intangible assets, such as confidential and proprietary information." [1] MMR also requires employees to sign and acknowledge its Rules of Conduct, which prohibits employees from "Theft or unauthorized removal of any property belonging to (i) MMR, (ii) the workplace, (iii) the job site, (iv) fellow employees, or (v) clients, contractors, suppliers, or vendors of MMR." [2] Further, MMR requires employees to sign and abide by its "Employer Loyalty/Confidentiality/Trade Secrets/Conflict of Interest Agreement."[3] Through this agreement, employees agree that:

> [d]uring and after the term of his employment, the EMPLOYEE agrees to hold as confidential all knowledge and information he has acquired in connection with his/her employment with MMR, and which is not otherwise generally available to the public or third parties, including but not limited to customer lists, financial information, pricing information, marketing material, technical data, drawings, memoranda, notes, programs, electronic gear, personnel records, policies, other items, and papers and reproductions (all of which is deemed "Confidential" and a trade secret) thereof relating the business of MMR.

20.     ISG knows that MMR takes these measures to safeguard its confidential business information.  The former MMR employees who now work for and manage ISG, for instance, signed and agreed to be bound by MMR's Business Code of Ethics, Rules of Conduct, and the

---

[1] *See* R. Doc. 1-2.

[2] *See* R. Doc. 1-3.

[3] *See* R. Doc. 1-4.

Employer Loyalty/Confidentiality/Trade Secrets/Conflict of Interest Agreement. Jason Yates signed these documents on May 21, 2015; Travis Dardenne, Walter Huffman and Tiffany Medine signed them on May 12, 2015; and Kasey Kraft signed them on May 3, 2017.

21.    Heroman did as well. On May 13, 2015, he signed and agreed to be bound by MMR's Business Code of Ethics,[4] Rules of Conduct,[5] and Employer Loyalty/Confidentiality/Trade Secrets/Conflict of Interest Agreement.[6] Further, Heroman was highly familiar with the intricacies of protecting sensitive data, having served as a computer forensic officer before joining MMR.

22.    MMR further protects its confidential information on password-protected internal computers servers that can only be accessed by select employees who have a valid reason to review or use the information. Several of its documents are further protected such that only certain management-level employees have the ability to modify sensitive data points within the documents. MMR also trains its employees, including all new hires, with access to confidential company documents that the documents are confidential and valuable to MMR and should not be disclosed to anyone outside of MMR.

23.    Additionally, MMR utilizes Trend Micro Apex Central data loss prevention software to track employee computing activity. Employee transfer of MMR information to external cloud-based repositories and physical external storage devices is monitored and tracked using this software, allowing MMR's Information Technology personnel to review and run reports concerning employee computing activity and access to confidential business information.

---

[4] *See* R. Doc. 1-2.

[5] *See* R. Doc. 1-3.

[6] *See* R. Doc. 1-4.

24.    MMR's confidential business information, such as customer-specific financial information, its cost-estimating tools, its employee data and records, and its proposals and draft proposals to customers for certain work on which MMR is bidding, is valuable because it is kept secret. In the hands of a competitor like ISG, the information can be used to review, compare, and undercut MMR's pricing on competitive bids, substantially harming MMR's business prospects.

*ISG Tries to Replicate MMR but Does So Unlawfully*

25.    ISG was formed in Gonzales, Louisiana and now provides industrial electrical and instrumentation services to public and private customers in direct competition with MMR.

26.    ISG, however, was not a direct competitor of MMR until launching a concerted effort to poach MMR personnel. This started with Jason Yates, who was an MMR Project Manager and had been with MMR since 2003, and Travis Dardenne, who was also an MMR Project Manager and had been with MMR since 2004.

27.    On July 29, 2021, Yates resigned from MMR to, he said, help his friend with a construction company that would be pursuing public works projects, primarily contractor services relating to traffic lights and associated equipment. The company that Yates went to work for was ISG, which brought Yates on to assume a key management role, with an ownership stake in the company. He is currently listed as a member/manager of ISG on the Louisiana Secretary of State's website.

28.    Around the same time, Dardenne resigned from MMR to join ISG. After bringing Yates and Dardenne on board, ISG started to expand its scope into industrial electrical and instrumentation services — that is, attempting to compete within the space that is MMR's bread and butter.

