UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| MMR CONSTRUCTORS, INC., | : | CIV. NO. 22-267 |
| | : | |
| Plaintiff, | : | |
| | : | |
| VERSUS | : | JUDGE BRIAN A. JACKSON |
| | : | |
| JB GROUP OF LA, LLC D/B/A | : | |
| INFRASTRUCTURE SOLUTIONS | : | |
| GROUP, ET Al., | : | MAGISTRATE JUDGE RICHARD L. |
| | : | BOURGEOIS, JR. |
| Defendants. | | |

**MMR'S MEMORANDUM IN SUPPORT OF ITS
MOTION FOR CONTEMPT OF PRELIMINARY INJUNCTION**

Plaintiff, MMR Constructors, Inc. ("MMR"), files this memorandum in support of its *Motion for Contempt of Preliminary Injunction* and, if necessary, requests an evidentiary hearing to fully demonstrate the extent of ISG's continued, contemptuous conduct.

**PRELIMINARY STATEMENT**

The Court should hold Defendant, JB Group of LA, LLC, d/b/a Infrastructure Solutions Group ("ISG"), in civil contempt for violating the Preliminary Injunction. Nearly two years ago, the Court enjoined ISG—and those in active participation with it—from "using MMR's trade secrets and confidential business information." (R. Doc. 23, ¶ 1). MMR has recently uncovered clear and convincing evidence that ISG was not only using this information before the Preliminary Injunction was issued but continues to do so today.[1] Just last month—despite ISG's extensive measures to delay and obstruct MMR's ability to uncover such evidence—ISG's Projects Control

---

[1] Specifically at issue here, as explained below, is the use of MMR's Estimating Tools, which are internal proprietary programs that MMR uses to create customer proposals and bids; MMR's Job Analysis Program, which is a custom system that assists management with assessing project management and allows for several up-to-date reports to clients; proprietary coding for MMR's project control databases; and even internal financial reports.

1

Director/Controller testified that ISG is continuing to use MMR's protected information to obtain business, with impunity. Throughout this litigation, ISG has made clear that it is unwilling (and unable) to comply with the Preliminary Injunction, and the Court can hold ISG in contempt based solely on this brief and supporting evidence. If, however, the Court wishes to develop a fuller record, MMR requests that an evidentiary hearing be held so that the Court has a full opportunity to weigh the evidence and then craft commensurate (and necessarily drastic) sanctions that will finally coerce ISG's compliance with the Preliminary Injunction and compensate MMR for its damages.

## FACTUAL BACKGROUND[2]

When MMR filed this suit nearly two years ago, it alleged that ISG and one of its former employees (David Heroman) had conspired to misappropriate MMR's protected information. MMR made clear that "ISG's disregard for fair business practices is allowing ISG to profit unjustly and threatens to continue to cause damages to MMR." (R. Doc. 1, ¶ 8).

After receiving a copy of MMR's complaint, ISG protested that it had no interest in, or need for, this information. ISG even memorialized this sentiment in an initial status report to the Court, stating:

> ISG does not want or need any information tied in any way to MMR, trade secret or not[, and] ISG and its employees look forward to fairly competing.

(R. Doc. 31, p. 6). Nearly two years later, MMR has uncovered that ISG built, and has continued to build, its entire business on the improper use of MMR's protected information—in direct violation of the Preliminary Injunction.

---

[2] In order to assist the Court's analysis, MMR has attached to this motion an Appendix that summarizes the most relevant witnesses at issue (*i.e.* those involved in the use of MMR's protected information), as well as the types of protected information at issue and the replicas that ISG is continuing to use. *See* (Appendix – Roadmap).

#102091798v3

### *Court Enters Injunctive Relief And Orders Computer Forensics*

MMR filed this suit on April 25, 2022, after learning that its former employee, David Heroman, had misappropriated MMR's protected information and brought that information with him to ISG, his new employer. The following day, the Court entered a Temporary Restraining Order, prohibiting ISG from, among other things, "using MMR's trade secrets and confidential business information" and "[f]ailing to return the information and external storage devices identified in the verified Complaint (Doc. 1), and any other documents/devices that contain MMR's confidential business information." (R. Doc. 7 at 13-14).

MMR and ISG ultimately agreed to forgo an evidentiary hearing on the requested injunctive relief after agreeing to the terms of the Preliminary Injunction and the terms of a forensic protocol that would assist ISG with its obligation to "return" MMR's protected information. On May 20, 2022, the Court entered the Preliminary Injunction,  enjoining ISG's use of and failure to return MMR's trade secrets and confidential business information. (R. Doc. 23). On May 31, 2022, the Court entered a Forensic Protocol Order governing terms under which ISG was to locate and return MMR's information. *See* (R. Docs. 22-2; 25). In addition, the Court permitted MMR to conduct limited depositions for the purpose of assisting with the identification of devices and accounts subject to the Forensic Protocol Order.

### *Limited Depositions Indicate Wider Misappropriation That ISG Then Tries To Hide*

During the limited depositions, MMR learned that other former MMR employees—including those who were now owners and/or managers at ISG—had also used external storage devices to misappropriate MMR information and had used that information to conduct business for ISG.

For instance, Jason Yates, a former MMR employee and now the CEO and minority owner of ISG, testified that he had retained an external hard drive that contained MMR's information and

3

that he had plugged in that external hard drive into his ISG computers.[3] *See* (Ex. 1 at 21:9-28). Mr. Yates also testified that Kasey Kraft—a former MMR employee and now Director of Estimating for ISG—had transferred MMR information to his ISG computer. (*Id.* at 34:4-37:25). During his limited deposition, Kasey Kraft confirmed that he had indeed used an external storage device to transfer MMR information to his ISG computer.[4] (Ex. 2 at 12:16-13:24). Finally, during the limited deposition of Michael Lowe, a former MMR employee identified by ISG as the person most knowledgeable about its computing network, Mr. Lowe testified that he too had retained an external hard drive that contained MMR information and had used that information to conduct business for ISG.[5] *See* (Ex. 3 at 15:21-16:10).

ISG did not disclose these additional sources of MMR information before the limited depositions. Even though ISG filed that early status report (R. Doc. 31), expressing their lack of desire for MMR's information, none of this rampant misappropriation was disclosed. MMR was forced to ferret it out during the limited depositions. At the time, there were still two former MMR/current ISG employees to sit for limited depositions, but these disclosures were immediately troublesome, prompting MMR to file a *Joint Motion to Approve Amendment to Forensic Protocol*, (R. Doc. 42), to expand the scope of the Forensic Protocol Order to include the previously undisclosed sources of MMR information. On August 11, 2022, the Court granted the motion and amended the Forensic Protocol. (R. Doc. 44).

---

[3] Attached as **Exhibit 1** is a true and correct copy of the transcript of the limited deposition of Jason Yates, taken on June 15, 2022.

[4] Attached as **Exhibit 2** is a true and correct copy of the transcript of the limited deposition of Kasey Kraft, taken on August 16, 2022.

[5] Attached as **Exhibit 3** is a true and correct copy of the transcript of the limited deposition of Michael Lowe, taken on July 13, 2022.

As MMR was awaiting dates for the next two preliminary depositions and just two weeks after the Court granted the *Joint Motion to Approve Amendment to Forensic Protocol*, ISG's counsel kicked off a campaign of delay tactics. They confirmed that ISG had instructed its forensic examiner to withhold the production of forensic reports and documents relating to the recently added ISG devices and accounts. That is, the work required under the Forensic Protocol Order was being unilaterally stalled. ISG's purported reason for doing so was that MMR had not sufficiently identified its trade secrets and confidential business information, even though MMR identified that information in its *Verified Complaint* and had already provided a list of documents to ISG's forensic examiner to aid his search for MMR information.

ISG's refusal to abide by and comply with the Forensic Protocol Order delayed MMR's ability to uncover the use of its protected information and resulted in what should have been unnecessary motion practice. For instance, ISG filed a motion to stay discovery—including the work required by the Forensic Protocol Order—on August 31, 2022, which the Court denied on October 6, 2022. *See* (R. Doc. 57). And it was not until the end of 2022 that MMR finally began to receive productions that had been required under the Forensic Protocol Order.

