**UNITED STATES DISTRICT COURT**

**MIDDLE DISTRICT OF LOUISIANA**

| | |
|---|---|
| **MMR CONSTRUCTORS, INC.,** | **CIVIL ACTION NO.: 22-CV-267** |
| Plaintiff, | **JUDGE BRIAN A. JACKSON** |
| **VERSUS** | **MAGISTRATE JUDGE RICHARD L. BOURGEOIS, JR.** |
| **JB GROUP OF LA, LLC D/B/A INFRASTRUCTURE SOLUTIONS GROUP, et al.,** | |
| Defendants. | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**DEFENDANT JB GROUP OF LA, LLC D/B/A INFRASTRUCTURE SOLUTIONS GROUP'S  RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR CONTEMPT OF PRELIMINARY INJUNCTION**

Defendant JB Group of LA, LLC, d/b/a/ Infrastructure Solutions Group ("ISG"), respectfully files this response in opposition to the Motion for Contempt of Preliminary Injunction filed by Plaintiff, MMR Constructors, Inc. ("MMR").

**I.   INTRODUCTION**

MMR's Motion mischaracterizes the record, lacks any context, and fails to inform the Court of material facts of the underlying dispute.  This is at least the third attempt by MMR to seek sanctions or contempt against ISG by twisting facts to make ISG appear as a bad actor, when ISG has been nothing but cooperative and transparent throughout the entirety of this litigation.  As the Court previously found, ISG is not in contempt and has not intentionally violated the Stipulated Preliminary Injunction. [R. 23] Therefore sanctions are not justified.

## II.   PRELIMINARY INJUNCTION AND FORENSIC PROTOCOL

By every possible measure, ISG complied with the Stipulated Preliminary Injunction.

In May 2022, to comply with the Stipulated Preliminary Injunction, Jason Yates personally went around to all ISG office personnel[1] and informed them of the injunction and the need to comply with it.  (*See* Exhibit A, Declaration of Jason Yates).  At that time, Yates further inquired whether the employees possessed any MMR information or documents. Yates specifically instructed these employees not to use any MMR information or documents whether it was deemed confidential or otherwise. ISG's instruction was clear, it did not want or need any MMR material.

Around this same time, ISG retained a forensic expert and began the process of identifying, imaging, and searching relevant electronic devices even before the agreed Forensic Protocol was entered. ISG reasonably consented to and complied with the early procedural and discovery process in this matter by agreeing to a Forensic Protocol [R. 26] and amending it to include additional parties, accounts and devices from time to time [R. 45]. At great expense to ISG, its forensic expert has continuously and diligently performed his work in compliance with the Forensic Protocol and has completed all forensic analysis envisioned by the protocol.  Part of the process for the Forensic Protocol was for an image of the entire ISG server to be taken.  After each search was produced, MMR would create a Remediation List with a selected group of documents it wished to "remediate" off the server and such items (as agreed to by both parties) would be remediated at one time at the end of this process.

To further aid in the process, depositions of the named defendants, and parties of interest were taken within four months of this litigation being filed.  What was discovered in these

---

[1]  ISG acknowledges that it may not have informed every field worker about the Stipulated Preliminary Injunction. However, such employees would not have access to or be involved in estimating work, working on proposals, or have access to the alleged materials related to MMR's Motion for Contempt.

depositions was that MMR's failure to implement the most basic procedures for document use or return or exit interviews in its offices created a situation wherein MMR permitted employees to leave with MMR materials. Some ISG employees who were former MMR employees were not even aware that they still retained MMR materials until they dug around junk drawers, car consoles, and old work bags in preparation for their depositions, especially since MMR never inquired into same upon their resignation from MMR. Until recently, MMR never implemented any use or control policies related to documents that remained on ex-employees' thumb drives, hard drives, and cell phones when their employment ended with MMR. MMR's failures have evolved into conspiracies that every ex-employee is a bad actor by simply being in possession of any MMR related material, confidential, trade secret or not.

