UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

MMR CONSTRUCTORS, INC.                                      CIVIL ACTION

VERSUS

JB GROUP OF LA, LLC, ET AL.                                 NO. 22-00267-BAJ-RLB

RULING AND ORDER

Before the Court is Plaintiff's **Motion for Contempt of Preliminary Injunction (Doc. 119)**, which contends that Defendant JB Group of LA, LLC d/b/a Infrastructure Solutions Group (ISG) has violated the Court's May 20, 2022 Preliminary Injunction, (Doc. 23), and requests that the Court sanction and hold ISG in contempt. For reasons that follow, Plaintiff's Motion will be **GRANTED**. The Court holds that ISG is in contempt of the Court's Preliminary Injunction, and a special master will be appointed to oversee ISG's compliance with the Court's Preliminary Injunction moving forward.

I.  BACKGROUND

This case is about ISG allegedly stealing confidential business information and trade secrets from MMR Constructors, Inc. (MMR), a competitor of ISG and a prominent company in the field of electrical and instrumentation contracting. (Doc. 53). Numerous key employees at MMR have left to join ISG, and MMR contends that several of those employees wrongfully took and used MMR's proprietary information at ISG. (*Id.*).

As noted in the Court's Order denying Defendants Joint Rule 12(b)(6) Motion to Dismiss, (Doc. 69), MMR's allegations have already been closely reviewed by the Court, in conjunction with the Court's adjudication of MMR's Motion for a Temporary Restraining Order (TRO), (Doc. 2). The Court granted MMR's TRO request on April 26, 2022. (Doc. 7). The Court then found that the materials that Defendants allegedly stole from MMR, which included customer and contact lists, estimating tools, customer-specific pricing, and detailed plans for MMR's ongoing and prospective projects in Orlando, Florida, qualified as "trade secrets" under the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq.* (DTSA), and its Louisiana counterpart, the Louisiana Uniform Trade Secrets Act, La. R.S. § 51:1431, *et seq.* (LUTSA). (*Id.* at pp. 9-10). The Court thereafter enjoined ISG from:

> (1) using MMR's trade secrets and confidential business information, including, but not limited to, all files that reside on any storage device, file-sharing account, or email account used by any former MMR employee that now work for ISG,
> (2) accessing or copying MMR's trade secrets and confidential business information in the possession of any former MMR employee that now works for ISG,
> (3) destroying or altering any information that may be relevant to the suit, and
> (4) failing to return the information and external storage devices named in the original Complaint and any other documents that contain MMR's confidential business information.

(*Id.* at pp. 13-14). MMR and ISG subsequently stipulated to a Preliminary Injunction with substantively the same terms as above, which the Court accepted and entered into the docket on May 20, 2022. (Doc. 23). The parties also agreed to a Forensic Protocol, (Doc. 26), that allowed MMR to investigate specified ISG computing devices, networks, and accounts for further dissemination of MMR's protected information.

2

The results of that investigation were such that MMR has now amended its Complaint twice to add additional former MMR employees as defendants. (Docs. 29, 53).

On March 27, 2023, almost a year after the entry of the Preliminary Injunction, MMR deposed Walter "Ben" Huffman, who was recruited from MMR by ISG to serve as its Project Controls Manager. (Doc. 126 at p. 6). At this deposition, Huffman confirmed that ISG was using MMR's information before the Court issued the Preliminary Injunction, specifically stating that MMR's "green sheets" and "overhead sheets," materials designed to generate estimates for clients, had been used by ISG. (*Id.* at pp. 7-8). Huffman admitted that such use violated the form confidentiality agreements that MMR uses for its employees. (*Id.* at p. 9). Huffman also admitted that he used an MMR database to create a replica timekeeping database for ISG, and that the MMR database was stored on his computer. (*Id.* at p. 11).

In response to this final admission, counsel for ISG unilaterally terminated the deposition to assess whether Huffman's actions posed a conflict such that he would be required to retain his own counsel. (Doc. 87 at p. 5). The Court ordered ISG to cover MMR's deposition costs for the early termination of Huffman's deposition, and for Huffman to appear for a second deposition. (Doc. 87). Huffman's timekeeping database is not in use at ISG. (Doc. 130 at p. 7).

