UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| **MMR CONSTRUCTORS, INC.,** | **CIVIL ACTION NO.: 22-CV-267** |
| **Plaintiff,** | **JUDGE BRIAN A. JACKSON** |
| **VERSUS** | **MAGISTRATE JUDGE RICHARD L. BOURGEOIS, JR.** |
| **JB GROUP OF LA, LLC D/B/A INFRASTRUCTURE SOLUTIONS GROUP, et al.,** | |
| **Defendants.** | |

*************************************************************************

## DECLARATION OF MICHAEL STOLPER
## IN OPPOSITION TO MOTION FOR PROTECTIVE ORDER

Michael Stolper, pursuant to 28 U.S.C. §1746, states under penalty of perjury that the following is true and correct:

1. I am a senior partner at Seiden Law LLP and have been recently retained to serve as lead trial counsel for Defendants JB Group of LA, Jason Yates and Travis Dardenne (collectively, "**ISG**") in this action and I submit this declaration in opposition to Plaintiff's motion for a protective order (the "**Motion**" or "**Mot.**"; ECF 151) based on my personal knowledge.

### The Limited Discovery Conducted to Date

2. The opening line of MMR's Motion states that "After 738 days of discovery, Defendants have changed course." Mot. at 1. This is wholly misleading. Very little discovery has taken place to date and what has occurred has been completely one-sided in MMR's favor. The following are the salient facts.

3.  Only five depositions have occurred to date, all taken by MMR. And four of those depositions were limited in scope relating to the injunction. ISG has yet to take a single deposition because document production by MMR has substantially not yet occurred.

4.  With respect to documents, ISG has produced more than one million pages of documents costing ISG hundreds of thousands of dollars in forensic computer consulting fees. In sharp contrast, MMR has produced just 1,679 pages in response to four out of 88 separate requests that ISG served. All but 7 pages of MMR's production consisted of personnel files of seven former MMR employees now at ISG. That is worth repeating: ISG has produced more than one million pages in contrast to MMR's barely 1,700 pages of documents.

5.  One of the obvious issues my firm has identified since our recent retention is the disparity in discovery. To rectify the imbalance, we are doing two things. *First*, we have served additional discovery demands, including but not limited to the ones with which MMR takes issue by its Motion. (The deadlines for these additional productions occur after the filing of the opposition to MMR's Motion.) *Second*, we intend to work with MMR's counsel to address the deficiencies with MMR's production to date (responding to only 4 out of 88 requests needs redress). Indeed, during a meet and confer call on May 24, 2024, the parties expressed the collective intent to resolve document discovery issues prior to the commencement of party depositions currently scheduled for September 2024.

6.  To the extent MMR's characterization of ISG "changing course" meant ISG was finally pushing to obtain its own discovery rather than solely providing discovery, ISG adopts the characterization. However, ISG refutes any suggestion that in a trade secret case MMR is the only party who can pursue discovery, especially with the discovery deadline months away.

**Plaintiff Opened the Door to the Discovery it Now Contests**

7. It is undisputed that from the time of ISG's formation to the filing of this lawsuit, a large number of employees voluntarily left MMR and a small percentage ended up working at ISG. Despite the mass exodus from MMR (something omitted by MMR in its litigation filings), MMR has taken issue in this litigation with the departure of its former employees to ISG in two ways.

8. The first is to allege that ISG recruited ("poached") MMR employees to "replicate MMR" by conspiring with MMR employees during the recruitment process to "steal" MMR materials for ISG's benefit. Complaint ¶¶ 2, 63.[1] "MMR began to uncover evidence that ISG was recruiting MMR employees who were willing to bring MMR's trade secrets and confidential business information with them to ISG. *Id.* ¶ 36. MMR's Complaint referenced Kasey Kraft as an example of this:

> ***ISG poached Kasey Kraft*** in March 2022, and on his last day of employment, Kraft was caught attempting to transfer a significant amount of MMR's trade secrets and confidential business information to an external storage device. MMR initially believed he had been thwarted in his attempts at stealing that information, but MMR now has reason to believe that ***Kraft retained MMR's trade secrets and confidential business information, allowing ISG to receive a highly valuable, yet unfair, competitive advantage***.