29.    In the last two months, Yates and ISG have ramped up their targeting of MMR personnel. On March 4, 2022, Walter Huffman, who was a Project Controls Manager and had been with MMR since 2013, informed MMR that he was leaving to accept another job. Huffman subsequently commenced employment with ISG. And on March 22, 2022, Tiffany Medine, who was Human Resources Coordinator and had been with MMR since 2007, left for a position with ISG.

30.    While MMR was concerned about its employees departing to go work for a direct competitor, these employees were free to do so, provided they had not breached their fiduciary duties before leaving and had not misappropriated MMR's confidential business information. Each of these individuals — Yates, Dardenne, Huffman, and Medine — had signed and agreed to abide by the obligations to safeguard MMR's confidential business information, and MMR did not have hard evidence that these individuals had compromised that information.

31.    Things changed, however, with ISG's most recent targeting of MMR personnel.

32.    In late March 2022, MMR began to uncover evidence that ISG was recruiting MMR employees who were willing to bring MMR's trade secrets and confidential business information with them to ISG.

33.    On March 31, 2022, MMR Project Engineer Kasey Kraft terminated his employment with MMR to accept a position at ISG. On Kraft's last day, an MMR employee witnessed Kraft transferring a large number of documents from his MMR work computer to an external storage device. When confronted about the file transfer, Kraft falsely claimed he was merely transferring personal information, not MMR's trade secrets and confidential business information. Review of the external storage device told the truth — Kraft had attempted to steal trade secrets but was thwarted when caught in the act. As detailed below, however, further

forensics indicates that Kraft was likely successful in misappropriating MMR's trade secrets and confidential business information.

### Computer Forensic Investigation Points to Massive Theft

34.     Heroman commenced his employment with MMR on or around December 6, 2012, as a communications technician in the Greater Baton Rouge area. He had previously worked in law enforcement, focusing on computer forensics. Over nearly a decade of working for MMR, Heroman rose through the ranks of the company, ultimately becoming an MMR telecommunications Project Manager, managing multiple MMR projects in Orlando, Florida.

35.     Through the course of his employment, and particularly after being promoted to Project Manager, Heroman had access to significant amounts of MMR's trade secrets and confidential business information. Specifically, Heroman had access to financial information concerning MMR's business and its operations in the regions he worked; access to employee databases containing detailed information about MMR's employees, their specializations, and their rates; customer-specific proposals, both submitted and in preparation; contracts with MMR's vendors and suppliers; MMR's cost estimating tools; and more.

36.     After Heroman's abrupt resignation on April 8, 2022, and generating the report from Trend Micro Apex Central data loss prevention software, MMR engaged a firm with an expertise in computer forensics to confirm whether — like Kasey Kraft — there was any evidence suggesting the potential theft of information.[7]

---

[7] Based out of Houston, Texas, LCG is a leading provider of computer forensic examinations. MMR retained LCG to assist with the computer forensic examination, and Michael Saunders is the LCG computer forensic expert who is conducting the forensic examinations for MMR in this case. Mr. Saunders is verifying the allegations relating to the forensic examination of the computer that MMR issued to Heroman. *See* R. Doc. 1-5.

37.     The computer forensic analysis and the report from Trend Micro Apex Central data loss prevention software determined that, in the month leading up to his resignation, Heroman began transferring large swaths of this information to external storage devices and a personal cloud-based storage platform.

38.     In the month before his resignation on April 8, 2022, Heroman downloaded over *1,500 files* from MMR's systems to several electronic storage devices and personal Google Drive account.