### MMR Finds Evidence Of Widespread Misappropriation

By March, 2023, MMR was able to complete its review of the documents produced under the Forensic Protocol Order and was able to determine that ISG had been using MMR's protected information *before* the Preliminary Injunction was issued. And this use was widespread throughout ISG, including by several additional ISG employees and even the majority owner/President of ISG, Shawn Breeland. Some instances included:

- ISG CEO (Mr. Yates) sharing MMR's protected financial statements with ISG's President/owner (Mr. Breeland) at a time when ISG was trying to raise capital investments;

- ISG's estimators using MMR's protected estimating tools to bid on and obtain work—estimating tools that provide MMR a unique advantage when bidding on potential work;

- ISG using MMR's commercial terms when sending bid proposals to customers;

- ISG using MMR's Job Analysis Program;

- Mr. Yates and Mr. Breeland receiving and using MMR's strategic customer plan that Mr. Kraft shared when ISG was recruiting him to leave MMR and join ISG;

- Mr. Yates and Mr. Breeland using MMR's rate build-up tools to develop pricing for ISG;

- ISG copying—word-for-word—MMR's onboarding documents and employee policies; and

- ISG copying MMR's safety manual and procedures, as well as MMR's QA/QC documents.

Essentially, before the issuance of the Preliminary Injunction, ISG was using MMR's information to build and run every aspect of its business, and there was additional evidence uncovered that suggested ISG was using MMR's protected information *after* the Court issued the Preliminary Injunction.

### *MMR Tries Deposing ISG's Project Controls Director/Controller*

Based on the forensic productions at that time, the ISG employee who seemed most knowledgeable about ISG's possible continued use of MMR's protected information was Ben Huffman. ISG hired Mr. Huffman in early March 2022 (shortly before this lawsuit was filed) in the roles of Project Controls Director and Controller. Previously, Mr. Huffman had worked for MMR since 2013 and was MMR's Project Controls Director. In this role, Mr. Huffman was instrumental in helping build several databases and systems that MMR used to manage its projects and workflows, with an intimate knowledge about how MMR's databases and tools worked. As MMR's Project Controls Director, Mr. Huffman oversaw and approved the internal publishing of

6

a Project Controls Plan that explained the types of project controls programs that MMR had built, which proved to be a helpful primer during his deposition.[6]

Though Mr. Huffman's devices and accounts were not subject to the Forensic Protocol Order at the time of his initial deposition, the documents from the forensic examinations of other ISG employees' devices and accounts suggested that ISG had hired Mr. Huffman to essentially recreate the databases and tools that were used at MMR. That is, Mr. Huffman was brought on to create replicas of MMR's most valuable tools. This is why MMR identified Mr. Huffman as the first witness for a full deposition.

Mr. Huffman's initial deposition took place on March 27, 2023, and during that deposition, Mr. Huffman admitted that ISG was using MMR's information _before_ the Court issued the Preliminary Injunction, including using MMR's estimating tools (which MMR refers to as Green Sheets and Overhead Top Sheets) to obtain business for ISG:

> Q:  Do you understand that MMR is claiming that ISG has misappropriated information?
>
> A:   Yes.
>
> Q:  Information like MMR's green sheets?
>
> A:  Yes.
>
> Q:  MMR's overhead sheets?
>
> A:  Yes.
> . . .
> Q:  And you know that ISG has, in fact, used that type of information, correct?
>
> A:  Yes.
>
> Q:  What information do you know that ISG has used?

---

[6] A version of the MMR Project Controls Plan is being filed as **Exhibit 4** under seal. It was uncovered as a misappropriated document by the forensic examiner through the Forensic Protocol Order.

A:       Green sheets.

Q:       Overhead sheets?

A:       Yes.

. . .

Q:       So just – you know that ISG has used green sheets and overhead sheets that belong to MMR?

A:       Yes.

. . .

Q:       Why else would you use a green sheet other than to obtain business?

A:       To create an estimate.

Q:       To give to a client to get business, correct?

A:       Yes.

. . .

Q:       You know that when ISG was using MMR's green sheets, ISG was trying to obtain business?

. . .

A:       As far as I know.

Q:       Same with the overhead sheets?

A:       Yes.[7]

(Ex. 5 at 8:11-10:1).  Mr. Huffman further admitted that these types of documents, as well as the project controls databases he helped develop at MMR, were MMR's confidential information that his confidentiality agreement with MMR required him to keep secret:

Q:       And I've got the same questions about your obligations to MMR regarding confidential information, right. You understood that the green sheets were confidential information belonging to MMR that you needed to protect the confidentiality of, correct?

. . .

A:       Based on this, I would assume so.

Q:       Same with the overhead sheets?

A:       I would assume so.

. . .

---

[7] Attached as **Exhibit 5** is a true and correct copy of the transcript of Ben Huffman's first deposition, taken on March 27, 2023, which contains redactions designated as Attorneys' Eyes Only.

8

Q:      And you know, for instance, green sheets, MMR's green sheets, you were contractually obligated to keep those confidential, correct?

A:      It appears so.

Q:      Sitting here today, were you contractually obligated to keep those confidential?

A:      It appears so.

. . .

Q:      [Reading from the confidentiality agreement:] Misuse of information. Employee may not use confidential information obtained through his or he employment for any purpose not authorized by MMR to carry out in the course and scope of employment. Reading this, you were contractually obligated not to use MMR's green sheets while working for ISG, correct?

A:      It appears so.

Q:      Same with the overhead sheets that belonged to MMR?

A:      It appears so.

Q:      Same with those MMR . . . project controls databases you created for MMR?

A:      It appears so.

Q:      Same with the job analysis spreadsheet you created for MMR?

A:      It appears so.

(*Id.* at 93:23-96:22).

If Mr. Huffman testified that ISG had continued to use these types of MMR documents *after* the Preliminary Injunction was entered, there would be clear and convincing evidence of contempt. However, before MMR could cross-examine Mr. Huffman on whether ISG had indeed continued to use MMR's protected information, ISG counsel unilaterally—and over MMR's objection—terminated the deposition.

The reason for this abrupt, unilateral termination was that Mr. Huffman dropped an evidentiary bombshell. After denying (before the lunch break) that he had retained or used any MMR information to build project control databases for ISG, Mr. Huffman admitted (under cross-

9

examination following the lunch break) that he had in fact used a protected MMR database to create a replica for ISG:

*Before lunch break:*

Q:    Did you create that[, a timekeeping database,]?

A:    Yes.

Q:    At MMR?

A:    Yes.

Q:    And have you built one similar for ISG?
. . .
A:    I have built one similar, yes.

Q:    And how did you build that?

A:    From scratch.
. . .
Q:    What did you use to do that?

A:    Microsoft Access.

Q:    What else did you use?

A:    Programming language and what I know.

Q:    You didn't look at any documents?

A:    Not that I recall.

Q:    No files?

A:    Not that I recall.

Q:    So you built a similar one — one similar to MMR's, but you just used what you remembered?
. . .
A:    Yes.
. . .
Q:    And is it your testimony that you built a similar timekeeping database for ISG?

A:    Yes.

10

Q:     And it's your testimony that you did not have access to MMR's database while you were creating that for ISG?

A:     As far as I know.

(Ex. 5 at 27:4-35:23).

*After lunch break*:

Q:     So you are positive about . . . what you're calling the bible, but you're unsure about the same question when it relates to the timekeeping database you were working on, correct?

A:     Correct.

Q:     Why is there uncertainty there?

A:     I don't know.

Q:     Is it because you knew you were working with an MMR database to create the timekeeping database for ISG?
. . .
A:     ***I had an MMR database.***

Q:     You did. So you're changing your testimony. You now remember you had an MMR database?

A:     Yes.

Q:     Okay. Why weren't you forthright when we first asked you about this?
. . .
A:     I don't know.
. . .
Q:     ***Why didn't you tell us the truth?***

A:     ***I don't know. I don't know.***

Q:     Where is the MMR database?

A:     On my computer.[8]

(*Id*. at 138:22-140:11) (emphasis added). After this revelation, ISG's counsel terminated the

deposition and would not allow Mr. Huffman to answer any further questions.

---

[8] Even though a forensic examination was eventually conducted on Mr. Huffman's ISG computer, this MMR database has never been produced to MMR.

*Court Sanctions ISG and MMR Receives Additional Forensic Examinations*

ISG's unilateral termination of the deposition was particularly troublesome because MMR was unable to question Mr. Huffman about whether ISG was continuing to use—for instance—MMR's estimating tools, Job Analysis Program, project control databases, and internal financial tools.  Unsurprisingly, the Court sanctioned ISG for its obstruction of the deposition, as "[t]here is no indication that there was grounds to terminate the deposition" and ISG's unilateral termination of the deposition "directly impeded, delayed, and frustrated Huffman's fair examination." (R. Doc. 87 at 7) (ordering ISG to pay reasonable costs and expenses incurred by MMR and requiring that Mr. Huffman sit for a full deposition).

Further, based on Mr. Huffman's testimony, MMR sought additional forensic examinations of the devices and accounts that ISG issued to Mr. Huffman—and MMR needed the results of those forensic examinations to be able to fully depose Mr. Huffman the second time.