ISG's extensive and good faith cooperation resulted in agreement to image and search of over a dozen devices/accounts—including the entire ISG OneDrive/Server. ISG then further agreed to image and provide forensic reports for the two (2) additional laptops and e-mail accounts ISG issued to non-parties Walter (Benjamin) Huffman [R. No. 67], and the ISG laptop and e-mail account ISG issued to non-party Laiton McCaughey, while seeking guidance from the Court relative to what search terms should be utilized on the devices of these non-parties. However, despite all of the actions described above, that was not enough for MMR, who sought to add 22 additional custodians to the Forensic Protocol. [R. 79]. At this point, ISG could no longer just agree to never-ending searches and the matter went before the Court who allowed the addition of only five (5) custodians with limited search terms. [R.101] In all, such forensic actions have cost ISG approximately $243,057.01 for the cost of the forensic vendor alone.

### III. ACTIONS OF ISG PRIOR TO THE LITIGATION

ISG was co-founded by Jason Yates, while he was employed with MMR as a Project Manager. Yates' MMR supervisors, co-workers, stockholders, and corporate counsel were all aware of Yates' ownership and involvement with ISG. (*See* Deposition of Jason Yates, p. 15 [R. 119-03]). On more than several occasions many of these individuals assisted Yates with ISG-related business. In fact, MMR's corporate counsel reviewed ISG contracts for ISG. During the period when Yates was working for ISG and MMR, Yates worked exclusively on Department of Transportation work.

During his deposition on June 15, 2022, Yates testified to using MMR estimating tools for ISG while employed a with MMR, and thereafter, all prior to the litigation. *Id*. Yates further testified that MMR was aware he was doing so. Yates further testified that ISG prepared new estimating tools that better fit ISG's line of work.

**Q.  Okay. What about green sheets? Were those used as well?**
A.  Yes, I believe so.
**Q.  Okay. And same thing; once -- those were in use while you were still at MMR, and then they continued to be used after you left MMR?**
A.  Yes.
**Q.  And were those used to win work on bids?**
A.  They were used for DOT work as new forms were being built for E&I work. And yes, they were used on some E&I jobs that none were awarded, and ISG did not win any at the point of using those sheets.
**Q.  Okay. At some point, did you stop using --**
A.  Yes.
**Q.  -- those type of sheets. And when was that?**
A.  That was probably -- strictly a guess, but I'm going to say a couple of weeks before all of this came up.
**Q.  Okay.**
A.  We were in the process of building new sheets that fit us because there were things I liked or I didn't like on those sheets that I wanted different.

(Deposition of Jason Yates, pp. 15-16  [R. 119-03]).

4

**Q.  Okay.  So I think you said you stopped using the top sheets a few weeks before this litigation was filed?**
A.  Yes.
**Q.  And so I believe this litigation was filed in April?**
A.  Yes.
**Q.  So sometime around either March --**
A.  Yeah.
**Q.  -- April time frame?**
A.  To give you an exact date, I couldn't.  We had been working on building new forms.
**Q.  Okay.  And who was involved in that?**
A.  Ben Huffman.
**Q.  Okay.  Ben Huffman.  And Ben Huffman was an estimator or was -- not an estimator, but he was an   employee of MMR --**
A.  Yes.
**Q.  -- as well, right?**
A.  Prior to his employment with me.
**Q.  Did Ben Huffman bring any top sheets or green sheets with him to ISG?**
A.  Not that I'm aware of.
**Q.  Did he bring any documents with him to ISG?**
A.  Not that I'm aware of. Everybody was instructed to not bring anything.

(Deposition of Jason Yates, pp. 18-19 [R. 119-03]).