Huffman was deposed for the second time on February 8, 2024. (Doc. 126 at pp. 13-14). At this deposition, Huffman testified that, despite the Court's Preliminary Injunction having been in place for nearly two years, several estimating tools and

management programs in use at ISG were identical to, and were built from, equivalent tools and programs developed by MMR. (Doc. 126 at pp. 21, 24, 26-27, 33-34, 36, 39). Those materials consisted of "labor and material sheets" (L&M sheets), "Overhead Top Sheets," a "Job Analysis Program," and a proposal tracking program called "the Bible." (*Id.* at pp. 20, 30, 37). In addition to these tools and programs, Huffman revealed that he had been using MMR's budget and spend (BS) reports to build replica internal financial (ITFN) reports for ISG. (Doc. 126 at pp. 39-41).

ISG does not contest that Huffman used MMR's estimating tools and programs to build materials for ISG. (Doc. 130 at p. 8). ISG's position is that Huffman's testimony "blindsided" the company, and that while it was aware that "some of the spreadsheets had a similar look and general purpose to the types of spreadsheets seen at MMR, it was not concerning as this type and form is common in the industry." (*Id.* at pp. 8-9). On this final point, ISG maintains that the information and programs allegedly stolen from MMR are neither confidential nor qualify as trade secrets. (*Id.* at p. 8).

MMR filed a Motion for Contempt of Preliminary Injunction several weeks after Huffman's second deposition. (Doc. 119). ISG has replied, and MMR has responded thereto. (Docs. 130, 137).

## II. LEGAL STANDARD

"A party commits contempt when he violates a definite and specific order of the court requiring him to perform or refrain from performing a particular act or acts with knowledge of the court's order." *Travelhost, Inc. v. Blandford*, 68 F.3d 958, 961-

62 (5th Cir. 1995). The moving party bears the burden of proving contempt, by clear and convincing evidence. *Donohue v. Wang*, No. 1:22-CV-00583-DAE, 2023 WL 6317451, at *2 (W.D. Tex. Sept. 28, 2023), *report and recommendation adopted*, No. 1:22-CV-00583-DAE, 2023 WL 7103270 (W.D. Tex. Oct. 27, 2023) (citing *Topletz v. Skinner*, 7 F.4th 284, 299 (5th Cir. 2021); *Whitcraft v. Brown*, 570 F.3d 268, 271 (5th Cir. 2009)). In this context, "clear and convincing evidence" is "that weight of proof which produces in the mind of the trier of fact a firm belief or conviction as to [the] truth of the allegations sought to be established, evidence so clear, direct, weighty and convincing as to enable the fact finder to come to a clear conviction, without hesitancy, of the truth of the precise facts of the case." *Johnson Serv. Grp., Inc. v. France*, No. 3:10-CV-1988-D, 2011 WL 2273529, at *1 (N.D. Tex. June 9, 2011) (quoting *Travelhost, Inc. v. Blandford*, 68 F.3d 958, 961 (5th Cir.1995) (internal quotation marks omitted)).

A party seeking a contempt finding must establish "that (1) a court order was in effect, (2) the order required specified conduct by the respondent, and (3) the respondent failed to comply with the court's order." *United States v. City of Jackson, Miss.*, 359 F.3d 727, 731 (5th Cir. 2004). "A contempt proceeding does not open to reconsideration the legal or factual basis of the order alleged to have been disobeyed and thus become a retrial of the original controversy." *Bd. Of Supervisors of La. State Univ. v. Smack Apparel Co.*, 574 F. Supp. 2d 601, 604 (E.D. La. 2008) (citing *Martin's Herend Imports, Inc. v. Diamond & Gem Trading USA, Co.*, 112 F.3d 1296, 1307 (5th Cir.1997)).

"The only issue in a civil contempt hearing is the respondent's compliance with the court's order; noncompliance can be contemptuous even [in] the absence of the respondent's willfulness." *Travelers Cas. and Sur. Co. of Am. v. Padron*, No. SA-15-CV-200-DAE, 2017 WL 8895641, at *5 (W.D. Tex. Aug. 31, 2017) (citing *Am. Airlines, Inc. v. Allied Pilots Ass'n*, 228 F.3d 574, 581 (5th Cir. 2000)). Further, "[g]ood faith is not a defense to civil contempt; the question is whether the alleged contemnor complied with the court's order." *Chao v. Transocean Offshore, Inc.*, 276 F.3d 725, 728 (5th Cir. 2002).