Complaint ¶ 3 (emphasis added).

9. The Complaint went beyond Kasey Kraft. "Despite Kraft being caught in the act, this ***did not prevent ISG from continuing to target MMR's employees and trade secrets***. The hiring of David Heroman was the latest iteration." MMR Complaint ¶ 4 (emphasis added). MMR alleged that "in the month before his resignation on April 8, 2022, Heroman downloaded over

---

[1] All citations to "Complaint" are to the Plaintiff's Second Amended Complaint (the "**Complaint**"; ECF 53).

*1,500 files* from MMR's systems to several electronic storage devices and personal Google Drive account." Complaint ¶ 42. To tie this effort to ISG, MMR alleged that "Heroman plugged in six external storage devices on his last day with MMR, yet chose to return only four of the six that he plugged in that day." Complaint ¶ 58. "Since his resignation from MMR on April 8, 2022, ISG has employed Heroman who continues to have the trade secrets and confidential business information stolen from MMR on personal electronic storage devices and in his Google Drive account." Complaint ¶ 64.

10. The purpose of this effort, according to MMR, was for Messrs. Kraft and Heroman to transfer "such information to ISG with the specific and malicious intent to exploit and misappropriate MMR's customer base, business strategies, and pricing to unlawfully compete against MMR for the benefit of ISG, its direct competitor." Complaint ¶¶ 110, 116.

11. Messrs. Kraft and Heroman have already debunked MMR's theory in their deposition testimony. For purposes of this Motion, MMR is the one that put at issue why and how these employees left MMR to join ISG. During Kasey Kraft's deposition, MMR asked if prior to joining ISG he discussed bringing MMR files to ISG. Kasey Kraft deposition at 54-56, attached hereto as **Exhibit 1**. And then MMR asked whether Mr. Kraft copied MMR files to external drives during his last week of employment with MMR. *Id.* at 41. The obvious connection MMR is trying to make is that these now former MMR employees were copying files at the behest of ISG for ISG's benefit.

12. MMR asked Ben Huffman the same questions, like "who recruited you to leave MMR and join ISG?" Mr. Huffman responded, "I wasn't necessarily recruited… I started contemplating leaving MMR probably six or eight months before that." Huffman Deposition (3/27/2023) at 53-54, attached hereto as **Exhibit 2**. This exchange alone opens the door on why

4

people left MMR. But then MMR pressed Mr. Huffman about whether they discussed during the interview process ISG's alleged scheme to obtain MMR materials to which Mr. Huffman responded "not at that time." *Id.* at 74.

13. MMR pursued its theory of ISG's alleged illicit recruiting scheme through written discovery as well.[2] For example, MMR sought documents and communications related to the "decision to hire" certain individuals, including Messrs. Heroman and Kraft. Expedited Request No. 1, attached hereto as **Exhibit 3**. Likewise, MMR requested "documents and communications" between Heroman and Kraft "before their last day of employment with MMR." *Id.* (Expedited Request No. 4). MMR served interrogatories asking for ISG to identify MMR employees that ISG recruited and "describe the nature of your communications (including whether you recruited them to join ISG) and the approximate date of such communications." Expedited Interrogatory No. 5, attached hereto as **Exhibit 4**.

14. The obvious point of these questions is to link the reason employees left MMR (were they recruited, as alleged, or did they leave for different reasons) to the taking of MMR files (did ISG ask or suggest files be taken, or were they taken for legitimate reasons). There is no other reason to be asking about the recruitment process or why and how people left MMR. MMR opened the door. It cannot now ask that the door be closed because the truth (and a valid defense for ISG) may "embarrass" or "annoy" MMR, as stated in MMR's Motion. Mot. at 13. ISG acknowledges that it is never comfortable for an employer to find out why employees departed, especially where

---

[2] MMR's First Set of Request for Production also demands "the Communications and Documents relating to the recruitment and/or hiring of the following individuals: Jason Yates, Travis Dardenne, Ben Huffman, Kraft, Heroman, Christopher Comeaux, and any other former MMR employee who is currently employed by ISG." First Set of Request for Production attached here to as **Exhibit 5**.

they left to join other industry participants, but that is not a proper reason to preclude discovery, especially where the employer put the question at issue in litigation.