39.     In total, the initial forensic analysis identified *14 external storage devices* that were plugged into Heroman's work computer during this March-April timeframe. They include the following listed in the chart below by description and correlating serial number, and the chart is color coordinated to reflect the *10 external storage devices* that were not returned at the time his resignation (green) and 4 external storage devices that were returned (yellow and red).

| Serial Number | Description |
| --- | --- |
| 511200204140FF2E0039 | Corsair Voyager GTX SCI Disk Device |
| 511200204140FF2E004B | Corsair Voyager GTX SCSI Disk Device |
| 9300E2FF041402002115 | Corsair Voyager GTX |
| 07A2010019637923 | Patriot Memory USB Device |
| 4C530199950720118525 | SanDisk Cruzer Glide USB Device |
| AABB0B2300001162 | PNY USB 2.0 FD USB Device |
| 0123456789ABCDEF | SanDisk Firebird USB Device |
| 070002AD3466C733 | USB DISK 2.0 USB Device |
| AA00000000000485 | Lexar USB Flash Drive |
| 08759313E642982B | SanDisk Cruzer USB Device |
| 4C530000100611113593 | SanDisk Ultra USB 3.0 USB Device |
| AA7KZLFL2I2Y9R2B | Lexar USB Flash Drive USB Device |

| 07A201003A50607D | Patriot Memory USB Device |
|---|---|
| 12081390120047 | Verbatim USB Device |

40.    It is clear that Heroman was transferring MMR's trade secrets and confidential business information for ISG's use, and that he was trying to hide his tracks when doing so.

41.    For instance, on Sunday, April 3, 2022 — just five days before he unexpectedly resigned — the "SanDisk Ultra USB 3.0" (yellow) was plugged into Heroman's MMR work computer. The forensic evidence establishes that the user "dheroman" accessed a folder entitled **"Estimating"** and a subfolder entitled **"2021 Estimates"** from the "SanDisk Ultra USB 3.0" while it was plugged into Heroman's MMR computer. A check of Heroman's MMR computer identified folders bearing the same names within a primary folder named "OneDrive – MMR Group, Inc."

42.    Further, the forensics establishes that the "**2021 Estimates**" subfolder was transferred to the "SanDisk Ultra USB 3.0" on that Sunday, April 3, 2022. This is also confirmed by the report generated by the Trend Micro Apex Central data loss prevention software. Both a check of Heroman's MMR computer and a review of the data loss prevention report confirm that these folders contain over 500 files that include customer-specific pricing and bids and MMR's estimates and estimating tools.

43.    That is, on a Sunday, just days before resigning, Heroman ensured that he had transferred a library of MMR's highly confidential bids, pricing, and estimating tools onto a portable medium that would allow the data to make its way to ISG. There was no legitimate business reason for him to do so on the Sunday before he resigned.

44.    The "SanDisk Ultra USB 3.0," moreover, was not the only external storage device connected to Heroman's MMR computer on Sunday, April 3, 2022. Three other external storage devices were also connected to that computer:

- Verbatim USB Device, Serial No. 12081390120047 (returned)

- Lexar USB Flash Drive, Serial No. AA00000000000485 (**unreturned**)

- PNY USB 2.0 FD USB Device, Serial No. AABB0B2300001162 (**unreturned**)

While those devices were in use, a number of folders that contained trade secrets and confidential business information were accessed on the Heroman MMR computer by the "dheroman" user.

45.    This was not the first time external storage devices had been connected to Heroman's MMR computer and MMR data was accessed by the "dheroman" user shortly before Heroman resigned. Just two days before, on Friday, April 1, 2022, the same SanDisk Ultra USB 3.0 was plugged into the Heroman MMR computer, and a folder named "**Banana**" was accessed by the "dheroman" user from the "SanDisk Ultra USB 3.0." A check of the Heroman MMR computer identified a folder bearing the same name within a primary folder named "OneDrive – MMR Group, Inc." This folder was found to contain subfolders, such as "**Price Lists**," "**New Hires and Employees**," "**Proposal Documents**," "**Rates**," "**Quality**" "**QAQC**," "**A Orlando Projections and Overhead**," "**A Daily Notes**," and "**A Bckup**" and contains *over 800 files*. This was also confirmed by the report generated by the Trend Micro Apex Central data loss prevention software.

46.    A review of these folders on Heroman's MMR computer identified over 800 files within the "**Banana**" folder (and its various subfolders) that contain MMR's highly valuable trade secrets and confidential business information, including operational information regarding work performed for MMR customers; proposals and draft proposals to actual and prospective customers; MMR pricing information and price lists, including customer specific price books and information about year-over-year trends in MMR's pricing; product descriptions and specifications; data concerning MMR's new hires and employees, including employee pay information and employee

training materials; and MMR's projections regarding each ongoing and prospective project in the Orlando area. In fact, included in these files was a "**Master Job Sheet – Bible**" that is exactly what the name implies: a document that is a veritable bible for completing work according to MMR's standards. This was also confirmed by the report generated by the Trend Micro Apex Central data loss prevention software.