This necessary forensic process stalled, however, because ISG would not agree to certain amendments to the Forensic Protocol Order. Specifically, there were certain "search terms" that MMR wanted to add to the Forensic Protocol Order, but ISG took issue with some of the terms. Nevertheless, there were numerous "search terms" that ISG agreed should be used and numerous forensic reports that ISG agreed should be generated. ISG, however, was not willing to begin the forensic process until there was either full agreement on all amendments to the Forensic Protocol Order or the Court ordered ISG to begin.

This delay led to motion practice, and during the first status conference with the Court, ISG was ordered to start conducting the forensic examinations based on the areas where there was agreement, which included generating the forensic reports and running the "undisputed" search terms for the devices and accounts of Mr. Huffman and Laiton McCaughey (another former MMR

employee now working as ISG's Director of Safety and QA/QC and who, according to the forensic evidence, had possession and used MMR's protected information).[9] *See* (R. Doc. 92). MMR did not receive the forensic reports and documents from Mr. Huffman's and Mr. McCaughey's ISG devices and accounts until September 1, 2023.

Just under two weeks later, the Court held a status conference on further amendments to the Forensic Protocol Order: specifically, whether the "disputed" search terms should be added and whether additional ISG employees' devices and accounts should be included. The Court found that the undisputed search terms would be sufficient, but ordered that the devices and accounts of five other ISG employees should be subject to the Forensic Protocol Order, including those of: ISG's President/Owner, Shawn Breeland; Senior Vice President, Kevin Alexander; Project Manager, Chris Comeaux;  Operation Manager, Tony Arimond; and Project Manager, Dan Howell.

In November, 2023, MMR received some of the required forensic productions for these additional five custodians.[10] Meanwhile, MMR's legal team continued to work through the forensic documents previously produced so that Mr. Huffman's second deposition could be set. On November 15, 2023, MMR's counsel sent a remediation list to ISG's counsel, indicating the documents from the devices and accounts of Mr. Huffman and Mr. McCaughey that should be remediated. Having completed the forensic review relating to Mr. Huffman, MMR was able to schedule his second deposition, which could not take place until February 8, 2024.

---

[9] The remaining issues for motion practice included the "disputed" search terms, as well as the addition of devices and accounts that ISG issued to other employees who, according to the forensic evidence, had possession and/or used MMR's protected information.

[10] ISG did not produce all the documents that hit on undisputed search terms. That refusal is now the subject of motion practice pending before the Magistrate Judge. *See* (R. Doc. 107, *MMR's Motion for Discovery Sanctions*). Additionally, ISG took the position that its President/Owner (Mr. Breeland) and its Senior Vice President (Mr. Alexander) did not have an "ISG computer." This led to further conferences with the Court, the results of which have been documented in Minute Entries. *See* (R. Docs. 113, 115).

#102091798v3

### Mr. Huffman Confirms Contempt

During his second deposition, when faced with the forensic reports that specifically documented his computing activity on an ISG-issued computer, Mr. Huffman was forced to admit that he misappropriated MMR's protected information. Specifically, Mr. Huffman admitted that he used external storage devices that contained MMR's information and then transferred that information to his ISG computer and accounts.[11] He further admitted that he used this MMR information to essentially create replicas—with the same protected information incorporated—for ISG's use. This included Project Controls programs and databases, including MMR's Job Analysis Program and Timekeeping Database. Further, Mr. Huffman confirmed that he also created replicas of MMR's estimating tools for ISG, estimating tools that included the most critical, protected information needed to accurately and competitively bid on work. He even confirmed that he created replicas of MMR's internal financial tools. Finally—and critical for this motion—Mr. Huffman confirmed that ISG had been and is currently using MMR's protected information in violation of the Preliminary Injunction. His testimony is highlighted below in further detail, with particular focus on ISG's continued use of MMR's estimating tools, Job Analysis Program, project control databases, and internal financial controls.

### Importance Of MMR's Protected Information

The importance of MMR's protected information cannot be overstated. MMR's estimating tools (its Green Sheets and Overhead Top Sheets) encapsulate decades of knowledge, honed

---

[11] Even though the Preliminary Injunction required all external storage devices containing MMR's information to be returned, these external storage devices were not returned before Mr. Huffman's first deposition. In fact, during his first deposition, Mr. Huffman lied about even using these devices, testifying that he never plugged an external storage device into his ISG computer and that he left (in his MMR office drawer) all external storage devices containing MMR information. (Ex. 5 at 96:19-97:15). These external storage devices still have not been returned to MMR and have not been provided to the forensic examiner. Instead, Mr. Huffman testified that he does not know where they are located. *See, e.g.*, (Ex. 6 at 98:24-100:15). The destruction of these critical sources of information will be the subject of a soon-to-be-filed spoliation motion.

#102091798v3

through years of trial and error, relating to the most effective and efficient way to construct a proposal for MMR's customers. These estimating tools are essential to MMR's ability to competitively and accurately bid on projects; are unique to MMR; are contractually protected from disclosure; and are not available in the public. Indeed, Mr. Huffman testified that he knew of nowhere outside of MMR that these estimating tools are available and that information within those estimating tools are not publicly available:

> Q:    Tell me a way that you can get it[, MMR's green sheets,] publicly if you're not inside MMR.
>
> A:    I don't know.
>
> Q:    You don't know of one, correct?
>
> A:    Correct.
>
> Q:    That's because you can't, correct?
>
> A:    I guess.
> . . .
> Q:    You can't go to NECA and say, give me MMR's green sheets, correct?
>
> A:    Correct.
>
> Q:    MMR doesn't publish their unit rates anywhere, correct?
>
> A:    As far as I know.
>
> Q:    And you know of nowhere where you can publicly get that information, correct?
>
> A:    The NECA information or MMR's?
>
> Q:    MMR's green sheets and the unit rates in their green sheets?
>
> A:    As far as I know, no.

(Ex. 5 at 78:2-79:14). Equally important is MMR's Job Analysis Program. As MMR's Projects Controls Director, Mr. Huffman described this program as follows:

> MMR . . . uses a ***custom system*** for job analysis. This system tracks overall project percent complete, percent complete by cost code,

15

> productivity, manhours spent, and quantity installed. This program
> assists management in showing areas that may need improvement
> as the project progresses. The program provides the client with
> several up-to-date reports.

(Ex. 4 at 13). During his initial deposition, Mr. Huffman provided further details about the Job

Analysis Program:

Q:     And what is it that job analysis spreadsheet did?

A:     So the job analysis spreadsheet takes the raw data from the estimate,
       basically, unit rates and quantities. It then applies or creates a unit rate for
       an activity. But it doesn't simply do it for one piece or part. So, for example,
       I may have four different pieces — sizes of conduit to install. Well, I may
       group two together because they have a smaller unit rate, whereas two do
       no. So half-inch conduit is very easy to install versus 6-inch conduit is not,
       so I would group those separately and get an effective unit rate, not just
       based on the footage of the conduit, but the fittings and everything else. It's
       an aggregate to determine how fast our guys estimate that they can install
       this conduit. What we do with it then is in turn record a quantities that are
       installed in the field on a daily basis per those and apply it to the system.
       What it does is it tells you, hey, they installed a thousand feet today versus
       what they should have installed was 10,000. And then they got what's called
       a work factor, performance factor. It varies in the industry to what you call
       it. And, basically, you look at it, and from a managerial standpoint, typically
       on a weekly basis, to determine how you're doing on a project versus what
       you had in the estimate. Allows you to kind of look ahead.

(Ex. 5 at 41:16-42:22). Further, Mr. Huffman confirmed that this Job Analysis Program and all of

MMR's project control tools are valuable to MMR's business and unique to MMR's business:

Q:     When it says, "MMR uses multiple systems" what are you referring to?

A:     Timekeeping, job analysis.

. . .

Q:     What you discuss here in this project controls plan and what MMR does on
       a project control basis, that was an important part of the business, correct?

A:     My personal opinion is that, yes, it is important. They allowed managers to
       track projects and see how they were performing against their bids.

Q:     And it was a valuable tool for clients, correct?

A:     Yes.

16

. . .

Q:    [Y]ou knew what you were doing was important to deliver the services that MMR was delivering its clients, correct?

A:    I believe so.

Q:    And this was valuable?

A:    I believe so.

. . .

Q:    So it's,[ MMR's Job Analysis Program,] a valuable tool?

A:    To me.

Q:    That's a yes?

A:    Yeah.

(*Id.* at 33:3-43:1).