**Q.  Okay.  And in ISG's interrogatory responses, I think it lists Kasey Kraft as an estimator?**
A.  That's correct.
**Q.  Is that his --**
A.  He's estimating manager, yes, which he's the  only estimator there so --
**Q.  Okay.  So would you say he's in charge of ISG's estimating?**
A.  Yes.
**Q.  And since he's been employed by ISG, he's been estimating E&I projects?**
A.  Yes.
**Q.  And during that whole time as far as you're aware, he had that estimate that he worked on for MMR, correct?**
A.  From 2019.
**Q.  Okay.  So that's "yes"?**
A.  Yes.
**Q.  Okay.  And do you know if he used that estimate in any way to estimate or bid work on behalf of ISG?**
A.  I would hope not considering it's 2019 and a lot of things have changed.
**Q.  Did you ask him if he used it at all?**
A.  No, I don't believe I did.
**Q.  Do you know what tool -- what estimating tools  Kasey Kraft is using for ISG?**
**A.**  Yes.  Labor sheets that were built by Ben Huffman and -- I actually don't know the name of the other sheet, but it's forms that were built by Ben Huffman.

5

**Q. Do you know if he's using any top sheets or green sheets from MMR?**
A. He should not be using any top sheets or greenmsheets from MMR.
**Q. Okay. But do you know if he actually is?**
A. Not that I've seen.

(Deposition of Jason Yates, pp. 37-38 [R. 119-03]).

Yates' transparent testimony illustrates that ISG admitted to utilizing MMR material on non-competitive work prior to the start of litigation, which ISG had used with the full knowledge and consent of MMR while Yates was still employed at MMR. Not until Yates resigned from his employment with MMR and ISG began competing for the same work as MMR, did MMR allege that this material was a trade secret. ISG is confident that it will demonstrate that the material is not confidential nor a trade secret of MMR. ISG has never attempted to hide or obfuscate anything from MMR (if any such obfuscation is possible with the searching of at least 7 Terabytes[2] of data).

## IV.   NON-PARTY HUFFMAN'S ROLE IN THE CASE

Huffman resigned from MMR on or about March 4, 2022, and joined ISG. (Dkt. No. 53, at ¶ 33). Yates hired Huffman and never asked Huffman to bring any MMR materials or information to ISG. (*See* Exhibit A, Declaration of Jason Yates). No one from ISG ever asked Huffman to bring any MMR materials or information to ISG. *Id*. As described above, Huffman was hired to create all new estimating and other project tools programs for ISG from his own knowledge of Excel and software coding. *Id.*

Huffman has never been a party in this case, and there has never been any allegation—in any of the *three* Complaints MMR has filed in this case, or in any of MMR's discovery responses—accusing Huffman of violating any obligation to MMR. There was no such suggestion by MMR

---

[2] Lee Whitfield Declaration [R.96-1].

that Huffman had retained any MMR materials (*see id*.), nor was ISG aware of Huffman having done so (*See* First Huffman Deposition; at 140:22-24 [R. 119-07]).

The first part of Huffman's deposition in this case took place on March 27, 2023 (the "First Huffman Deposition"). The second part of Huffman's deposition in this case took place on February 8, 2024 (the "Second Huffman Deposition").

At the First Huffman Deposition, Huffman disclosed, for the first time to anyone, that he had retained and brought to ISG, an MMR "Timekeeping" document. (Huffman Deposition, p. 140 [R. 119-07]. Huffman *testified he had not previously disclosed this information to ISG management, anyone at ISG, or to ISG's counsel* (*Id.* at 140:14-19). With respect to the Timekeeping document, Huffman also testified that, although he initially created an ISG Timekeeping document based on the MMR Timekeeping document, he decided to scrap its use because he thought that an off-the-shelf solution was better. ( *Id.* at pp. 36-41 and Exhibit A, Declaration of Jason Yates). An investigation at ISG confirmed that ISG used an off-the-shelf accounting program which ISG enters all of its time into, Viewpoint Spectrum, and did not use the program linked to MMR that was created by Huffman. (*See* Exhibit A, Declaration of Jason Yates).