Finally, should a party be deemed in contempt of a court order, federal courts have "broad discretion in assessing sanctions to protect the sanctity of its decrees and the legal process," and the "proper aim of judicial sanctions for civil contempt is full remedial relief, that such sanctions should be adapted to the particular circumstances of each case, and that the only limitation upon the sanctions imposed is that they be remedial or coercive but not penal." *Smack Apparel Co.*, 574 F. Supp. at 604 (citing *Test Masters Educ. Servs., Inc. v. Singh*, 428 F.3d 559, 582 (5th Cir. 2005); *Fla. Steel Corp. v. Nat'l Labor Relations Bd.*, 648 F.2d 233, 239 (5th Cir. 1981)) (internal quotations omitted). A contempt order may be "employed for either or both of two purposes: to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained." *Am. Airlines, Inc.*, 228 F.3d at 585 (quoting *United States v. United Mine Workers of America*, 330 U.S. 258, 303-04 (1947)) (internal quotations omitted).

6

## III. ANALYSIS

### a. Contempt of Preliminary Injunction

Here, it is clear that ISG is in contempt of the Court's May 22, 2022 Preliminary Injunction. The Court has informed ISG that the estimating tools allegedly stolen from MMR qualify as trade secrets on numerous occasions. (Docs. 7, 69). ISG does not contest that its L&M sheets and its Overhead Top Sheets, each of which are estimating tools and each of which were used by ISG after the entry of the Preliminary Injunction, were built from precedent MMR materials that Huffman either retained from his employment with MMR or was sent from other former MMR employees. (Doc. 130 at p. 8). On this basis alone, the Court could hold ISG in contempt.

Additional support for such a holding, however, exists in light of ISG's reliance on MMR's materials to construct its Job Analysis Program, its Bible, and possibly its IFTN reports. Regarding the Bible, ISG contends that a "Bible" is a widely used term in the telecommunication space to describe a job creation and tracking system. (Doc. 130 at pp. 10-11). As in the case of the estimating tools, the Court has already determined and informed ISG that MMR's Bible is, at the very least, confidential. (Docs. 7, 69). ISG does not contest that portions of MMR's Bible were used to create its own Bible, which was in use until February 2024. (Doc. 130 at pp. 10-11). These actions, again, violate the Court's Preliminary Injunction.

MMR's Job Analysis Program keeps company management informed about the progress of the company's projects, and allows management to allocate manpower as

7

necessary. (Doc. 126 at pp. 30-31). It is again uncontroverted that ISG copied its Job Analysis Program from MMR and used this program, albeit allegedly only once, after the entry of the Preliminary Injunction. (Doc. 130 at p. 10). ISG contests that MMR's Job Analysis Program is neither confidential nor a trade secret. (*Id.*). The Court disagrees.

The DTSA states that all forms and types of "business" or "technical" information, and all "programs," are trade secrets if the owner has taken reasonable measures to keep such information secret and the information derives independent economic value from not being generally known or available to other entities who can obtain economic value from the use of the information. 18 U.S.C. § 1839(3). ISG does not contest that MMR's Job Analysis Program is not publicly available. Indeed, were that the case then Huffman would not have needed to maintain the Job Analysis Program on an external storage device. (Doc. 126 at pp. 31-32). ISG instead appears to assert that MMR's Job Analysis Program is neither confidential nor a trade secret because, in ISG's view, MMR did not take reasonable measures to keep its information private. (Doc. 130 at p. 3).

Again, the Court has already concluded that MMR's measures to protect its information were reasonable. (Doc. 7 at p. 9). MMR required employees to sign various confidentiality agreements and acknowledge policies that protected the confidentiality of its information, limited employee access to certain confidential business information and password protected that information, and monitored transfer of confidential information through data loss prevention software. (*Id.*).

8

These measures are sufficient to qualify the protected information as trade secrets. *See* Unif. Trade Secrets Act § 1(4)(ii) cmts. (drafters of Uniform Trade Secrets Act, on which the LUTSA is based, explain that "reasonable efforts to maintain secrecy" may include advising employees of the existence of a trade secret or limiting access to a trade secret on a "need to know basis").

Further, it is apparent that MMR derives economic value from its custom-built Job Analysis Program because such a system helps the company with client satisfaction and retention through improved project management and reporting, and that economic value is dependent on MMR's Job Analysis Program not being generally available to others in the space. (Doc. 126 at pp. 30-31). Accordingly, MMR's Job Analysis Program does indeed qualify as a trade secret. ISG accessed and used a version of this Job Analysis Program to construct their own replica system after the entry of the Preliminary Injunction and in violation thereof. (Doc. 130 at p. 10). This act alone, as in the cases of ISG's use of MMR's Green Sheets, Overhead Top Sheets, and Bible, is sufficient for the Court to hold ISG in contempt.