15. The second way MMR takes issue with the departure of its former employees is to allege lost profits from ISG "poaching" MMR' employees and customers. *See* Complaint ¶ 111 ("ISG not only allowed itself to profit from the Individual Defendants' unlawful misappropriation and deceptive trade practices, but it also aided, abetted, and encouraged the unlawful competition with the specific intent of harming MMR and depriving MMR of its customers and competitive advantage"). This damages theory puts at issue why MMR employees and clients left MMR. This is evidenced by MMR's deposition of Mike Lowe in which MMR asked why he left MMR and joined ISG. His response: "Because of the way that [MMR] treated the client, we were going to lose that client, several of them. And that's why I left MMR." Lowe Depo at 59, attached hereto as **Exhibit 6**. ISG did not recruit or solicit Lowe or ask him to take MMR materials with him to make his employment with ISG more valuable. Rather, Lowe testified that he left because MMR's business practices hurt his reputation with customers and his ability to retain customers. *Id.* at 59-60. ISG intends to prove that MMR lost no business because of ISG's possession of certain alleged MMR templates and Excel files. Aside from proving that none of the files at issue are proprietary or MMR trade secrets, ISG will demonstrate that any MMR loss of clients was due to other factors unrelated to ISG. The discovery ISG now seeks, and which MMR complains of is in fact directly probative to this point. Mike Lowe's testimony is just one piece of evidence that ISG intends to obtain in discovery and use at trial.

16. MMR's narrative about the departure of its employees to ISG, which forms the gravamen of its case is captured in more than its Complaint. The opening line of a press account of MMR's lawsuit states that MMR is alleging "an orchestrated effort by ISG to steal MMR's

trade secrets and confidential business information." The article is attached hereto as **Exhibit 7**. The means through which this stealing occurred was by "poach[ing]" key MMR personnel. *Id.* Not surprisingly, ISG had to respond in the article by explaining "it didn't poach anyone. When a former MMR employee started the firm, others reached out looking for work [ISG] says." *Id.*

17. In short, the crux of ISG's defense to an allegation that ISG recruited an employee to bring trade secrets from MMR is to prove that (a) ISG did not recruit the employee, the employee left on his or her own volition for reasons other than competitive theft and (b) what the employee took was not a trade secret of MMR and taking those kinds of files from one competitor to another is common industry practice. MMR, through its Motion, is trying to deprive ISG from securing independent evidence that helps its defense and disproves MMR's case.

18. Based on all the above, there can be no credible debate that MMR made a significant issue in this case why and how its employees left to join ISG. MMR has kicked open the door to the question of why its personnel left (*e.g.*, were they solicited by ISG, as alleged, or did they leave because of internal issues at MMR) and how they left (did they conspire with ISG to take MMR files for ISG's benefit). These questions are inextricably linked, at the heart of the case and a valid basis for discovery.

### The Purpose of the Contested Discovery

19. In response to the allegation that ISG conspired to steal MMR materials through a scheme to poach key MMR employees, ISG is entitled to challenge MMR's narrative through discovery. As stated above, ISG intends to prove that: (a) employees voluntarily left MMR in droves for a myriad of reasons; (b) people joined ISG for a host of reasons as well but not because they were more valuable to ISG by bringing over MMR materials; and (c) most importantly, whatever materials people brought to ISG were not trade secrets.

7

20.     In order to do so, ISG needs documents and depositions from MMR and non-parties. Part of the non-party testimony ISG intends to obtain will come from asking why former MMR employees left MMR. Among other things, this evidence will corroborate the reasons given by former MMR employees now with ISG and rebut MMR's allegations in its Complaint.