47.    As with the over 500 files within the "**Estimating**" folder, Heroman ensured that ISG would also have access to over 800 additional files within the "**Banana**" folder and its various subfolders.

48.    The "SanDisk Ultra USB 3.0," moreover, was not the only external storage device connected to Heroman's MMR computer on April 1, 2022. Four other external storage devices were connected:

- Lexar USB Flash Drive, Serial No. AA00000000000485 (**unreturned**)

- SanDisk Cruzer USB Device, Serial No. 08759313E642982B (**unreturned**)

- Lexar USB Flash Drive USB Device, Serial No. AA7KZLFL2I2Y9R2B (returned)

- Patriot Memory USB Device, Serial No. 07A2010019637923 (returned)

While those devices were in use, folders were being accessed by the "dheroman" user on Heroman's MMR computer that contained trade secrets and confidential business information.

49.    As his final day approached, Heroman continued to ensure that he had the trade secrets and confidential business information that ISG would need to unfairly compete with MMR.

50.    On April 4, 2021, MMR's trade secrets and confidential business information were being accessed by the "dheroman" user while the Patriot Memory USB Device was plugged into Heroman's MMR computer.

51.    On April 5, 2021, just three days before Heroman's resignation, three external storage devices were plugged into his MMR work computer:

- Lexar USB Flash Drive, Serial No. AA00000000000485 (**unreturned**)

- Corsair Voyager GTX SCSI Disk Device, Serial No. 511200204140FF2E004B (**unreturned**)

- Lexar USB Flash Drive USB Device, Serial No. AA7KZLFL2I2Y9R2B (returned)

Just before these devices had been connected, MMR's trade secrets and confidential business information were being accessed by the "dheroman" user, including an apparent contact list entitled "**contacts.CSV**."

52.       In fact, around this same time on April 5, 2021, a Google Drive account was being accessed, and the report from the Trend Micro Apex Central data loss prevention software indicates that the file "**contacts.CSV**" was uploaded to the Google Drive account. With Heroman's MMR contact list in his personal Google Drive account, this file can be accessed from any device and shared with anyone he chooses, including ISG.

53.       On April 8, 2022, several more external storage devices were connected to Heroman's MMR work computer. These included the following:

- Lexar USB Flash Drive, Serial No. AA00000000000485 (**unreturned**)

- Corsair Voyager GTX SCSI Disk Device, Serial No. 511200204140FF2E004B (**unreturned**)

- SanDisk Ultra USB 3.0, Serial No. 4C530000100611113593, (returned)

- Patriot Memory USB Device, Serial No. 07A201003A50607D (returned)

- Lexar USB Flash Drive USB Device, Serial No. AA7KZLFL2I2Y9R2B (returned)

- Verbatim USB Device, Serial No. 12081390120047 (returned)

54.       In other words, Heroman plugged in six external storage devices on his last day with MMR, yet chose to return only four of the six that he plugged in that day.

55.       Further, Heroman returned the "San Disk Ultra USB 3.0" with *zero files on it*.

56.    This is particularly troubling because there were ***over 1,500 files*** present on that device just days before, including ***over 500 files*** within a "**2021 Estimates**" folder that was transferred to the device on Sunday, April 3, 2022, just five days before.

57.    Being a sophisticated computer user, with a background in computer forensics, Heroman knew exactly what he was doing — that is, he was trying to hide his tracks so that MMR would not be alerted to his highly suspicious computing activity.

58.    There is simply no valid or innocent excuse for Heroman's use of and failure to return the external storage devices and to attempt to cover up the fact that he had transferred a treasure trove of MMR's confidential business information in the days leading up to his resignation. Heroman's activity was intentional, and likely directed by ISG, Heroman took the information on the external storage devices to assist ISG in unfairly competing against MMR.