This testimony confirms the Court's finding when entering the Temporary Restraining Order—specifically, that MMR was likely to prevail on the merits of its claims because "the misappropriated information qualifies as trade secret under the DTSA and LUTSA." (R. Doc. 7 at 9). This finding, moreover, was supported by the *Verified Complaint*, which explained the importance and value of MMR's confidential business information, the reasonable measures that MMR takes to protect the secrecy of its confidential business information, and the economic value arising from this business information being confidential and not available to its competitors.

In essence, Mr. Huffman confirmed that ISG had made replicas of MMR's protected information: confidential business information that allowed ISG to build proposals to win work; to recreate project control tools to track, in real-time, the progress of jobs won; and to copy internal controls to enhance numerous internal workflow efficiencies. And Mr. Huffman confirmed that ISG is currently using these replicas, with impunity and with no regard to this Court's Preliminary Injunction.

**ARGUMENT**

## I.    Legal standard for civil contempt.

Federal courts possess the inherent authority to enforce their own injunctions through contempt orders. *See Wafenschmidt v. MacKay*, 763 F.2d 711, 716 (5th Cir. 1985) (affirming civil contempt award, which included attorney's fees, for violating the court's temporary restraining order); *see generally* 11A Wright, Miller, Kane & Marcus, Federal Practice and Procedure § 2960 (2010) ("A court's ability to punish contempt is thought to be an inherent and integral element of its power and has deep historical roots."). The Court can hold ISG in civil contempt based on clear and convincing evidence that: (1) a court order was in effect; (2) the order required certain conduct by ISG; and (3) ISG failed to comply with the order. *See American Airlines, Inc. v. Allied Pilots Ass'n*, 228 F.3d 574, 581 (5th Cir. 2005) (citing *Martin v. Trinity Indus., Inc.*, 959 F.2d 45, 47 (5th Cir. 1992)).

## II.    ISG is in contempt by violating the Preliminary Injunction.

The evidence clearly and convincingly establishes each required element for a civil contempt finding. The first two elements cannot be disputed: one, the Court issued a Preliminary Injunction Order on May 20, 2022, that is still in effect today, and two, the Preliminary Injunction enjoins ISG from, among other things, "using MMR's trade secrets and confidential business information, including, but not limited to, all such trade secrets and confidential business information that reside on any electronic storage device, cloud-based file repository or file-sharing account, and/or email account used by . . . any former MMR employee that now works for ISG." (R. Doc. 23, ¶ 1). The third element is likewise indisputable. ISG is violating the Preliminary Injunction by using MMR's protected information not only to obtain business but also to ensure that ISG remains profitable and sustains customer relationships.

A.     **ISG continues to use MMR's estimating tools.**

It is undisputed that ISG was using MMR's estimating tools from 2021 through the date of the Preliminary Injunction. In his first deposition, Mr. Huffman admitted the ISG was using these tools when he started at ISG in early March 2022, a little over a month before the Court issued the Temporary Restraining Order:

Q:     You know ISG has used MMR information?

A:     Yes.

Q:     Okay. What information do you know that ISG has used?

A:     Green sheets.

Q:     Overhead sheets?

A:     Yes.

(Ex. 5 at 9:13-20). And Mr. Huffman testified that these estimating tools were MMR's confidential business information, the confidentiality of which Mr. Huffman was required to protect. During his onboarding with ISG, Mr. Huffman signed an identical "Employer Loyalty/Confidentiality/Trade Secrets/Conflict of Interest Agreement" that he had signed with MMR, and after testifying that he was contractually required to keep confidential the estimating tools that ISG was using,[12] he also testified that he was similarly required to contractually protect the confidentiality of MMR's estimating tools:

Q:     And I've got the same questions about your obligations to MMR regarding confidential information, right. You understood that the green sheets were confidential information belonging to MMR that you needed to protect the confidentiality of, correct?

A:     Based on this, I would assume so.

---

[12] ISG even misappropriated MMR's onboarding documents, which included its Employee Handbook, as well as the "Employer Loyalty/Confidentiality/Trade Secrets/Conflict of Interest Agreement." The only difference was that ISG replaced all references to "MMR" with "ISG."

19

Q:      Same with the overhead sheets?

A:      I would assume so.

*See* (Ex. 5 at 93:9-94:10).

Though the unilateral termination of Mr. Huffman's initial deposition prevented MMR from exploring whether ISG was continuing to use MMR's estimating tools, Mr. Huffman admitted in his second deposition that ISG was doing just that. He testified that ISG essentially copied the substantive data and formulas from MMR's estimating tools and that he simply altered the aesthetic look and gave them different names (*e.g.*, MMR's Green Sheets became known as ISG's Labor and Material Sheets or L&M sheets, and MMR's Overhead Top Sheets became known as ISG's Overhead Sheets):

Q:      ISG estimators are estimating jobs today, correct?

A:      ISG estimators are estimating jobs today, yes.

Q:      Okay. And they're using tools that you helped build, correct?

A:      Yes.
. . .
Q:      What . . . ISG's calling labor and material sheets . . . [y]ou were
        instrumental in building those labor and material sheets, correct?

A:      Correct.[13]

(Ex. 6 at 69:14-70:15). He continued later in the deposition:

Q:      Okay. And let's compare it[, the ISG labor and material sheet,] real
        quick to the master green sheet that Kasey Kraft had sent to you,
        which is Exhibit 53[, MMR's green sheet]. . . . Would you agree that
        item code in these two spreadsheets, what's populated there, is
        identical?

A:      They're similar, yes.

---

[13] Attached as **Exhibit 6** is a true and correct copy of the transcript of Ben Huffman's second deposition, taken on February 8, 2024, which contains redactions for testimony designated as Attorneys' Eyes Only.

Q:    Including the font, right, like the material code, it's the same font size, same color, right?

A:    Yes.

Q:    Same order, right?

A:    Yes.

Q:    And there are for this – I'm on the green sheet. There are . . . 6,000 or so entries?

A:    I guess.

Q:    Does that sound right?

A:    I guess. It's been so long since I've looked at it.

Q:    Okay. And then it's the same as what is in Exhibit 57[, an ISG labor and material sheet], which is what you sent to Travis [Dardenne] and Jason [Yates] and Kasey [Kraft], correct?

A:    That's what it looks like.

Q:    I mean you even get random blue x in the same spots, right?

A:    Yes.

Q:    So clearly this was just copied and pasted?

A:    That's what it looks like.

. . .

Q:    At this point what you sent to them you know . . . somebody, whether it was you or somebody else, has copied and pasted the database from the MMR green sheet into the labor and material data sheet, correct?

A:    That's what it looks like.

Q:    And you said you worked on the formulas. And that's to make it do what, to take what?

A:    To do the V look-ups. So where the L&M sheets are, that's where they do the code, and it does all the look-ups and time, so forth.

Q:    And the V look ups are all pulling information from what you call the data and what MMR called the database, correct?

A:    Correct.

#102091798v3

Q:      And the labor units are exactly the same for these two[, the MMR green sheets and ISG Labor and Material Sheets,] correct?

A:      That's what it looks like.

Q:      So it's not just description, it's the actual labor units that are exactly the same?

A:      That's what it looks like.

Q:      And, again, you don't know how MMR came up with what they list as their labor units?

A:      I don't know the specifics of that.

Q:      But you do know what ISG used to come up with the labor units here because they copy and paste from the MMR green sheet, correct?

A:      That's what it looks like.

Q:      And this was approved, right, at ISG, this form, this is the labor and material sheet that is in use today?

A:      Yes.

Q:      So estimators are using this labor and material sheet to build proposals to customers?

…

A:      As far as I know.

Q:      No one has asked you to build a new one, correct?

A:      Correct.
. . .
Q:      And here, the material price?

A:      The material would vary based on estimate. That goes out for pricing each time from my understanding.
. . .
Q:      Right. But MMR has what they think should be the baseline for these products, correct, for these materials?

A:      That's what it looks like, yes.

Q:      And ISG just copied what MMR had developed as the baseline and put it in the L&M sheet, correct?

#102091798v3

A:     That's what it looks like.

Q:     And you're saying you weren't the one who did it, someone else did?

A:     Yeah.

Q:     So what you did was essentially you made it[, the ISG labor and material sheet] aesthetically different, right, you added the blue and salmon colors?

A:     Essentially, yes. Built the columns for the formulas. But that's about it.

. . .

Q:     Let's look at notes section of the two spreadsheets. So you've got – you've made this a title "database changes sheet," right?

A:     That's what it looks like.

Q:     Why would there be any changes in your L&M sheet when it's never been used?

A:     That's the way Travis [Dardenne] and them wanted it. They wanted the sheets.

Q:     So Travis and Jason wanted to know why MMR had changed its database in the green sheets, they wanted that information included in what you were building as the L&M sheets?