Because ISG learned for the first time that Huffman was in possession and possibly using MMR material for work he was performing at ISG, ISG required that Huffman retain separate counsel to represent him including with respect to the remainder of his deposition. Neither ISG nor ISG's counsel communicated with Huffman about the lawsuit, his testimony, or the deposition, since it was believed Huffman's deposition would shortly be continued. MMR demanded, and ISG agreed to, additional forensics related to Huffman's ISG devices and accounts after the First Huffman Deposition, and MMR insisted that those additional forensics be complete before the Second Huffman Deposition.

7

At the Second Huffman Deposition, in February 2024, Huffman revealed, *for the first time and in contradiction to his original testimony*, that he had used: an MMR "Green Sheet"/"Overhead and Top Sheet"; a MMR "Job Analysis" spreadsheet; and MMR tracking materials to create material for ISG. ISG strongly contends that these spreadsheets do not contain confidential or trade secret information but instead information that is used and shared throughout the industry.

In fact, the "Green Sheet"/Overhead and Top Sheet" was the same material used by Yates for ISG with the knowledge and consent of MMR while he was employed at MMR. Nonetheless, ISG had no knowledge that Huffman used any alleged MMR documents in creating the new ISG documents. (*See* Exhibit A, Declaration of Jason Yates). At the time Huffman created the Labor and Material Sheet, the Bible, and the Job Analysis documents, Huffman informed ISG that he created them "from scratch."

Although ISG was aware that some of the spreadsheets had a similar look and general purpose to the types of spreadsheets seen at MMR, it was not concerning as this type and form is common in the industry. (*See* Exhibit A, Declaration of Jason Yates). Huffman did not tell anyone at ISG that he brought any MMR materials to ISG or that he actually used any MMR materials to create documents for ISG. ISG had no reason not to believe Huffman that he created such documents from scratch and did not have the required technical expertise to determine if Huffman created such codes/formulas himself or not.

Moreover, Huffman also denied using any MMR documents in creating any of these three ISG documents in the First Huffman Deposition[3] and also initially denied doing so at the Second

---

[3] First Huffman Dep. Tr. 24-31, 45-47, 53, 137-139. [R. 119-07].

8

Huffman Deposition[4]. To be frank, that Huffman would attempt or fail to reveal to ISG such actions after explicitly being told not use any MMR material and with full knowledge that the Forensic Protocol was ongoing left ISG blindsided. If ISG believed that such matters were occurring, why would it ever agree to the voluntary Forensic Protocol in the first place?

### A. ISG Did Not Stop Huffman's Deposition In Bad Faith

After Huffman's contradictory testimony at the First Huffman Deposition, ISG's counsel determined that, consistent with counsel's own ethical obligations, it could no longer represent both Huffman and ISG.[5] Huffman agreed that he should be represented by separate counsel. (*Id.* at 145:19-146:6, 141:24-142:16, 143:16-144:4). Huffman retained separate counsel by May 19, 2023 and ISG (by stipulation) reimbursed MMR's and its counsel's travel costs between New Orleans and Baton Rouge and any court reporter appearance fee for the First Huffman Deposition. The only reason that Huffman's continuing deposition was delayed almost a year, was MMR's demand that the deposition had to wait for Huffman's devices and accounts to be searched pursuant to the Forensic Protocol. As noted above, ISG agreed to submit Huffman's ISG devices and accounts to the Forensic Protocol; but the parties could not agree as the search terms which was adjudicated by the Court. Finally, MMR already sought sanctions for ISG's actions relative to ending the First Huffman Deposition, but the Court denied MMR's request, except for the stipulated amounts ISG already agreed to pay. [R. 87].

---

[4] Second Huffman Dep. Tr. 19-20, 69-72. [R. 119-08].
[5] "Except as stated in paragraph (c), a lawyer . . ., where representation has commenced, shall withdraw from the representation of a client if: the representation will result in violation of the rules of professional conduct or other law." La. R. Prof. C. 1.16(a)(1). "A lawyer representing an organization may also represent any of its directors, officers, employees, members, shareholders or other constituents, subject to the provisions of Rule 1.7." La. R. Prof. C. 1.13(g). "Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if: (1) the representation of one client will be directly adverse to another client; or (2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client . . .". La. R. Prof. C. 1.7(a).