Alternatively, even were the Court to ultimately determine that MMR's Job Analysis Program is not a trade secret, the plain language of MMR's form confidentiality agreement, which was signed by each former MMR employee now employed by ISG, (Doc. 1 at p. 6), shows that the Job Analysis Program was confidential to MMR and its current employees. MMR's "Employer Loyalty/Confidentiality/Trade Secrets/Conflict of Interest Agreement" provides, in relevant part, that

9

> "[d]uring **and after the term of his employment**, the employee agrees to hold as confidential all knowledge and information he has acquired in connection with his/her employment with MMR, and which is not otherwise generally available to the public or third parties, including but not limited to . . . **programs** . . . and reproductions (**all of which is deemed "Confidential"** and a trade secret) thereof relating the business of MMR."

(Doc. 1-4 at p. 1) (emphasis added). MMR's Job Analysis Program was demonstrably confidential by these terms. The Preliminary Injunction ordered ISG to cease from using MMR's confidential business information. (Doc. 23). ISG therefore alternatively violated the Preliminary Injunction by accessing and using MMR's confidential information to create their replica Job Analysis Program.

Because each of the above instances is sufficient for the Court to hold ISG in contempt, the Court does not reach an analysis of whether ISG's IFTN reports are violative of the Court's Preliminary Injunction. As opposed to the L&M sheets, the Overhead Top Sheets, the Bible, and the Job Analysis Program, Huffman testified that he provided the IFTN report template to ISG management prior to entry of the Preliminary Injunction. (Doc. 126 at pp. 39-41). However, Huffman also testified that he used an MMR BS report to create the IFTN report template. (*Id.* at p. 41). ISG is advised that, to the extent the company is currently using an IFTN report template that is based on or derives from the format or programming of MMR's BS reports, rather than third-party software as it contends, (Doc. 130 at p. 13), ISG is in further violation of the Preliminary Injunction.

ISG may not rely on its supposed ignorance of Huffman's activities to avoid a finding of contempt. As noted, "[g]ood faith" is not a defense. *Transocean Offshore, Inc.*, 276 F.3d at 728. Even if it were, it is not clear to the Court that ISG attempted

10

to comply with the Preliminary Injunction in good faith, or that it was entirely oblivious to Huffman's activities.

In constructing the replica systems for ISG, Huffman was apparently sent precedent documents from various members of ISG's corporate team who were employed by MMR. (Docs. 126 at pp. 20, 137 at p. 3). Huffman further testified that he worked under and with former MMR employees to create these databases, and that approval for these replica systems ultimately fell to ISG's executive officers – each of whom was previously an MMR employee and each of whom was thereby intimately familiar with MMR's materials and programs. (Doc. 126 at pp. 21, 23, 25, 36, 39). The Court also pauses to note that nearly a year passed between Huffman's first deposition, in which Huffman admitted that he used MMR's information to build a duplicate timekeeping system, and Huffman's second deposition, when he confessed to using MMR materials to build the other tools and programs discussed above. The Court has not been provided with any evidence that ISG performed any sort of internal investigation during this time period to determine whether the other programs and tools created by Huffman were based on MMR's information, despite being emphatically put on notice of the possibility thereof.[1]

ISG informed the Court at the April 2 hearing on MMR's Motion that it did not question Huffman because it did not want to run the risk of influencing his testimony. Yet even if the Court accepts ISG's reasoning as to its communication with Huffman,

---

[1] Although not a mitigating factor, such a remedial response may have suggested good faith and diligent adherence to the Preliminary Injunction.

11

ISG still fails to explain what prevented the company from independently taking a closer look at its estimating tools and management programs. This closer look may have revealed that portions of the programs and tools built by Huffman displayed an MMR physical address, provided a link to MMR's online website, listed information for projects that predated ISG's entry into the telecommunications market, and presented other characteristics that indicate the tools and programs were directly copied from MMR. (Doc. 126 at pp. 21, 33, 34).

Nonetheless, it is again a party's actions, not their subjective intent, that determines whether a party is in contempt of a court order. *Transocean Offshore, Inc.*, 276 F.3d at 728. Here, MMR has shown by clear and convincing evidence that ISG has acted, on numerous occasions, in defiance of the Court's Preliminary Injunction.

      **b.**    **Sanctions**

Having determined that ISG is in contempt of Preliminary Injunction, the Court now turns to the matter of appropriate sanctions. The kinds and types of sanctions to be assessed against ISG are, again, within the Court's "broad discretion" so long as those sanctions are remedial in nature. *Smack Apparel Co.*, 574 F. Supp. at 604 (citing *Singh*, 428 F.3d at 582; *Fla. Steel Corp.*, 648 F.2d at 239).