21.     MMR's Motion argues that there is no claim relating to the hiring of MMR employees so any effort to obtain discovery about why and how employees left MMR is irrelevant. Mot. at 11. This is belied by the cites in the preceding section. MMR's trade secret claim accuses ISG of scheming to obtain trade secrets by hiring MMR employees. This not only relates to MMR's trade secret claim but also ISG's defense to this aspect of MMR's trade secret claim. MMR points to the absence in ISG's Answer to this defense but this is merely MMR conveniently conflating an affirmative defense, which must be pled, with an ordinary defense, which does not need to be pled. This legal issue is addressed more appropriately and fully in ISG's accompanying Memorandum of Law.

### What ISG Asked For

22.     To that end, one of the first things my firm put in motion was an investigation into why people left MMR. We needed to find out if MMR employees were solicited by ISG and, if so, did the recruitment include a request or suggestion that ISG employment would be more valuable if these employees came to ISG with MMR materials. The investigation involved, among other things, speaking with former MMR employees, only some of whom made their way to ISG. Through this effort we uncovered evidence of at least four reasons why so many employees had left MMR during the relevant period in question.

23.     The first is that MMR itself had poached a number of employees from its primary competitor, ISC Constructors ("ISC"), and in so doing changed the culture and dynamics within

8

MMR for the worse. Former MMR employee Ben Huffman testified that one of the reasons he chose to leave MMR was because he "didn't particularly care for what the future looked like at MMR" because "most of the managers are primed for retirement or fixing to leave." Exhibit 2 at 66-67. Managers were leaving in part because of the influx of ISC personnel.

24. The investigation also revealed that employees were fleeing MMR because of the way in which MMR handles workplace injuries. In the construction business, injuries on a job site are not infrequent. The issue, as we learned, is that MMR handles these injuries off the books, in violation of OSHA regulations. Injured workers are not provided with insurance coverage but instead doctor and hospital bills are paid by MMR with corporate credit cards. If the injured worker was a foreigner, it is more likely the injury was not reported. For MMR, underreporting of injuries allows MMR to falsely bolster its safety incident record, which in turn helps MMR obtain jobs in competitive bidding situations and reduce administrative expenses. We learned of at least one employee who left MMR because he was uncomfortable with the way in which MMR handled workplace injuries. Discovery will determine the extent of this cause for workers to have left MMR for cause, not ISG's "poaching." This is why ISG asked for medical bills, credit card receipts, reports and complaints concerning workplace injuries.

25. The third reason we identified as to why MMR lost staff is because of the way in which MMR paid bonuses to its key employees who were also shareholders. Like many corporations, MMR pays employee bonuses at the end of the calendar year but unlike many corporations, MMR's CEO, Pepper Rutland, notifies each employee of a bonus via a hand-written card and instructs each employee not to spend the bonus money before the end of the calendar year to ensure that MMR's books do not reflect the bonuses in the current calendar year. We learned that the cards are kept under lock and key by MMR's Chief Financial Officer and not shared with

others at MMR except for Mr. Rutland. By handwriting and secreting the bonus money, traditional accounting documents are not utilized, making it easier to conceal MMR's true tax liability. Similarly, not allowing employees to utilize bonus money in the same calendar year it was awarded suggests the bonus money is being accounted for elsewhere.

26. The concern of at least one such former MMR employee is that under this "bonus" scheme, Mr. Rutland maintained complete control over when and how much of the bonus would be paid, sometimes withholding bonus money for whimsical reasons. Because the non-reporting of bonuses was not captured on the books of the company, an individual employee lacked (or perceived to lack) the ability to compel payment of the bonus after it was earned and disclosed to the employee. This scheme creates the proverbial golden handcuff scenario. This is why ISG asked for the note cards on which bonuses were reflected.

27. The fourth reason personnel departed MMR was because of its business practices with certain customers, including Louisiana State University ("LSU"). In the case of LSU, MMR was contracted to install and service lighting and security cameras on the LSU campus. Because MMR's scope of work impacted campus safety, the contract and MMR's performance were monitored by the LSU Police Department. Former MMR employees reported that MMR failed to maintain the campus security cameras, which created a campus safety hazard. Moreover, these employees maintain that MMR would frequently falsify its bills to LSU and other customers. For example, a task that would actually take just a few hours of work would be inflated and billed to LSU for eight hours. MMR was able to maintain this scheme for several years by recruiting and hiring retired LSU Police Department personnel, who in turn oversaw MMR's "performance." ISG is aware of at least one employee who left MMR because of the way in which MMR conducted

business with customers like LSU. Consequently, ISG requested documents concerning, among other things, complaints about equipment and billing for LSU.