### *ISG Now Has MMR's Playbook and Is Competing Unfairly*

59.    Taken together, the misappropriated information essentially provides a competitor with the blueprints to replicate MMR's business, without investing any of the substantial time, money, effort, and manpower needed to create the information. In the hands of a direct competitor, this information could be devastating to MMR.

60.    Since his resignation from MMR on April 8, 2022, ISG has employed Heroman who continues to have the trade secrets and confidential business information stolen from MMR on personal electronic storage devices and in his Google Drive account.

61.    Upon information and belief, the stolen trade secrets and confidential business information have been accessed on or from ISG's computing system and have been disclosed to ISG and/or stored within ISG's computing network.

62.    ISG has already started to benefit from the use of the stolen trade secrets and confidential business information, as ISG is targeting MMR customers with whom ISG had no previous relationships and projects about which it had no previous knowledge.

63.    ISG and all of its employees, including Heroman, must be enjoined from retaining, using, and disclosing MMR trade secrets and confidential business information, and must submit to a <u>thorough computer forensic examination</u> to ensure that MMR's information is permanently removed from ISG's and its employees' computing devices and computing network.

*Additional Forensic Analysis Indicates Further Misappropriation*

64.    Following the initial pleading, MMR engaged its forensic expert to analyze the computer issued to Kraft. MMR believed that it had initially prevented Kraft from misappropriating its trade secrets and confidential business information when it caught him downloading data on his last day of employment.

65.    However, the recent events with Heroman prompted MMR to dig deeper. The forensic analysis indicates that Kraft had been downloading data to external storage devices before his last day of employment, which would have allowed Kraft to transfer data to other computers before he was caught on his last day of employment.

66.    For instance, from March 22-29, 2022, Kraft plugged a Seagate external hard drive into his MMR-issued computer several times and transferred *1194 files* to that device.

67.    Though MMR caught him seeking to download more files to this Seagate external hard drive on March 31, 2022 (his last day of employment), Kraft had connected that hard drive to, and removed that hard drive from, his MMR-issued computer several times from March 22-29, 2022.

68.     Accordingly, Kraft was able to plug that hard drive into other computers and transfer the content of that hard drive before MMR caught him downloading files to it on March 31, 2022.

69.     Further, the forensic analysis also indicates that more external storage devices were used by Kraft during his employment, but those devices have not been returned by Kraft.

70.     Based on the misconduct in this case, including Kraft's efforts to misappropriate more information on his last day of employment and then lie about it, MMR has reason to belief that Kraft has access to MMR trade secrets and confidential business information, including what he transferred to the Seagate external hard drive from March 22-29, 2022, and on other connected external storage devices that were not returned. Kraft's personal computing devices, external storage devices, and file-sharing/email accounts should therefore be subject to forensic examination.

**CAUSES OF ACTION**

**COUNT 1**
*Violation of the Defend Trade Secrets Act*
**(Against all Defendants)**

71.     MMR repeats and re-alleges each of the allegations of the preceding paragraphs as if fully stated here.

72.     The DTSA defines a trade secret as, *inter alia*, "all forms and types of financial, business, scientific, technical, economic, or engineering information . . . whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing" provided that the owner took "reasonable measures to keep such information secret," and it offers the holder of the trade secret an advantage over competitors who do not use the trade secret.

73.     MMR's trade secrets, including its customer lists and contact information, customer pricing information, financial information, business and project forecasts, customer pricing estimating tools, and other documents, were kept secret by substantial measures undertaken by MMR to protect the secret and private nature of the information.

74.     MMR's trade secrets are related to products and services offered in interstate commerce.

75.     Heroman and Kraft were entrusted with this confidential business information in the performance of his job duties on behalf of MMR.

76.     In the days before his resignation, Heroman surreptitiously and improperly deleted, copied, and/or stole these trade secrets and, upon information and belief, is unlawfully using these trade secrets to benefit himself and ISG, which knows or has reason to know that these trade secrets were acquired by improper means. Kraft did the same.

77.     Upon information and belief, Heroman and/or Kraft has disclosed these trade secrets to ISG and/or is using them to conduct business on ISG's behalf.