A:     I would say so.

Q:     Because you don't know why – like, this reasoning for this change in conduit, you don't know  -- you have no idea why, right?

A:     Correct.

Q:     And MMR is explaining it in their green sheet, which made sense for MMR, right?

A:     Yes.

Q:     Because they were the ones who developed this green sheet and the ones who were making material changes, right?

. . .

A:     Correct.

Q:     And so you copied and pasted this over?

23

A:      I don't remember if I did or if Travis [Dardenne] did.

Q:      But you remember them directing you to do that?

A:      Directed me to do what?

Q:      Include this database changes sheet in the L&M sheet.

A:      Correct.

. . .

Q:      So is it your testimony you don't know if you're the one that actually copied and pasted it there?

A:      I don't remember doing that. Like I say, they did the population of it.

Q:      Okay. But you just remember that direction?

A:      Yes.

Q:      So you see the commodity? You have it, commodity breakout sheet?

A:      Yes.

Q:      . . . MMR has a JA breakout, right?

A:      Um-huh.

Q:      But the description, it's the exact same names, correct, and the exact same order?

A:      Um-huh.

Q:      Couldn't memorize that, that had to be copied and pasted, correct?

A:      I would assume so.

(Ex. 6 at 211:17-220:2). Far from starting from scratch to build its estimating tools, ISG simply

copied MMR's. And this was deliberate—as Mr. Huffman confirmed—because the ISG estimators

only knew how to use the estimating tools that they used while MMR:

Q:      Was the overall direction to, you know, Ben, make this sheet look as – look new but do exactly the same thing that the MMR green sheets did?

A:      I never got specific direction like that.

Q:      Did you understand that to be the directive?

A:    I mean, I guess. I don't know.

. . .

Q:    I'm asking you as you're making this, what did you think your directive was as the projects controls director and controller of this company?

A:    Yeah, I guess so.

Q:    And that's because a lot of these estimators – part of the reason is they all were former MMR employees who grew up on the green sheets and overhead top sheets, correct?

A:    Yes.

Q:    It's what they knew how to do, correct?

A:    Yes.

Q:    It's how – they knew how to use these sheets and build proposals at one job, correct?

A:    Yes.

Q:    And they wanted, basically, the same thing at ISG, correct?

. . .

A:    I would assume so.

Q:    And that's what you were trying to provide to them, correct?

A:    I would assume so.

(*Id.* at 221:8-223:4). Indeed, to make sure the record was clear after having compared MMR's estimating tools with the "new" ISG estimating tools ISG, Mr. Huffman confirmed that MMR's information was being used:

Q:    Now, you also – you agree . . . after having gone through that, the labor and material sheets are using information and data that was taken directly from MMR's green sheets, correct?

A:    That's what it looks like.

Q:    That's a yes?

A:    That's what it looks like.

(*Id.* at 223:14-23).

Mr. Huffman, moreover, gave similar testimony concerning the copying and continued use of MMR's Overhead Top Sheets while being shown a copy of a MMR's Overhead Top Sheet and a copy of ISG's "new" overhead sheet:

Q:    Other than the coloring, maybe some font, it looks the same, correct?

A:    Similar, yes.
. . .
Q:    Were you using those [MMR] overhead top sheets to build this new one?

A:    I don't remember specifically.

Q:    Do you think you could build this from scratch and have it look so similar to the MMR spreadsheet?

A:    Not without the help of Travis and Kasey.

Q:    And not without the help of actually looking at the [MMR] spreadsheet, correct?

A:    I would assume so.
. . .
Q:    Looks like just the sheet name themselves are even the same, right? I mean, you've got – bid info is the same?

A:    Um-huh.

Q:    Labor is the same. Rates is the same, correct?

A:    Correct.

Q:    Summ. What is S-u-m-m?

A:    I believe that's summary, is what that's supposed to be.

Q:    Okay. You've got even the same abbreviation for summary here, right?

A:     Um-huh.

Q:    Staff, the same. Staff is the same. Equip. What equip stand for?

A:    Equipment.

Q:    That's the same?

A:    That's what it looks like.

26

Q:     Expense, the same.

A:     That's what it looks like.

Q:     And then recap, correct?

A:     Yes.

Q:     And you've got dropdowns. MMR has some notes. Is that accurate?

A:     Correct.

Q:     Is it your testimony that the three of you[, Ben Huffman, Travis Dardenne, and Kasey Kraft,] in some way happened to memorize the exact same structure and exact same spelling of all these sheets?

A:     No. Like I say, they instructed me how they wanted it built, so I did it as they were telling me.

Q:     My question's a little different. You had to have been looking at the MMR or working from a version of the MMR overhead top sheets to have it line up so identically, correct?
. . .
A:     I don't know. I would think so.

Q:     I mean, you built this, right?

A:     I built the framework of it, yes.

Q:     I understand others weighed in and told you, instructed you what to do. But you actually did the mechanical work of building it, correct?

A:     Correct.

Q:     So it would have been you, for instance, that was naming these tabs if you worked from scratch?

A:     Yes.

Q:     And you would have had to have been looking or copying the MMR overhead top sheet, correct?

A:     I would think so. But, like I say, I was taking direction from them.

Q:     Was it direction to just change the aesthetics? Like you said, take direction, but you're not telling me what the direction was, I guess. . . . I'm going to have to really pry because unless you can tell me. What was the direction?

A:     Just to build a new sheet, you know, basically a new sheet similar in nature.

27

Q:      New sheet that basically we all know how to use, correct?

A:       Yes.

Q:      And the one they know how to use is the MMR overhead top sheet, correct?

A:      Correct.

Q:      And you did a great job of making it look almost identical. Would you agree with that?

A:      It looks similar.

Q:      And you did a great job of making it work almost identically, correct?

A:      I would assume so.

Q:      You've heard no complaints from the estimators that formerly worked at MMR, correct?

A:      No.

Q:      You haven't heard anybody say, hey, this doesn't work like the old MMR overhead top sheet that we're used to using, correct?

A:      Correct.

Q:      Same with the new labor and material sheets?

A:      Correct.

Q:      You didn't hear any complaints from the old – the former MMR estimators or employees that, look, this sheet doesn't work like the green sheet we're all used to using, correct?

A:      Correct.

Q:      And this overhead top sheet is – it's still in use today, correct, that't the one on the right?

A:      As far as I know.

Q:      And that's Exhibit 59. You haven't been asked to build a new one?

A:      No.

(*Id.* at 229:2-234:2).

28

To make matters even worse, Mr. Huffman confirmed just how cavalier ISG is in their continued contemptuous conduct. When asked, for instance, how ISG's use of the labor and material sheets could possibly comply with the Court's Preliminary Injunction, Mr. Huffman—ISG's Controller/Project Control Director—could only say:

"I don't know."

(*Id.* at 226:12-16). Mr. Huffman also admitted that *not one* person at ISG—or any attorney representing ISG—has ever instructed him about the restrictions in the Preliminary Injunction:

Q:    Have you ever been instructed that you need to comply with this order?

A:    By?

Q:    Anyone at ISG. An attorney? Has anyone told you that you need to comply with this order?

A:    I haven't been told specifically on that.
. . .
Q:    And no one at ISG has instructed you [that] you can't use MMR's information based on what the judge has ordered?

A:    I haven't talked to anybody. I mean, they haven't instructed me.

Q:    So that's the question. A simple yes or no, did anyone instruct you at ISG?

A:    No.
. . .
Q:    Mr. Huffman, real quick, have you asked anyone at ISG how it is that you're supposed to comply with this order that the judge issued, the injunction?

A:    Not that I know of.

(*Id.* at 226:4-227:11). In sum, Mr. Huffman provided clear and convincing evidence that ISG is violating the Preliminary Injunction by using MMR's protected information. And as Mr. Huffman confirmed, ISG is continuing to use the replica estimating tools today—nearly two years after the

29

Court issued the Preliminary Injunction.[14]

**B.** **ISG continues to use MMR's Job Analysis Program.**

ISG is also violating the Preliminary Injunction by using a replica of MMR's Job Analysis

Program. As with the estimating tools, ISG did not build its own job analysis program before Mr.

Huffman joined ISG in March 2022:

> Q:      . . . You have an entry [on your to-do list] here job analysis, correct, that's
>         an item?
>
> A:      Yes.
>
> Q:      And for description, "complete new job analysis program." And that's
>         because it's new because ISG didn't have a job analysis program when you
>         started, correct?
>
> A:      Correct.