9

## V. ISG'S ACTIONS AFTER THE SECOND HUFFMAN DEPOSITION

Immediately after the Second Huffman Deposition, ISG began taking steps to address Huffman's testimony even though ISG maintains that the that Labor and Material Sheet/ Overhead Sheets, the Bible, and the Job Analysis do not contain MMR's confidential or trade secret information. Specifically, ISG is undertaking the following steps:

### A. The Job Analysis Spreadsheet

The Job Analysis spreadsheet Huffman created for ISG was used to track productivity and manpower on projects. (*See* Exhibit A, Declaration of Jason Yates and Exhibit B, Declaration of Dan Howell). ISG's investigation after Huffman's Second Deposition revealed that Dan Howell, Special Projects Manager, used the Job Analysis spreadsheet for only one job, but he discontinued the use of the Job Analysis Spreadsheet during the Project because it was not useful. *Id.* On or about February 9, 2024, Yates instructed all ISG personnel to immediately stop using the Job Analysis spreadsheet Huffman created for ISG. The ISG Job Analysis spreadsheet is not in use at ISG.

### B. The "Bible"

The "Bible" is a widely used term to describe a proposal tracking system. It gives each job proposal a specific identifying number and then tracks the outcome of the proposal. (*See* Exhibit A, Declaration of Jason Yates and Exhibit B, Declaration of Dan Howell). ISG maintains that the "Bible" is also not a confidential MMR document or trade secret. After Huffman testified in the Second Huffman Deposition, that the tracking document he created may have been based off a document he used while at MMR, ISG immediately instructed everyone at ISG to stop using the Huffman "Bible". *Id.*

ISG instructed Howell to create a new ISG proposal tracking document, without using the document created by Huffman. Howell immediately began doing so. The "Bible" spreadsheet/program is not in use at ISG. Instead, since February 15, 2024, ISG has used the ISG Opportunity Log which is a proposal tracking sheets that uses SharePoint (a program that comes with Microsoft 365). (*See* Exhibit B, Declaration of Dan Howell). This document did not rely on any MMR material. *Id.* The creation of this document was easily completed by Howell as it only gives identifiers to estimates and provides a location to track the job from a high level (i.e. did ISG win the job, the status of the job, the costs of the job, etc.).

C. **Labor & Material Sheets / Overhead Sheets "Estimating Tools"**

The labor and material sheets /overhead sheets aka the "estimating tools" work by pulling in data through an Excel function known as a V (vertical column) LOOKUP into other sections of the spreadsheet. The units in the LOOKUP come from publicly available National Electrical Contractors Association ("NECA") rates for material and labor costs. (See Exhibit A, Declaration of Jason Yates). ISG manually input the NECA rates into the estimating tools after purchasing the information from NECA. Additionally, ISG would source material rates from multiple vendors to compare for the best pricing. For every job, after the VLOOKUP in the spreadsheet would pull in those labor and material rates, ISG managers, would then review the rates and further adjust the output based on their decades of industry knowledge related to estimating projects in the electrical industry. *Id*.

The information affecting the changed rates in a bid are items like location of the project difficulty level of the work, and many other variables. No bid was based solely on the initial output of the spreadsheet which nonetheless is created by using NECA rates. These rates cannot be MMR rates. They are not anybody's rates but NECA. Both Yates and Huffman testified that the NECA

11

rates were used and are the basis of the spreadsheets. (See Jason Yates deposition transcript, pg. 60-61 [R. 119-03] and Huffman First Deposition transcript, pg. 76-79 [R. 119-07]) Furthermore, material costs and labor rates regularly change, and they have increased steadily since Huffman joined ISG so even if MMR information was utilized it would be woefully out of date. Moreover, ISG also utilized an estimating tool called Bluebeam to calculate and track the quantities of materials which are to be used any job. *Id.* Accordingly, these "estimating tools" do not contain confidential MMR information nor is it an MMR trade secret.