MMR has requested the appointment of a special master to monitor ISG's compliance with the Preliminary Injunction. The Court may appoint a special master pursuant to Federal Rule of Civil Procedure 53 when appointment of a master is necessary to "address pretrial and posttrial matters that cannot be effectively and timely addressed by an available district judge or magistrate judge of the district."

When considering whether to appoint a special master, a court "must consider the fairness of imposing the likely expenses on the parties and must protect against unreasonable expense or delay." Fed. R. Civ. P. 53(a)(3). "Generally, special masters are appointed in exceptional situations involving complex matters." *Gonzales v. Lone Star Wireline Servs.*, LLC, No. CV-SA-15-CA-00882-DAE, 2016 WL 11586102, at *3 n.1 (W.D. Tex. July 25, 2016). However, courts occasionally appoint special masters to ensure compliance with their preliminary injunctions. *E.g., Total Safety U.S., Inc. v. Rowland,* No. CIV.A. 13-6109, 2014 WL 1691551, at *2 (E.D. La. Apr. 29, 2014); *Monroe v. Meeks*, No. 3:18-CV-00156-NJR, 2021 WL 5882129, at *1 (S.D. Ill. Dec. 13, 2021).

The circumstances here warrant the appointment of a special master. The Court has neither the time nor the expertise to review the materials in use at ISG for remnants of MMR's confidential business information. This case began with allegations of multiple former MMR employees stealing *thousands* of files each, (Doc. 1), and, as evidenced by both ISG's sentiments that they were unaware of Huffman's use of MMR's materials and the MMR code embedded within certain ISG programs, the proliferation and use of MMR's confidential information at ISG may be widespread. (Doc. 130 at p. 9). The appointment of a special master, with ISG to cover related costs and expenses, neither runs the risk of being an unfair sanction or of causing unnecessary delay. Because MMR was subjected to unnecessary costs in bringing the present Motion, requiring ISG to pay for the special-master-related expenses is correspondingly a remedial sanction. *See Total Safety v. Rowland*, R. Doc.

321, No. 13-6109 at p. 14 (E.D. La. Oct. 29, 2014) (available at Doc. 119-17). Upon the appointment of the special master, the Court shall take up the issue of apportioning Plaintiff's attorney's fees and costs in bringing the present Motion. Finally, the Court believes that the introduction of a special master will promote the efficiency with which this matter can be adjudicated, since appointment of a special master will presumably forestall any motions of this nature in the future.

Regarding the other sanctions ordered below, the Court concludes that such actions are necessary to coerce ISG into compliance with the Preliminary Injunction.

## IV. CONCLUSION

Accordingly,

**IT IS ORDERED** that MMR's **Motion for Contempt of Preliminary Injunction (Doc. 119)** be and is hereby **GRANTED.**

**IT IS FURTHER ORDERED** that ISG immediately cease using all replicas of MMR's protected information, including the L&M sheets, Overhead Top Sheets, Job Analysis Program, and all other databases and reporting tools created by Ben Huffman, and all other documents and files that are in any way based on MMR's information.

**IT IS FURTHER ORDERED** that MMR and ISG will submit one (1) memorandum each recommending at most two (2) persons to serve as the court-appointed special master by April 17, 2024. Each recommendation shall be accompanied by a curriculum vitae and a description of any relevant experience. The special master will be tasked with ensuring ISG's compliance with the Preliminary

Injunction and the sanctions discussed below. ISG will be responsible for expenses related to the appointment of the special master.

**IT IS FURTHER ORDERED** that MMR and ISG meet and confer regarding the list of ISG employees from whom MMR will receive signed acknowledgements attesting that the designated employee has received a copy of the Preliminary Injunction and that said employee cannot use any confidential MMR information or any program or tool derivative therefrom.

**IT IS FURTHER ORDERED** that MMR and ISG meet and confer regarding the scope and parameters of the Remediation Protocol that the court-appointed special master will administer in order to cleanse ISG's systems of MMR's confidential information.

**IT IS FURTHER ORDERED** that, prior to the submission of any bid on future work, ISG shall meet and confer with counsel for MMR to ensure that no confidential MMR information was used in the creation of said bid. Information shared during this process with counsel for MMR shall be deemed for attorney's eyes only, and counsel for MMR shall not share any details regarding any such bid with MMR outside of confirming that the company's confidential information was not used.

Baton Rouge, Louisiana, this 11th day of April, 2024

_____
**JUDGE BRIAN A. JACKSON**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**