### ISG's Discovery Demands Were Requested in Good Faith

28. Aside from the obvious relevance of the contested discovery requests, these requests were drafted and served in good faith. This is easily demonstrable by three separate facts.

29. *First*, before any discovery was served, we called for an in-person meeting with MMR counsel in Baton Rouge to discuss and serve the now contested document demands for MMR and a subpoena for LSU, and to explain the relevance and context of this discovery to avoid any knee-jerk objections MMR may have had. Ninety percent of the meeting was spent on our sharing the findings of our investigation described above. The investigator who conducted the investigation, a respected veteran retired FBI agent, was present at the meeting and explained some of his findings, I personally explained why we firmly believed the requests were very relevant to the case and how MMR had opened the door to these requests. MMR's outside counsel and in-house counsel to MMR who were present at the meeting did not assert any specific objections other than to generally state that they did not believe the discovery was relevant.

30. While those in attendance at the May 2nd meeting may have disagreed on the relevancy of ISG's discovery requests, everyone agreed on one thing: there was no potential for settlement based on all that had transpired to date. Indeed, MMR's counsel stated that the parties "were crossing the Rubicon," a point of no return in relation to settlement. Thus, I was surprised and disappointed that MMR suggested in its Motion that ISG's requested discovery was nothing more than a tool to "force" MMR to settle. Mot. at 12. The opposite was agreed to at the meeting. And I specifically articulated ISG's belief that Mr. Rutland had no intention of ever settling with ISG because it was his intent through this lawsuit to inflict as much harm on ISG and its principals

11

for having the audacity to leave the "MMR family" and start their own competitive business. Those present for MMR did not refute ISG's understanding.[3]

31. *Second*, we revised the LSU subpoena after receiving an email from MMR's counsel pointing out that the subpoena, as drafted, may run afoul of the Court's prior ruling with respect to a subpoena served on ISG's shareholders. The Court order directed the parties to first obtain discovery from the parties before asking non-parties for the same discovery. Consequently, we revised the LSU subpoena to ask for only those items exclusively in LSU's possession (and not likely in MMR's possession).

32. When MMR's counsel continued to object to serving any non-party subpoenas, I offered to meet and confer over the objection. MMR's counsel preferred to raise the issue with the court without discussion with ISG counsel. The obvious inference is that MMR was not interested in resolving anything and preferred instead to try and quash the LSU subpoena outright through any means necessary.

33. *Third*, ISG did not serve the LSU subpoena after objections were raised and to date, the LSU subpoena has not been served.[4] If ISG's intent was purely to harass and embarrass MMR with its customers like LSU, ISG would have proceeded with serving the LSU subpoena because any objections or hearing on the merits of the subpoena would have been beside the point. The fact that ISG refrained from serving the subpoena and is awaiting its day in court to proceed with the

---

[3] MMR's Motion suggests that the May 2nd meeting was influenced by the contempt proceeding and a prior settlement discussion. Mot. at 5. This could not be further from the truth. I personally was not involved in the contempt process and that process was not even a consideration for meeting with MMR counsel. I broached the subject as new counsel to inquire whether there was a path to resolve what ISG believes to be an ill-founded trade secret lawsuit. It had nothing to do with contempt. The intent for the May 2nd meeting was purely to avoid wasting resources on baseless objections to legitimate discovery; obviously we did not satisfy the objective.

[4] Prior to the filing of MMR's Motion, I notified MMR's counsel by email that the LSU subpoena had not been served and will not be served until resolution of MMR's objection. Nevertheless, MMR's Motion includes a heading (on page 8) that reads "ISG's counsel indicates that the LSU subpoena is being served."

contested discovery speaks volumes about its intent and should debunk any suggestion that the LSU subpoena was drafted in bad faith.

34. I declare under penalty of perjury that these statements are true and correct. Executed in New York, New York on June 10, 2024.

_____
Michael Stolper