78.     The categories of misappropriated MMR information include, for example, estimates and estimating tools; operational information regarding work performed for MMR customers; proposals and draft proposals; MMR pricing information and price lists; product descriptions and specifications; data concerning MMR's new hires and employees; and MMR's Master Job Sheet showing detailed information regarding each ongoing and prospective project in the Orlando area.

79.     ISG's management was aware of, encouraged, and/or engaged in this practice, which has allowed and continues to allow ISG to profit unjustly and cause damage to MMR.

80.    As a direct result of Defendants' conduct, MMR has been harmed and continues to be irreparably harmed.

## COUNT 2
### *Violation of the Louisiana Uniform Trade Secrets Act*
### *(Against All Defendants)*

81.    MMR repeats and re-alleges each of the allegations of the preceding paragraphs as if fully stated here.

82.    The LUTSA, La. Rev. Stat. 51:1431 *et seq.* defines a trade secret as, "information, including a formula, pattern, compilation, program, device, method, technique, or process, that: (a) derives independent economic value, actual or potential, from not being generally known to and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use, and (b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy."

83.    MMR's trade secrets, including its customer lists and contact information, customer pricing information, financial information, business and project forecasts, customer pricing estimating tools, and other documents, were kept secret by substantial measures undertaken by MMR to protect the secret and private nature of the information.

84.    Heroman and Kraft were entrusted with this confidential and proprietary information in the performance of his job on behalf of MMR.

85.    In the days prior to his resignation, Heroman surreptitiously and improperly deleted, copied, and/or stole these trade secrets and, upon information and belief, is unlawfully using these trade secrets to benefit himself and ISG, which knows or has reason to know that these trade secrets were acquired by improper means. Kraft did the same.

86.     Upon information and belief, Heroman and/or Kraft disclosed these trade secrets to ISG, which knew or had reason to know that these trade secrets were acquired by improper means.

87.     The categories of misappropriated MMR information include, for example, estimates and estimating tools; operational information regarding work performed for MMR customers; proposals and draft proposals; MMR pricing information and price lists; product descriptions and specifications; data concerning MMR's new hires and employees; and MMR's Master Job Sheet showing detailed information regarding each ongoing and prospective project in the Orlando area.

88.     ISG's management was aware of, encouraged, and/or engaged in this practice, which has allowed and continues to allow ISG to profit unjustly and cause damage to MMR.

### COUNT 3
### *Injunctive Relief under the DTSA and LUTSA*[8]
### (Against All Defendants)

89.     MMR repeats and re-alleges each of the allegations of the preceding paragraphs as if fully stated here.

90.     As a direct and proximate result of ISG, Heroman, and Kraft's misappropriation of MMR's trade secrets, MMR faces the threat of irreparable harm in the form of disclosure of its trade secrets. Moreover, the misappropriation continue to afford ISG, a direct competitor of MMR, an unfair head start and illegal advantage in gaining business to MMR's detriment.

91.     MMR has no adequate remedy at law. Should ISG, Heroman, and Kraft's actions continue unabated, MMR will lose the value of its investment in the trade secrets that were

---

[8] Heroman and Kraft executed a Dispute Resolution Agreement with MMR. While referring certain potential claims between them and MMR to arbitration, the Dispute Resolution Agreement explicitly provides that "all claims by the Employee and/or the Company for temporary and/or preliminary injunctive relief, or such other emergency injunctive and/or equitable relief" are not covered until an Arbitrator may be appointed.

misappropriated, as well as the customer relationships (and goodwill that accompanies them) and market share it took MMR many years to build, thereby threatening to irreparably affect MMR's legally-obtained competitive advantages.

92.     ISG, Heroman, and Kraft will suffer no inconvenience from the issuance of injunctive relief based on the actual and/or threatened disclosure of MMR's trade secrets, and the use of those trade secrets by ISG, as provided for under both the LUTSA, La. Rev. Stat. 51:1432, and the DTSA, 18 U.S.C. § 1836(b)(3)(A).

93.     Additionally, ISG, Heroman, and Kraft's actions in misappropriating MMR's trade secrets justify the expectation that ISG, Heroman, and Kraft will continue to violate the DTSA and LUTSA without immediate action in the issuance of injunctive relief.