(Ex. 6 at 152:18-153:4). And Mr. Huffman explained why it was so important to build a Job

Analysis Program at ISG, based on how effective this tool was at MMR:

> Q:      [H]ow MMR does it and what tools they're using to create a job analysis is
>         unique to MMR, correct?
>
> A:      Yes.
>
> Q:      And that why you have referenced here, custom system for job analysis,
>         right?
>
> A:      Yes.
> . . .
> Q:      It's valuable – internally[, the Job Analysis Program,] it's valuable so that
>         management can make whatever business decisions it needs on a particular
>         project, correct?
>
> A:      The job analysis is valuable in that it shows the productivity on the job and
>         allows supervision to determine whether you need more manpower or less

---

[14] If the Court needs to hear additional testimony on these estimating tools, MMR will call the necessary witnesses. Further, so that the Court can view the similarities of these replica estimating tools, MMR is filing, under seal, **Exhibit 7**, an example of a misappropriated MMR Green Sheet; **Exhibit 8**, an example of ISG's replica labor and material sheet; **Exhibit 9**, an example of MMR's Overhead Top Sheet; and **Exhibit 10**, an example of ISG's replica overhead sheet. Mr. Huffman testified about these examples.

through strict schedule, so.

Q:    'Cause on these projects, right, you're getting for management there are tons of information going on and that could get lost. It could just – problems could go unabated. But because you're tracking it and you have this system, it allows management to quickly see what is going on at any given point in time, correct?

A:    Correct.

Q:    And then it also allows management to communicate with clients about projects, right?

A:    Weekly reporting, yes.

Q:    Right. Or if there's an issue that we need to quickly address, we can get out in front of this and do some client control, correct?

A:    Correct.

Q:    And that's why it was one of the first thing that you have on your to-do list once you got to ISG, because they didn't have a job analysis program, correct?

A:    Correct.

(*Id.* at 154:4-157:1).

But whereas ISG's executives and employees gave Mr. Huffman copies of MMR's estimating tools to build replicas for ISG, Mr. Huffman actually transferred MMR's Job Analysis Program from an external storage device to his ISG computer on his first day of work:

Q:    I'm going to show you what we marked as 23[, the forensic report from Mr. Huffman's first ISG computer]. . . . So line 19, JA tracking master, that is the Excel sheet that is MMR's job tracking analysis program, correct?

A:    I'd have to see it.

Q:    Okay. Well, look, here, okay. Time[, March 7, 2022]?

A:    Yeah.

Q:    That was right after you plugged in the flash drive, correct?

A:    Correct.

Q:    And we've established that MMR's job analysis tracking program was an

31

Excel sheet, correct?

A:    Correct.

Q:    You still have doubts that this is the MMR job-tracking analysis?

A:    Not with that logic.

Q:    So we are in agreement that this is MMR's job analysis tracking program, correct?

A:    That's what it looks like.

Q:    [After being shown a document with "JA tracking master" in the title.] Is this MMR's job-tracking analysis?

A:    Yes.
. . .
Q:    And you brough that – the one we looked at, the JA tracking that showed up on the forensic report on Exhibit 23 . . . you brought that with you on the flash drive from MMR to ISG?

A:    That's what it looks like, it was on the flash drive.

(*Id.* at 157:4-160:21).

Mr. Huffman, moreover, testified that creating the replica version of MMR's Job Analysis

Program was an iterative process, during which he used MMR's program for ISG's benefit:

Q:    I have on the screen what we marked as Exhibit 39[, MMR's Job Analysis Program]. I just wanted to confirm. I think this is accurate but, for instance, like the manload and the S-curve, this allows you to – this Excel allows you to generate PDFs from it?

A:    Yes. You can print a PDF from an Excel document, yes.

Q:    And once this data is in, you can just hit print and it will print a PDF and it will give you a hard copy instead of a native version of whatever it is you tell it to print. Is that accurate?

A:    Yes.

Q:    I'm going to show you what I've marked as Exhibit 40. . .  Is Trevor [Besse, an ISG estimator/project manager,] asking you to build a histogram?

A:    That's what it looks like, yes.

32

Q:    And this is for an ISG project, correct?

A:    Correct.

Q:    . . . This is a printout of an S-curve and a histogram. Is that accurate?

A:    Yes.

Q:    And you were using an MMR database or MMR excel sheet, tracking sheet, to do this, correct?

A:    It looks similar to this.

Q:    Well, here's why I know because – does ISG have offices in Baton Rouge?

A:    No.

Q:    Right. So you see in the footer of this document?

A:    Yeah.

Q:    Okay. That is Baton Rouge [zip] code 70817, correct?

A:    Correct.

Q:    That's MMR – this is MMR's address, correct?

A:    I assume so.

Q:    And what you did is, it looks like you erased the actual, you know, street. Is that accurate?

A:    I don't remember.

Q:    And ISG doesn't even have a dot com, right, they're ISG dot work?

A:    Yes.

Q:    If you look at Exhibit 2, see the first page of Exhibit 2?

A:    Yes.

Q:    You see the footer on Exhibit 2, the first page?

A:    Yes.

Q:    See, it has the exact – that's MMR's address. And it's the same as what's in Exhibit 40, right?

33

A:      That's what it look like.

Q:      And so you erased the other indicating information that would clearly say that this related to MMR, correct?

A:      I guess. I don't know.

Q:      It doesn't just disappear on its own?

A:      Correct.

Q:      And you were using the MMR job tracking program to generate this, correct?
. . .
A:      Yes.

(*Id.* at 162:5-165:12).

Mr. Huffman also confirmed that he was using misappropriated elements MMR's Job Analysis Program during this iterative process for ISG's behalf—even trying to mask this conduct my putting ISG logos on the documents:

Q:      I'm going to show you what I'm marking as Exhibit 41. . . . And it's called manload-S-curve master . . .  do you recognize this document?

A:      Yes.

Q:      You put this [ISG] logo here?

A:      Yes.

Q:      ISG? Okay. And – but ISG didn't have a project in 2018, correct?

A:      Correct.

Q:      That was an MMR project?

A:      I assume so.

Q:      And, again, we know that 'cause if we click on the data tab, right here's MMR, correct?

A:      Yes.

Q:      So this was – this is MMR's manload-S-curve master document?

A:      That's what it looks like, yes.

34

Q:      And you were trying to make this look like an ISG document, correct? . . .
        By putting the ISG logo on it?

A:      That's what it looks like, yes.

. . .

Q:      Why didn't you just build it yourself if it's nothing special? Why did you
        have to take MMR's and hide the fact that – what you were doing?

A:      It was just easier.

Q:      Why wouldn't you just leave the MMR label on it? That would have been
        easier, right?

A:      Yes, that would have been easier.

Q:      But this looks more like a little deceitful? . . . Do you agree with that?

A:       I guess.

(*Id.* at 165:19-167:25).

In the end, Mr. Huffman—after being shown both MMR's Job Analysis Program and the

replica he finalized for ISG—had to admit that he used MMR's protected program and that MMR's

information was incorporated into ISG's replica:

Q:      . . . [I]t look as if this was happening in steps, the finalizing of the JA
        tracking program? See 17, fine tune?

A:      Yes.

. . .

Q:      Is there a master version currently at ISG that's being used?

A:      They should be, yes.

Q:      It's your expectation as project controls director, right?

A:      Um-huh.

Q:      That everyone's working from the master?

A:      They should be, yes.

Q:      That you yourself approved?

A:      Yes.

35

Q:     Did you have to get approval from Jason Yates, Travis Dardenne, or Shawn
       Breeland before you approved the master?

A:     Yes.

Q:     Okay. And they approved it?

A:     Yes.

. . .

Q:     You now remember that you were accessing the MMR job tracking analysis
       that you took from MMR, correct?

A:     Obviously on the computer it shows that.

Q:     Right. You're looking at it. And then in your to-do list, you're creating a
       new one for ISG at the same exact time, correct?

A:     Correct.

Q:     So given those things, do you agree that you were looking at accessing
       MMR's job tracking database to create this ISG job tracking database?

A:     I don't remember specifically doing that. But, like I say, it looks that way.

Q:     It looks that way, okay. And this job analysis program is being used today?

A:     As far as I know, it is.

(*Id.* at 170:18-177:5).[15]

And consistent with its contempt for the Preliminary Injunction when using the replica

estimating tools, ISG took no steps to ensure that the replica job analysis program was no longer

being used:

Q:     And this job analysis program is being used today?

A:      As far as I know, it is.

Q:     There's been no instruction, for instance, since this lawsuit was filed, the
       injunction's been in place, everyone stop using the job analysis program,
       we're going to completely start over?

---

[15] MMR is filing, under seal, **Exhibit 11**, an example of MMR's Job Analysis Program, and **Exhibit 12**, an example of ISG's replica program.

A:    Not that I know of.

Q:    There's been no instruction at all to stop using the job analysis program,
      correct?