Nonetheless, ISG has taken steps to procure a much more robust off-the-shelf estimating and project management tools. Even before the Second Huffman Deposition, ISG was looking for new software that would take over every part of the process- from estimating to invoicing. ISG was particularly interested in ProCore as this project management software ties into ISG's existing Viewpoint financial system. (*See* Exhibit A, Declaration of Jason Yates). Moreover, it was a complete package and would be one of the only tools that ISG would utilize. On February 27, 2024, ISG contacted the ProCore account representative to further these discussions and obtain a quote for the ProCore Project Management Pro, Project Financials, Bid Management, Estimating, Field Productivity, and Viewpoint Spectrum Enterprise Resource Planning ("ERP") modules.

Unlike the rudimentary MMR spreadsheets at issue, each of these robust ProCore modules would flow into the existing ISG Viewpoint financial ERP system, consolidating the project management and estimating process into one automated ecosystem. *Id.* Below are links to the ProCore resources describing the robust nature of the products:

Procore Estimating[6]

Field Productivity: T&M to Change Management[7]

---

[6] https://view.highspot.com/viewer/65de113d6132674382333614?iid=631a76316347e452777bfd74
[7] https://view.highspot.com/viewer/65de113d6132674382333614?iid=607772b1628ba21351a1f94f

12

[Project Management Pro Demo Video](#)[8]

The estimate ProCore provided for the Project Management Pro, Project Financials, Bid Management, Estimating, and Field Productivity modules, with the Viewpoint Spectrum ERP Connector, depending on various parameters, was $92,468 to $157,209 per year depending on the amount of revenue (i.e. 30 to 90 million). *Id.* ISG is also in the process of obtaining a quote for a similar ERP system from Accubid which is approximately $22,682.30. *Id.* See link below:

[Trimble Accubid Classic | Electrical Estimating Software](#)[9]

ISG should make its determination on which system to use within the next two weeks. Once this occurs there will be no possibility of MMR material being utilized by ISG. ISG would no longer even use the ISG One Drive and very few items that are not created by the new software directly.

### D. Other Documents Referenced by MMR

ITFN Report

The ITFN report is just a summary of the costs ISG spent on a job vs. what ISG budgeted for the job. This information comes from internal sources and relates to ISG actual costs. This document comes directly from the Viewpoint accounting software and cannot be based on MMR materials. (*See* Exhibit A, Declaration of Jason Yates).

Quality Management System Documents

In July of 2022, ISG sought outside vendors to provide quality management system documents including a: Project Quality Plan, Quality Manual, Standard Operating Procedures, Submittal Forms and Complete Inspection Checklist Package. On August 2, 2022, ISG purchased

---

[8] https://procore.wistia.com/medias/6msy9v41yp
[9] https://mep.trimble.com/en/electrical-solutions/estimating-and-takeoff/trimble-accubid-classic

13

such manuals and procedures for $1,390.00. Therefore, such documents were created by the outside vendor and cannot be based off MMR materials. (*See* Exhibit A, Declaration of Jason Yates).

### Employee Handbook and Safety Manuals and Procedures

ISG instructed Laiton McCaughey to write entirely new employee and safety manuals that did not contain any MMR material. McCaughey drafted the handbooks, manuals, and procedures from publicly available materials, and they were in use by ISG by the summer of 2022. (*See* Exhibit A Declaration of Jason Yates).

### Site Specific Plan

A "Site Specific Plan" is just an execution plan based on your estimate on how ISG will supply the job, how ISG will efficiently work, and how ISG will come under budget. Materials from MMR would not be useful because the plan must be specific to how ISG plans to carry out a specific job. Nonetheless, ISG has only been requested to formally provide such a "Site Specific Plan" on one occasion, which it did.

### Proposals and Specific Terms

Bid clarifications are terms added to a contractor's bid typically as "inclusions" or "exclusions". The clarifications ensure that the owner or prime contractor understands what the bidder is offering and can then carry out an informed evaluation of what has been offered and at what price. These clarifications all depend on the type of work being performed and are mostly standardized throughout the industry. There is nothing confidential about them. Moreover, not all clarifications apply to all jobs and so picking and choosing what clarifications are applicable to the work must be done on a per project basis.