94.     The balance of the equities in this case clearly weigh in favor of granting injunctive relief, as does the public interest in preventing unfair competition or the disclosure of MMR's trade secret information.

## COUNT 4
### *Violation of the Louisiana Unfair Trade Practices Act*
### (Against All Defendants)

95.     MMR repeats and re-alleges each of the allegations of the preceding paragraphs as if fully stated here.

96.     LUTPA prohibits unfair trade practices, which involve some element of fraud, misrepresentation, deception, or other unethical conduct.

97.     Defendants have engaged in false, misleading, and deceptive practices in their unlawful competition with MMR using MMR's confidential business information.

98.     Defendants have attempted to sabotage MMR's relationships with its customers by using MMR's misappropriated confidential business information, regardless of whether that information rises to the level of a trade secret.

99.     Defendants' conduct constitutes unfair trade practices under LUTPA, as such conduct offends established public policy and is immoral, unethical, oppressive, unscrupulous, a breach of fiduciary duty, and substantially injurious.

100.    Notice of this Complaint will be sent to the Attorney General pursuant to La. Rev. Stat. 51:1409(B) immediately upon filing.

101.    MMR has been damaged in the form of lost profits and damaged customer relationships, and loss of customer goodwill as a result of ISG, Heroman, and Kraft's concerted, unlawful actions. MMR will be entitled to treble damages under La. Rev. Stat. 51:1409 for any continued violations of LUTPA, as well as attorneys' fees.

### COUNT 5
### *Civil Conspiracy*
### (Against All Defendants)

102.    MMR repeats and re-alleges each of the allegations of the preceding paragraphs as if fully stated here.

103.    Heroman accessed, downloaded, uploaded, emailed and/or transmitted MMR's trade secrets and confidential business information and transferred such information to ISG with the specific and malicious intent to exploit and misappropriate MMR's customer base, business strategies, and pricing to unlawfully compete against MMR for the benefit of ISG, its direct competitor. Kraft engaged in similar acts.

104.    Upon information and belief, ISG not only allowed itself to profit from Heroman's and/or Kraft's unlawful misappropriation and deceptive trade practices, but it also aided, abetted,

and encouraged the unlawful competition with the specific intent of harming MMR and depriving

MMR of its customers and competitive advantage.

105.    Thus, ISG conspired with Heroman and/or Kraft to commit the unlawful acts that

constitute the misappropriation of trade secrets and unfair trade secret (*i.e.*, the underlying business

torts) to unlawfully compete against MMR, and to illegally transfer MMR's business to ISG.

106.    Defendants are liable for conspiracy to intentionally and unlawfully harm MMR.

107.    Pursuant to La. Civil Code art. 2324(A), Defendants are solidarily liable for any

and all damages caused by these "intentional and willful" acts of conspiracy.

## COUNT 6
### *Unjust Enrichment*
### (Against All Defendants)

108.    MMR repeats and re-alleges each of the allegations of the preceding paragraphs as

if fully stated here.

109.    Heroman accessed, downloaded, uploaded, emailed and/or transmitted MMR's

confidential, proprietary, and/or trade secret information and transferred such information to ISG

with the specific and malicious intent to exploit and misappropriate MMR's customer base,

business strategies, and pricing to unlawfully compete against MMR for the benefit of ISG, its

direct competitor, in direct violation of MMR policies. Kraft engaged in similar conduct.

110.    Upon information and belief, ISG accepted and subsequently retained and

misappropriated for itself MMR's confidential, proprietary, and/or trade secret information in

order to harm MMR and deprive MMR of its customers and competitive advantage.

111.    ISG, Heroman, and Kraft therefore benefited and profited directly from their

conspiracy to misappropriate MMR's confidential, proprietary, and/or trade secret information. It

would be unfair to allow Defendants to retain the enrichment they have unjustly received, and

MMR has experienced damages from the wrongful use of its confidential, proprietary, and/or trade secret information.

## COUNT 7
### *Breach of Fiduciary Duty and/or Duty of Loyalty*
**(Against Heroman and Kraft)**

112.    MMR repeats and re-alleges each of the allegations of the preceding paragraphs as if fully stated here.

113.    Heroman and Kraft were  trusted MMR employees with significant duties, had access to highly sensitive trade secrets and confidential business information, and owed fiduciary duties to MMR, including a duty of loyalty and fair dealing.