A:    Not that I know of.

(*Id.* at 177:1-14). As with the estimating tools, ISG's so-called job analysis program is a nearly

identical replica of MMR's (with some aesthetic changes), and the only way that ISG will stop

using this information is if the Court issues drastic sanctions.

    **C.    ISG continues to use a project controls database built from MMR's.**

ISG is also violating the Preliminary Injunction by using a project controls database that

Mr. Huffman built from the Project Controls Database he misappropriated from MMR. After

continued cross-examination during his first deposition, Mr. Huffman finally testified that he had

misappropriated MMR's Timekeeping database (a project controls database) and was using it to

create a replica database for ISG's use. (Ex. 5 at 138:22-140:11). But Mr. Huffman maintained

that ISG was not using that database and that he did not use the MMR Timekeeping database (or

any other MMR database) when creating a project controls database for ISG's use.

That testimony turned out to be false. ISG is using a project controls database that it calls

"The Bible"—a name that clearly indicates its importance to ISG. Even during his second

deposition, Mr. Huffman tried to maintain that he built that "The Bible" from scratch:

Q:    So do you recall testifying about the database that you call the bible?

A:    Yes.

Q:    And do you recall being certain that that was not based off of an MMR database?

A:    Yes.

Q:    And is that truthful?

A:    Yes.

(Ex. 6 at 115:24-116:6). However, after being shown an example of "The Bible"—and specifically, the code within "The Bible"—Mr. Huffman was forced to admit that he in fact built "The Bible" from an MMR database:

Q:    Is this a version of the bible?

A:    Yes.

Q:    Now, if I want to get to the code of this database, I would go to database tools, correct?

A:    Yes.
. . .
Q:    If I click on these, it will show me –

A:    It should show code for each one of these.

Q:    Okay, Now what is module? What this mean here?

A:    It's just a module of code so you can put them in separate pieces, parts.

Q:    So if go to emails output – having trouble here. I'm sorry, emails. All right. It's working now. And I go down to – you see in the green message box?

A:    Yep.

Q:    . . . [Y]ou're saying you built this from scratch, correct?

A:    I didn't remember doing that, but.

Q:    So this here in the code of this document is MMR, correct?

A:    Yes.

Q:    And it's a message that would pop up on MMR's database that said, "Emails successfully sent to the project controls department. I guess since you finally listened, I'll give you back your buttons." Correct?

A:    Yes.

Q:    You see that? And that was a prompt that you had created for MMR databases, correct?

A:    Yes.

Q:    Okay. And that was you personally, right?

#102091798v3

A:    I believe so.

Q:    And the buttons that you give back, are these – are these MMR buttons, correct?

A:    That what it looks like, yes.

Q:    So MMR equipment visible, MMR PO visible, correct?

A:    Yes.

Q:    Okay. So I'm having a real hard time understanding how if you built this from scratch, right, a black Access database, we could have a prompt that you – in the code – that you created for MMR's databases and that include MMR in the code.

A:    I must have used some of the code. I completely forgot about that.

Q:    Okay. So what happened was you were using MMR's database and code to create this database for ISG, correct?

A:    It looks like I had some code, yes.

Q:    Okay. And this database, this bible, is in use at ISG today, correct?

A:    Yes.

(*Id.* at 116:22-120:3). Based on this testimony, ISG's use of MMR's information is so extensive and thorough that Mr. Huffman cannot even recall when and how it started. But that is no excuse for ISG's continued contemptuous behavior.

**D.    ISG is also using MMR's internal financial controls.**

Mr. Huffman further confirmed that he is using MMR's information in his role as a controller. And he's doing so with ISG's full approval. On his second day of work at MMR, Mr. Huffman sent an email to ISG's CEO (Mr. Yates) and President/Owner (Mr. Breeland) that read: "Here's the excel version of the BS report with sample data and all of the formulas. Please let me know if you have any questions. Thanks." And attached to this email was an MMR "budget vs. spend" tool, which Mr. Huffman admitted:

Q:    And this was an MMR BS report, correct?

#102091798v3

A:     An Excel version, yes.

. . .

Q:     . . . [I]f we look back at your to-do list, Exhibit 33, you see updated BS report mockup, that's what you're referring to is updating this MMR BS report?

A:     That's what it looks like.

. . .

Q:     So you wanted to use MMR's report and create the same one for ISG?

A:     Similar.

Q:     Okay. Some aspects you wanted of it, of the MMR report?

A:     Yes.

Q:     You didn't just start from scratch on building this report for ISG, correct?

A:     Correct.

. . .

Q:     So we left off talking about Exhibit 11, the [MMR] BS report. And I'm going to show you what I marked as Exhibit 34 . . . If we look back the actual cover email, it says – ITFN reports is the subject.

A:     Yes.

Q:     What is ITFN? What does it stand for?

A:     Internal financial.

Q:     And if we look at the first page of the attachment, it's an ITFN report. What generates this?

A:     Viewpoint Spectrum.

Q:     I left Exhibit 11[, the MMR BS Report,] on the screen so you could look at it. Were you building – do you agree that this is very similar, 11 – the MMR BS report in Exhibit 11 is very similar to the ITFN report?

A:     Yes.

Q:     And, for instance, like some of the phase description like H1, H2, Home office support is H1; H2, training. Do you see that? It's the same on both?

A:      Yes.

Q:     Now, on that to-do list that we discussed earlier where you discussed creating the BS mockup, right, you with me? Remember it?

40

A:      Yeah.

Q:      And you worked from Exhibit 11[, the MMR BS Report,] for that, correct, you started from Exhibit 11?

A:      Yes.

Q:      Okay. And then it[, the MMR BS Report,] eventually. . . became what we're seeing in Exhibit 34, the ITFN report, correct?

A:      Correct.

Q:      And this ITFN report is being used currently at ISG?

A:      Yes.

Q:      Is this an important financial tool, reporting tool, at ISG?

A:      It's a job cost report, so yes, I would say so.

Q:      It's how you keep track – how you keep management informed of the financials on projects, correct?

A:       Yes.

. . .

Q:      Now, I think you testified that the ITFN report, that falls within the controller job responsibilities?

A:      Yeah. I would say so.

(*Id.* at 137:7-142:10).[16] This is yet another example of ISG creating a replica of MMR's information and then using that replica, despite what the Preliminary Injunction orders.

## III.    ISG's contempt was calculated and egregious and warrants commensurate sanctions.

Federal courts have "broad discretion in assessing sanctions to protect the sanctity of its decrees and the legal process," and the "proper aim of judicial sanctions for civil contempt is full remedial relief, that such sanctions should be adapted to the particular circumstances of each case, and that the only limitation upon the sanctions imposed is that they be remedial or coercive but not

---

[16] MMR is filing, under seal, **Exhibit 13**, an example of MMR's Budget v. Spend Report, and **Exhibit 14**, an example of ISG's replica IFTN Report.

penal." *Bd. Of Supervisors of La. State Univ. v. Smack Apparel Co.*, 574 F. Supp. 2d 601, 604 (E.D. La. 2008) (Lemmon, J.). Further, a contempt order may be "employed for either or both of two purposes: to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained." *Am. Airlines, Inc. v. Allied Pilots Ass'n.*, 228 F.3d 574, 585 (5th Cir. 2000); *Total Safety v. Rowland*, No. 13-6109 (E.D. La. Oct. 29, 2014) (R. Doc. 321) ("The purposes of civil contempt are two-fold: to compensate the prevailing party for losses and damages caused by the other's noncompliance and to coerce the derelict party into compliance with the original injunction.").[17]

Based on the particular circumstances of this case and ISG's continued disregard for the enjoined activities set forth in the Preliminary Injunction, the Court should enter both coercive and compensatory relief.

## A.    ISG has gone far further than merely "skirting the line of permissible conduct."

Courts have warned that parties who are enjoined should not merely slightly modify their behavior such that they "skirt the line of permissible conduct." *See Smack Apparel Co.*, 574 F. Supp. 2d at 605 ("The court must give careful consideration to the possibility that a defendant found to have either infringed the plaintiff's mark or unfairly competed with the plaintiff will modify his behavior ever so slightly and attempt to skirt the line of permissible conduct."). An enjoined party, such as ISG, should "thereafter be required to keep a safe distance away from the dividing line between violation of, and compliance with, the injunction." *Id.* Parties like ISG should "keep a safe distance away from the margin line—even if that requirement involves a handicap as compared with those who have not disqualified themselves." *Id.* (internal quotations

---

[17] The Eastern District's Contempt Order in *Total Safety v. Rowland* is attached hereto as **Exhibit 15**.

omitted).