VI.   **LEGAL ARGUMENT**

A movant in a civil contempt proceeding bears the burden of establishing by clear and convincing evidence 1) that a court order was in effect, 2) that the order required certain conduct by the respondent, and 3) that the respondent failed to comply with the court's order. *Bd. of Supervisors of the Louisiana State Univ. v. Smack Apparel Co.*, 574 F. Supp. 2d 601, 604 (E.D. La. 2008). "Then the respondent must show any mitigating circumstances that might cause the court, in its discretion, to withhold the exercise of its contempt power." *Id.* at 977.

Civil contempt "should not be resorted to where there is [a] *fair ground of doubt as to the wrongfulness of the defendant's conduct.*" *Taggart v. Lorenzen*, 139 S. Ct. 1795, 1801, 204 L. Ed. 2d 129 (2019) (citing *California Artificial Stone Paving Co. v. Molitor*, 113 U.S. 609, 618, 5 S.Ct. 618, 28 L.Ed. 1106 (1885)). "[A] sanction imposed on a party held in civil contempt generally may serve either or both of two purposes: to coerce the contemnor into complying in the future with the court's order, or to compensate the complainant for losses resulting from the contemnor's past noncompliance." *Perfect Fit Indus., Inc. v. Acme Quilting Co*., 673 F.2d 53, 56 (2d Cir. 1982) (citing *McComb v. Jacksonville Paper Co., 336 U.S. 187, 191, 69 S.Ct. 497, 499, 93 L.Ed. 599 (1949)*).

In either event, civil contempt is a severe remedy, which may be improper if a party's attempt to comply was reasonable. *Taggart v. Lorenzen*, 139 S. Ct. 1795, 1801, 1802, 204 L. Ed. 2d 129 (2019); *see also* 11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2960, pp. 430–431 (2013) . The courts have broad discretion in its determining sanctions and have found that subjective intent is relevant to its determination. *Id*. at 1802; *see also* § 87:41. Discretion of court as to punishment for civil contempt, 15A Cyc. of Federal Proc. § 87:41 (3d ed.). "[O]nly the least possible power adequate to the end proposed should be used in contempt cases." *Taggart*

15

*v. Lorenzen*, 139 S. Ct. 1795, 1801, 1802, 204 L. Ed. 2d 129 (2019) (citing *Young v. United States ex rel. Vuitton et Fils S. A.*, 481 U.S. 787, 801, 107 S.Ct. 2124, 95 L.Ed.2d 740 (1987)).

ISG is not attempting "to skirt the line of permissible conduct" as it was unaware of Huffman's actions. Contrary to Huffman's failed recollections, ISG through Yates specifically instructed ISG personnel to ensure that they were not using MMR materials and to advise if they were. Huffman failed to abide by ISG's instructions or disclose such information, after having told ISG that he created the ISG documents from scratch. ISG has taken every possible measure to comply with the injunction injunction and—regardless of whether the documents Huffman used are confidential or trade secret—to take quick and substantial steps as soon as it learned of Huffman's use at the Second Huffman Deposition.

Additionally, MMR attempts to confuse the issue of ISG's actions *prior* to the litigation and its actions *after* the litigation began. MMR highlights testimony from Huffman which appears to insinuate that ISG, since the start of this litigation, was currently using estimating tools containing MMR materials. [R. 120-1, pg. 7]. However, this is not what Huffman is referring to. As previously noted, Yates admitted that he utilized MMR estimating tools and legal advice related to the DOTD work that ISG performed while he still worked at MMR and shortly thereafter. (See Deposition of Jason Yates, pp. 15-16 [R. 119-03]). As ISG moved into electrical, ISG hired Huffman to create new estimating tools that did not originate in any way from MMR. The testimony from Huffman quoted by MMR is in fact referring to ISG's use of these estimating tools *preceding* the litigation. Huffman further clarified that after he created the new sheets (shortly after being hired) that ISG stopped using the MMR green sheets:

> A. Kasey came after we developed the new sheets.
> Q. After you developed the new sheets?
> A. Yes.
> Q. He was hired after you were -- ISG was no longer using MMR's green sheets?