114.    In the days leading up to his departure from MMR, Heroman secretly prepared to join ISG by arming himself to take MMR's trade secrets and confidential information with him to ISG. He prepared, with ISG's knowledge and participation, to use these trade secrets and confidential information to unlawfully benefit ISG and harm MMR. Kraft did the same.

115.    Heroman and Kraft took these actions to harm MMR's ability to compete with ISG, as he knew he would be resigning from MMR to take a similar position with ISG.

116.    Heroman and Kraft knowingly and intentionally, with the intent to benefit himself and ISG at MMR's expense, breached his fiduciary duties to MMR, and MMR has sustained significant damages as a result of his actions.

117.    Kraft engaged in similar misconduct, as detailed above.

118.    Accordingly, MMR is entitled to damages from Heroman and Kraft for breaching their fiduciary duty to MMR.

## JURY DEMAND

119.    MMR demands a trial by jury.

## PRAYER FOR RELIEF

For these reasons, MMR, respectfully requests ISG, Heroman, and Kraft be cited to appear and answer, and MMR respectfully requests that the Court enter a judgment against the Defendants awarding money damages and all other relief to which MMR is entitled in contract, law, and equity, including but not limited to:

1.  Judgment in favor of MMR and against the Defendants on Count One, awarding damages to MMR for the Defendants' violation of the Defend Trade Secrets Act, 18 U.S.C. § 1125 *et seq.*;

2.  Judgment in favor of MMR and against the Defendants on Count Two, awarding damages to MMR for the Defendants' violation of the Louisiana Uniform Trade Secrets Act, La. Rev. Stat. 51:1431 *et seq.*;

3.  Judgment in favor of MMR and against the Defendants on Count Four, awarding damages, including treble damages, to MMR for the Defendants' violation of the Louisiana Unfair Trade Practice Law, La. Rev. Stat. 51:1401 *et seq.*;

4.  Judgment in favor of MMR and against the Defendants on Count Five, awarding damages to MMR for the Defendants' for unlawful conspiracy;

5.  Judgment in favor of MMR and against the Defendants on Count Six, awarding damages to MMR for the Defendants' unjust enrichment at MMR's expense;

6.  Judgment in favor of MMR and against Heroman and Kraft on Count Seven, awarding damages to MMR as a result of Heroman's breach of fiduciary duties and/or duties of loyalty to MMR;

7.  Entry of a temporary restraining order prohibiting Defendants, and/or any person or entity acting in concert with them, from using, disclosing, or disseminating MMR's trade secrets or confidential and proprietary information, and requiring forensic examinations of the work computers and accounts that ISG issued to Heroman and Kraft, ISG's servers, and the personal devices and accounts used by Heroman and Kraft;

8.  After due proceedings conclude, entry of a preliminary injunction prohibiting Defendants, and/or any person or entity acting in concert with them, from using, disclosing, or disseminating MMR's trade secrets or confidential and proprietary information; and

9. After due proceedings conclude, entry of a permanent injunction, an award of damages based on all the claims stated herein (actual, compensatory, exemplary, and punitive), and other such damages as provided by applicable statute, common law, or the Agreement (or any other agreement) between the parties, including attorneys' fees, expert fees, and costs. The permanent injunction shall prohibit Defendants, and/or any person or entity acting in concert with them, from using, disclosing, or disseminating MMR's trade secrets or confidential and proprietary information.

Respectfully submitted:

*/s/ P.J. Kee*
P.J. KEE  (La. Bar No. 34860)
THOMAS P. HUBERT (La. Bar No. 19625)
JACOB J. PRITT (La. Bar No. 38872)
MICHAEL A. FOLEY (La. Bar No. 35774)
JONES WALKER, LLP
201 St. Charles Avenue - 50th Floor
New Orleans, Louisiana  70170-5100
Telephone:  (504) 582-8000
Facsimile:  (504) 589-8230
Email:  pkee@joneswalker.com

**Counsel for MMR Constructors, Inc.**