Here, ISG chose not to steer away from the enjoined activities. Instead, ISG even took extensive efforts to mask and hide the fact that they were continuing to use MMR's protected information by creating mere replicas of what they were enjoined from using. In essence, the Preliminary Injunction had ***zero*** impact on the way ISG was building its business off the back of MMR's information. Nothing underscores this point more starkly than the astronomical rise in value in a year period following the issuance of the injunction. In that short time, a private equity firm appraised the enterprise value of ISG to have skyrocketed from $███████ in February, 2022, to over $███████ in July, 2023. Such an astronomical rise in value, in such a short period of time, is unheard of for a start-up company within this industry and market. All that unjust enrichment can be directly attributed to ISG's continued use of MMR's protected information in direct violation of the Preliminary Injunction.

Indeed, the person at ISG who was essentially tasked with creating the replicas of MMR's protected information was not even told by anyone at ISG—or anyone representing ISG—how he was required to comply with the Preliminary Injunction. Nor was he instructed to stop using the replicas or to start from scratch and build an entirely new set of tools and databases that in no way were based on MMR's protected information. ISG's attitude after the entry of the Preliminary Injunction was the same as before: ISG will continue to profit from the use of MMR's information, no matter who (or what Judge) tells them to stop.

The most poignant example of this attitude is the fact that ISG did nothing—in the year span between its unilateral termination of Mr. Huffman's initial deposition in March 2023 and the start of his second deposition in February 2024—to ensure he was no longer using MMR's information. ISG did not even have a conversation with him following the March 2023 deposition

about the Preliminary Injunction and how to comply with it. Nearly two years have gone by since the injunction issued. Now is the time for the Court to step in and enforce compliance.

**B.     The Court should craft a stiff coercive sanction.**

Without further relief, ISG has shown it will not keep a safe distance from using MMR's protected information or from violating the Preliminary Injunction. ISG is intent on making the Preliminary Injunction as toothless as possible and depriving MMR of the protections that the Court ordered. The whole purpose of the Preliminary Injunction was to prevent MMR from continuing to suffer irreparable harm from ISG's use of its protected information. ISG's flagrant violation of the Preliminary Injunction must result in appropriate remedial and coercive sanctions.

MMR therefore proposes the Court issue a coercive order that specifically requires ISG to do the following:

- ISG must immediately cease using all replicas of MMR's protected information, including its estimating tools, job analysis program, all databases created by Mr. Huffman, all reporting tools created by Mr. Huffman, and all other documents and files that are, in any way, based on MMR's information;

- ISG must obtain, and provide the Court and MMR with, signed acknowledgments from each of its employees that they have received a copy of the Preliminary Injunction and understand that they cannot use any MMR information or any derivatives or replicas based on MMR information;

- ISG must submit to a Remediation Protocol for identifying and then cleansing ISG's systems, devices, and accounts of MMR's information;

- ISG must work in good faith with a court-appointed Special Master to ensure compliance with the Remediation Protocol;[18]

---

[18] It is not uncommon for Courts to appoint a Special Master under these circumstances, as there will need to be a level of expertise involved and trust with the Court. For instance, in *Rowland*, the Court appointed a Special Master and ordered the defendant found in contempt to work with the Special Master to remediate misappropriated data, along with other relief. *See* (Ex. 15 at 15-21).

44

- ISG must assist with the court-appointed Special Master with filing a compliance report that indicates the Remediation Protocol is complete;

- ISG cannot bid on any future work until the Special Master has filed the compliance report indicating that the Remediation Protocol is complete;[19]

- ISG must grant, following the competition of the Remediation Protocol, the Special Master periodic access to its computing systems, devices, and accounts on a bi-monthly basis for a period of two years; and

- ISG must file into the record, for a period of two years following the completion of the Remediation Protocol, a bi-monthly compliance report that certifies the efforts to comply with the Preliminary Injunction and Contempt Order, which shall attach signed acknowledgements from any new ISG employees.

**C.    The Court should also enter an order that compensates MMR for its damages to police compliance and disgorges ISG unjust enrichment.**

The Court should also include a compensatory sanction in its contempt order. MMR spent valuable time and resources policing and attempting to enforce the Court's order, and at a minimum, the Court should award MMR its attorneys' fees and costs associated with these efforts. The Court should also disgorge any profits that ISG made from the use of MMR's protected information after the Preliminary Injunction was entered. *See Smack Apparel Co.*, 574 F. Supp. 2d at 605-06 (disgorging profits stemming from contemptuous conduct). Such an award will compensate MMR for the damages associated with ISG's contempt and, combined with the coercive sanctions requested above, "are necessary to enforce future compliance" with the Preliminary Injunction. *Id.*

---

[19] This type of sanction is also not uncommon when there is contempt of a preliminary injunction order prohibiting the use of a competitor's confidential business information. *See Orion Constr., Inc. v. Coyle*, 2017 U.S. Dist. LEXIS 179456, at *26-27 (S.D. Tex. Oct. 26, 2017).

#102091798v3

## CONCLUSION

The clear and convincing evidence demonstrates ISG continues to violate the Preliminary Injunction, and given ISG's obstinate refusal to comply, the Court should enter stiff sanctions to ensure future compliance and to compensate MMR for the damages suffered from this contemptuous conduct. ISG will only become more emboldened—causing MMR to expend more resources to police the injunction—if a firm message is not sent through this ruling. MMR believes that the Court could fashion sanctions just based on this brief and the supporting evidence; however, given the scope of ISG's contempt and the types of documents at issue, should the Court deem it necessary, MMR requests an evidentiary hearing to present a full record that supports the requested relief. In any event, we are close to two years since the Preliminary Injunction was issued, and MMR should not have been forced to spend substantial resources to police compliance with the injunction, over every objection from ISG to engaging in meaningful discovery. MMR reiterates that following are appropriate sanctions:

- Requiring ISG to immediately cease using all replicas of MMR's protected information, including its estimating tools, job analysis program, all databases created by Mr. Huffman, all reporting tools created by Mr. Huffman, and all other documents and files that are, in any way, based on or incorporate MMR's information;

- Requiring ISG to obtain, and provide the Court and MMR with, signed acknowledgments from each of their employees that they have received a copy of the Preliminary Injunction and understand that they cannot use any MMR information or any derivative or replicas based on MMR information;

- Requiring ISG to submit to a Remediation Protocol for identifying and then cleansing ISG's systems, devices, and accounts of MMR's information and all derivatives that information;

- Appointing a Special Master to oversee the Remediation Protocol, at ISG's expense;

#102091798v3

- Requiring ISG to assist the court-appointed Special Master in filing a compliance report that indicates the Remediation Protocol is complete;

- Prohibiting ISG from being able to bid on any future projects until the Special Master certifies to the Court that Remediation Protocol is complete and there is no evidence of MMR information on ISG's systems, devices, and accounts;

- Requiring bi-monthly monitoring for a period of two years, following the conclusion of the Remediation protocol;

- Requiring ISG to grant, following the completion of the Remediation Protocol, the Special Master periodic access to its computing systems, devices, and accounts on a bi-monthly basis, for a period of two years, in order to ensure that there are no further instances of MMR information being used or stored on ISG's systems, devices, and accounts

- Requiring ISG to file into the record, for a period of two years following the completion of the Remediation Protocol, a bi-monthly compliance report that certifies the efforts to comply with the Preliminary Injunction and Contempt Order, which shall attach signed acknowledgements from any new ISG employees;

- Requiring ISG to pay for the fees and costs associated with the remediation, as well as all fees and costs incurred by MMR to uncover ISG's contempt;

- Disgorging all profits ISG made from its contemptuous conduct; and

- Entering all other sanctions and relief the Court deems necessary to ensure compliance with the injunction and to compensate MMR for the damage associated with ISG's continued contempt.

*[Remainder of page left blank intentionally for signatures]*

47

Respectfully submitted:

*/s/ P.J. Kee*
P.J. Kee (La. Bar No. 34860)
Thomas P. Hubert (La. Bar No. 19625)
*Michael W. Magner (La. Bar No. 01206)
Jacob J. Pritt (La. Bar No. 38872)
Michael A. Foley (La. Bar No. 35774)
Jason A. Culotta (La. Bar No. 35731)
Connor H. Fields (La. Bar No. 39880)
JONES WALKER, LLP
201 St. Charles Avenue - 50th Floor
New Orleans, Louisiana 70170-5100
Telephone: (504) 582-8230
Facsimile: (504) 589-8230
Email: pkee@joneswalker.com
*Motion to Enroll Pending
***Counsel for MMR Constructors, Inc.***

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served through the Court's pacer e-filing system on March 7, 2024.

*/s/ P.J. Kee*
P.J. Kee

48

#102091798v3