16

>A. As far as I know.
>Q. And who developed those new sheets?
>A. I did.

(Huffman First Deposition, page 17. [R. 119-07])[10]

MMR's attempt to conflate the two issues are important when such actions took place PRIOR to the Stipulated Preliminary Injunction and when ISG testified that it was actively attempting to rectify the matter before the litigation was ever filed.

MMR's requested sanctions are draconian, unnecessary, and should not be granted by this Court.  As noted above, immediately upon learning about the possible use of MMR information regardless of whether the information was confidential or a trade secret, which ISG denies, ISG took actions to stop use of these materials.

Additionally, ISG and MMR disagree as to what items contain and/or derivatives of MMR confidential materials.  Items included by MMR in its Remediation Lists as purportedly MMR "confidential" or "trade secret" include personal items of employees such as golf schedules, materials from other clients, personal photos, and numerous other items that could never be connected to MMR or be its property. For example, MMR claims that ISG's basic invoices look like MMR invoices.  This is a simple format issue only as each invoice much reflect that work was actually performed by ISG on that particular job.  What MMR confidential material could possibly by therein? Invoice formatting is not confidential.  ISG does not agree to delete any invoice it has ever sent to a Contractor, Owner, or Client for work ISG performed based on MMR's bare claims.  A Remediation Protocol is unwarranted and at a very minimum premature at this juncture and would basically require an entire trial on the merits.

---

[10]  See also Huffman Second Deposition Tr. 105-106.  [R. 119-08].

To that end, disgorgement of profits when ISG was unaware of Huffman's actions; ISG took actions prior to the litigation of stopping use of the MMR estimating tools, and there has been no proof that such tools are actually confidential or trade secrets is not a reasonable sanction. "Judicial sanctions in civil contempt proceedings, may in a proper case, be employed for either or both of two purposes: to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained." *United States v. United Mine Workers of America*, 330 U.S. 258, 303–04, 67 S.Ct. 677, 91 L.Ed. 884 (1947.) Since ISG's possible violation was not intentional, it is unnecessary to coerce it into compliance. Moreover, since learning of the possible violation, ISG has taken reasonable steps to ensure compliance and prevent any future violations.

Moreover, "the purpose is to compensate for the damages sustained" which in this case have not been alleged with any particularity or even proven in the slightest. And, this is an issue that will be resolved at trial, after full testimony. Based upon the forgoing, ISG submits that the Court should deny MMR's request for compensatory damages.

## VII.   CONCLUSION

By every possible measure, ISG complied with the Stipulated Preliminary Injunction. Immediately after the Second Huffman Deposition, ISG began taking steps to address Huffman's testimony even though ISG maintains that the that Labor and Material Sheet/ Overhead Sheets, the Bible, and the Job Analysis do not contain MMR's confidential or trade secret information. ISG is not in contempt of the Stipulated Preliminary Injunction.

Dated: March 27, 2024

        Respectfully submitted:
        **DUNLAP FIORE LLC**

        /s/ Jennifer A. Fiore
        Jennifer A. Fiore (Bar # 28038)
        Erin G. Fonacier (Bar # 33861)
        6700 Jefferson Hwy, Building #2
        Baton Rouge, LA  70806
        Telephone:  225-282-0660
        Facsimile:  225-282-0680
        jfiore@dunlapfiore.com
        efonacier@dunlapfiore.com

        *Attorneys for JB Group of LA, LLC d/b/a Infrastructure Solutions Group*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing was filed electronically with the Clerk of Court using the CM/ECF system, which will send notice to all counsel on this 27th day of March 2024.

        /s/ Jennifer A. Fiore
        Jennifer A. Fiore