UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| MMR CONSTRUCTORS, INC., | CIV. NO. 22-267 |
| Plaintiff, | |
| VERSUS | JUDGE BRIAN A. JACKSON |
| JB GROUP OF LA, LLC D/B/A INFRASTRUCTURE SOLUTIONS GROUP, ET Al., | MAGISTRATE JUDGE RICHARD L. BOURGEOIS, JR. |
| Defendants. | |

**OPPOSITION TO MOTION TO DISSOLVE PRELIMINARY INJUNCTION**

Plaintiff, MMR Constructors, Inc. ("MMR"), files this memorandum in opposition to Defendants JB Group of LA, LLC, Jason Yates, and Travis Dardenne's (collectively, "ISG") *Motion to Dissolve Preliminary Injunction* (R. Doc. 161).

**SUMMARY OF ARGUMENT**

If nothing else, ISG's litigation strategy and business practices are audacious. ISG has been sanctioned for unilaterally shutting down a deposition when its Director of Project Controls (Ben Huffman) was ready to disclose its violations of this Court's injunction.[1] It has tried to prevent forensic examinations from moving forward.[2] It has tried to conduct improper, irrelevant discovery for the sole purpose of harassing MMR.[3] It has been held in contempt after egregiously and consistently violating the Court's injunction for over two years.[4] And now that the Court has ordered remedial measures overseen by a Special Master, ISG asks the Court to dissolve the

---

[1] *See* (R. Doc. 87) (sanctioning ISG).

[2] *See* (R. Doc. 46) (seeking to stay forensic examinations).

[3] *See* (R. Doc. 160) (granting protective order and quashing subpoena to prevent harassing discovery).

[4] *See* (R. Doc. 145) (finding ISG in contempt).

Injunction Order, after the Court found good cause for issuance of injunctive relief and reaffirmed that finding when holding ISG in contempt.

One would expect some new, smoking-gun evidence to support ISG's brazen request to alter the *status quo* so drastically. But that is far from the case. ISG merely presents contorted, cherry-picked testimony from third parties who <u>lack any personal</u> knowledge about the case and who were not even shown MMR's trade secrets during their depositions.[5] A look at the full deposition transcripts shows that one deponent was never an employee of MMR — and had <u>never</u> seen any of MMR's protected information — and the others were low-level, sometimes disgruntled former MMR employees who actually <u>confirmed</u> the confidential, proprietary nature of the stolen documents.

But guesses and uniformed opinions from third parties are unnecessary: ISG could have simply asked its own subject matter experts, each of whom had access to MMR's trade secrets. ISG's Director of Estimating — Kasey Kraft — provided a sworn statement that confirmed the confidential, proprietary, and valuable nature of the misappropriated documents (including MMR's estimating tools that ISG stole and then used in violation of the injunction). ISG's Director of Project Controls — Ben Huffman — also testified that the information at issue belonged to MMR, was confidential, and was then used by ISG to obtain business.

ISG's motion falls woefully short of meeting the standard required to dissolve the Court's Injunction Order, a standard that requires ISG to produce "significant, new evidence" to demonstrate that MMR is no longer entitled to injunctive relief. Here, the third-party testimony actually bolsters the need for keeping the injunction in place, and the testimony of ISG's subject

---

[5] These four third-party witnesses are Billy Hoover ("<u>Hoover</u>"), Rob Mason ("<u>Mason</u>"), Russell Gaudin ("<u>Gaudin</u>"), and Tracey Hollier ("<u>Hollier</u>").

#102519284v16

matter experts conclusively proves that the Injunction Order, combined with the contempt sanctions this Court has already found were warranted, are absolutely necessary. Because ISG has not provided this Court with any new, *significant* evidence that would change the Court's *consistent* findings that MMR is likely to succeed on the merits and (at a minimum) faces the threat of irreparable harm, the Court should deny ISG's motion. The Injunction Order merely requires ISG to refrain from using MMR's protected information — that's it. ISG's blatant and utter inability to comply with the Injunction Order for two years, and now renewed efforts to be free from that simple restriction, speak to the importance and value of the information stolen from MMR. The Injunction Order must remain in place and be reinforced by the contempt sanctions, especially the Special Master's oversight.

## **RELEVANT BACKGROUND**

By late April, 2022, MMR had uncovered evidence of ISG's scheme to build a business on the improper use of MMR's trade secrets and confidential business information. MMR initiated this lawsuit by requesting injunctive relief, including a Temporary Restraining Order and a Preliminary Injunction. In support of this request, MMR provided sworn verifications — from executives and its forensic examiners — and further supported its allegations with documentary evidence.

This Court entered a Temporary Restraining Order based on the documentary evidence and sworn statements. (R. Doc. 7). Specifically, the Court found that MMR had satisfied its burden for proving the four elements required for injunctive relief, including that MMR was likely to prevail on its trade secret claims because the "copied files and folders identified through MMR's third party forensic investigation contain highly sensitive business information that is not generally known and gives MMR a competitive edge" and because "MMR took reasonable efforts to

3

maintain the secrecy of this information by requiring employees to sign agreements and acknowledging policies protecting the confidentiality of the information; by limiting employee access to certain confidential business information and password protecting that information; and by monitoring transfer of confidential information through data loss prevention software." (*Id.*).

Before the hearing on the requested preliminary injunction, ISG *voluntarily* agreed to a preliminary injunction in the face of definitive evidence that ISG was caught in possession of, and using, MMR's trade secrets and confidential business information.[6] ISG's agreement to the Court's Injunction Order was not surprising, given that ISG's executive team was aware of the confidential and proprietary nature of the information it had misappropriated from MMR. *See* (R. Doc. 120-1) (detailing evidence of ISG's misappropriation).

However, neither the temporary restraining order nor the preliminary injunction stopped ISG's misconduct. For over two years, ISG continued its unlawful and anti-competitive use of MMR's protected information even *after* agreeing to the Injunction Order. ISG admitted in open court that its Director of Project Controls was doing so:

| The Court: | Well, counsel, it seems to me that it is undisputed at least that Mr. Huffman relied on information that was prohibited from use after the entry of the preliminary injunction. Do we both Agree? Or do you Both Agree? |
| MMR Counsel: | Yes, Your Honor. |
| ISG Counsel: | Yes, Your Honor.[7] |

Discovery proved, moreover, that ISG did nothing meaningful to ensure its employees complied

---

[6] ISG complains in its Preliminary Statement that the parties' consent injunction "was not based on any factual record before the Court." (R. Doc. 161-1). But this statement is incorrect. The allegations in MMR's complaint are *verified*, and MMR provided supporting declarations from a forensic expert, Michael Saunders; from MMR's Chief Information Officer, Marcel Lalonde; and from an MMR Senior Vice President, John Clouatre. *See* (R. Doc. 1, 27-30).

[7] *See* Exhibit 1, Transcript of Contempt Hearing held on April 2, 2024, at 7-9, 28.

4

with the agreed Injunction Order, so the Court had no choice but to hold ISG in contempt and order remedial, corrective measures to ensure compliance going forward.[8] Such measures included the appointment of a Special Master, a required remediation protocol, required acknowledgements of future compliance, and required meet-and-confers for any estimating bids. (R. Doc. 145).

But now that ISG understands it could not simply agree to an injunction in theory while intentionally violating it in practice, ISG wants out. Compliance, ISG has decided, is too onerous. ISG tells the Court it should, in effect, reverse itself (twice) and dissolve the agreed Injunction Order, thereby granting ISG a free license to use the stolen information.

ISG, however, offers no new significant change either in factual conditions or in the law to warrant such a windfall. Instead, it argues that the Court should reverse its findings that MMR is likely to succeed on the merits of its claims because, somehow, _none_ of the stolen information is entitled to legal protection. This is in the face of the Court _twice_ finding that MMR's information was protected, including in its most recent contempt finding:

> ISG instead appears to assert that MMR's Job Analysis Program is neither confidential nor a trade secret because, in ISG's view, MMR did not take reasonable measures to keep its information private. (Doc. 130 at p. 3). Again, the Court has already concluded that MMR's measures to protect its information were reasonable. (Doc. 7 at p. 9). MMR required employees to sign various confidentiality agreements and acknowledge policies that protected the confidentiality of its information, limited employee access to certain confidential business information and password protected that information, and monitored transfer of confidential information through data loss prevention software. (_Id._). These measures are sufficient to qualify the protected information as trade secrets. Accordingly, MMR's Job Analysis Program does indeed qualify as a trade secret. ISG accessed and used a version of this Job Analysis Program to construct their own replica system after the entry of the Preliminary Injunction and in violation thereof. (Doc. 130 at p. 10). This act alone, as in the cases of ISG's use of MMR's Green Sheets, Overhead Top Sheets, and Bible, is sufficient for the Court to hold ISG in contempt.

---

[8] Following the Contempt Order — but not until almost two years after the injunction was entered — ISG _finally_ purchased third-party services to perform the functions of its stolen MMR files. The fact that ISG wants to go back to using MMR's information speaks volumes about the value of what ISG misappropriated.

(R. Doc. 119, *Contempt Order*, at 7-12).

To advance this hollow argument nearly two and a half years after MMR first moved for a Temporary Restraining Order, ISG provides the Court with selective testimony from third parties, but omits the testimony that causes these arguments to collapse like a house of cards.[9] Further, the sworn statement of ISG's Director of Estimating (Kraft), as well as testimony from others from ISG (*e.g.*, Huffman), demonstrate not only that the Motion should be denied, but also that the findings for injunctive relief and contempt were entirely correct. Kraft confirmed that, before the agreed Injunction Order was entered, ISG was using MMR's estimating tools (green sheets and overhead and top sheets) to obtain business, a fact that was included and supported in MMR's contempt motion. And, critically, Kraft conceded that those estimating tools are MMR's proprietary, confidential information:



————————————
[9] ISG frames these third-party deponents as "four unbiased witnesses with decades or relevant industry experience among them[.]" (R. Doc. 161-1 at 2). Many of them, however, have friendships and/or working relationships with ISG's executives. Gaudin, for instance, testified that he has known Mr. Yates for "years," and ISG recently hired him to build ISG certain spreadsheets. (R. Doc. 161-5 at 158, 181-182). Hollier testified that her company, Merit, was trying to do business with ISG for an out-of-state job. (R. Doc. 161-6 at 37-38).

#102519284v16



(Exhibit 2, Filed Under Seal, Statement of Kasey Kraft, at 34-38).

Kraft also confirmed that ISG had no intention of complying with the injunction. After the

Court entered the agreed Injunction Order, ISG directed Huffman to manually copy and paste

MMR's business information, creating "new" derivatives of what ISG had stolen:





#102519284v16

(*Id.* at 41-44).

Following the issuance of the Injunction Order, ISG used its MMR-derivative estimating tools to bid around *1,000 new projects*. (*Id.* at 80-81). As Kraft admitted, the estimating tools ISG stole are valuable:



(*Id.* at 107-108). Kraft also had no difficulty concluding that the information ISG stole — and continued to use after the entry of the agreed Injunction Order — included confidential information and trade secrets:





(*Id.* at 140). Nothing in Kraft's statement is surprising, as ISG's Director of Project Controls (Ben Huffman) testified similarly. As set forth in MMR's *Motion for Contempt* (R. Doc. 119-1), Huffman testified that the following documents stolen by ISG were MMR's confidential business information: MMR's Green Sheets, MMR's Overhead and Top Sheets, MMR's Job Analysis Program, and MMR's project control databases.

Ultimately, the Court relied on the verified evidence to issue a temporary restraining order and consent preliminary injunction, and it relied on the testimony and documentary evidence to find ISG in contempt. The third-party testimony that ISG offers does not present a *significant change*; instead, the testimony merely bolsters the need for injunctive relief. A full analysis of this testimony makes that clear.

Take, for instance, the testimony of Billy Hoover.[10] MMR formerly employed Hoover in its estimating department before he left to join Merit Electrical, which is a *competitor* that is trying to do business with ISG. Hoover gave testimony in response to MMR's questioning that torpedoes ISG's arguments, such as:

Q:   Do you know whether or not Merit expected you to keep their confidential proprietary information confidential?

A:   I mean, it's kind of a given, I would think, in the industry. It was never said, hey, you know, don't go tell everybody our secrets. You know, there's certain information, I guess, you don't share.

Q:   So, if you – for instance, if you are estimating for Merit, you send the bid out to – to a customer, that's information that Merit would expect you to

---

[10] ISG provided a copy of the transcript as an to exhibit to their motion. (R. Doc. 161-3).

#102519284v16

keep confidential, right?

A:      Yes.

Q:      It's not something that you would share with the competitor?

A:      No.

Q:      And even with respect to Merit, you use Accubid, right?

A:      Yes.

Q:      And that's something that's more, like, a store bought type of estimating tool?

A:      Yes.

Q:      That's populated, I think you said, with NECA rates?

A:      It's populated with rates. I would assume they come from NECA because that's usually the industry standard, but I don't know that for one hundred percent, yes.

Q:      All right. And you said you have to have a license to utilize the Accubid program, right?

A:      Correct.

Q:      All right. So, at least with respect to the finished product when you did an estimate, you created what you would consider a bid that would go to the customer. That would be considered confidential for Merit Electric, would you agree with that?

A:      Yes.

Q:      All right. You are not handing out your potential bid to competitors, right?

A:      Correct.

Q:      All right. And the information that went into creating that bid, same things, like, material pricing that you would get form vendors for Merit, if you got special pricing from the vendors, would you consider that to be confidential?

A:      Yes.

Q:      Any of the cost structures in preparing the ultimate bid, those would be confidential to Merit.

A:      Specifically that project, yes.

Q:      All right. And if you have specific labor rates for, say, certain types of welders or certain types of positions that you are going to put on the job, that you would not want to share with a competitor, would that be accurate?

Mr. Stolper: I am going to object to form. It's unclear on timing.

Q:      You can answer.

#102519284v16

A:    Correct. Yes.

(R. Doc. 161-3 at 46-48). Unlike the individual defendants in this case, Hoover did not take any

MMR information with him when he left to join Merit, and he agreed that it was expected that he

would not do so. (*Id.* at 49). Hoover testified that the same was true for his employment with

MMR:

Q:    And just like with Merit, MMR expected that any information that belonged
      to MMR would be maintained and left at MMR when you left the company,
      right?

A:    Yes.

Q:    All right. So, you didn't download any estimating tools, did you?

A:    No. Not to my knowledge.

Q:    You didn't e-mail them to yourself?

A:    No.

Q:     You didn't copy any estimating tools that belonged to MMR?

A:    Not to my knowledge, no.

Q:    You didn't copy the green sheets, right?

A:     No.

Q:    You didn't copy the master green sheet, correct?

A:    Correct.

Q:    You didn't copy the overhead top sheet document?

A:    No.

Q:    All of those Excel spreadsheets that you described earlier, you didn't take
      any of that with you when you left MMR, right?

A:    No. Not to my knowledge, no.

Q:    And those are they type of tools that MMR would not want at the hands of a
      competitor, would you agree with that?

A:    Yes.

Q:    I mean, you testified earlier that MMR built its own database, right?

A:    Yes.

(*Id.* at 50-51). Later, Hoover testified in no uncertain terms that MMR would not want its estimating

tools, which are at issue in this case, in the hands of a competitor like ISG:

13

Q:      You would agree, Mr. Hoover, that MMR would not want its database –
        green sheet database copied and pasted into a different – in creating a
        different database for a competitor. Would you agree with that?

A:      Yes.

(*Id.* at 56). Hoover further agreed that pricing information is confidential:

Q:      You didn't have to ask every single time you were doing a project for the
        price, correct?

A:      Correct.

Q:      Would you agree that the pricing that they would get on certain materials[,]
        that that price would be considered confidential to MMR?

A:      Yes.

Q:      And that's something that would be utilized to come up with your cost
        structure that would then would be important to the bid that you ultimately
        sent in to the customer, right?

A:      Yes.

. . .

Q:      My question is –

A:      – a little different, yeah.

Q:      – when MMR was negotiating prices for certain materials with vendors,
        whatever that price ultimately was, that would be considered confidential
        by MMR. Would you agree with that?

A:      Yes. Yes.

Q:      That's all I'm trying to get to.

A:      Okay. I just want to make sure I understood.

Q:      Similar. The cost - - the labor rates that MMR had, their insurance cost that
        they had, the transportation cost that they had, all of the things that go into
        that overhead sheet, those are - - those are particular to MMR, would you
        agree with that?

Mr. Stolper: Object to form.

A:      Yes.

Q:      And that MMR would not want to share that type of information with a
        competitor that was bidding on a project against it, would you agree with
        that?

A:      Yes.

(*Id.* at 64-66). Hoover again testified about MMR's estimating tools and that they do not belong

in the hands of a competitor:

> Q:    And, Mr. Hoover, I think I'm just about finished, and we might talk for a second and see if there is something that I missed, but basically the estimating tools that you utilized at MMR, you believe they belong to MMR, right?
>
> A:    Yes.
>
> Q:    And that you had no right to take them with you when you left the company; is that correct?
>
> A:     Yes.
>
> Q:    And all of the – all of the estimates and bids that you created while – while working for MMR, those belong to MMR didn't they?
>
> A:    Yes.
>
> Q:    And that you had no right to take those with you to Merit when you left to go to Merit, right?
>
> A:    Correct
>
> Q:    And, again, you did not do that, did you?
>
> A:    No.
>
> Q:    Did that ever – did that thought ever even come into your mind that you are going to take information that belonged to MMR and take it over to a competitor?
>
> A:    No.

(*Id.* at 72-73).

Another similar example is the testimony of Rob Mason.[11] Mason first worked for Merit, then joined MMR (from 2011 to 2017), then returned to Merit (in 2019), then went to Southwest Electrical (from 2020 to 2022), then returned to MMR before he was fired in 2023. (R. Doc. 161-4 at 19-27, 137). As a threshold issue, it is noteworthy that Mason was never in MMR's estimating division. Nor does he have any idea how MMR built its database of labor units for estimating. (*Id.* at 175-178). For that reason, Mason could not even offer a personal opinion on whether MMR developed its own labor units over the years, whether MMR considers them proprietary and

---

[11] ISG provided a copy of the transcript as an exhibit to the motion. (R. Doc. 161-4).

confidential, or whether MMR's estimating tools are valuable to how it conducts business and therefore would not want them in the hands of a competitor. (*Id.* at 178-180). But Mason, did, however, agree that MMR has its employees sign confidentiality agreements:

> [after showing Mason separate confidentiality agreements that he signed at the start of both of his stints of employment with MMR]

> Q:    Okay. But now seeing these two documents, do you agree that both in your first stint and your second, MMR was having employees sign confidentiality agreements to protect MMR's information?

> Mr. Stopler: I am going to object to foundation - - on foundation grounds because you asked 'all' employees. I think you were asking - - if you're asking about him, he knows what he did. I don't know if he knows what everyone else - -

> Q:    Well, I'll start with you. Do you believe that MMR makes sure that it was protecting its confidentiality of its proprietary information before it gave you access to it.

> A:    I assume that's what that says, yes.

> O:    Okay. And you recall this as being part of the new hire packet?

> A:    Correct.

(*Id.* at 140-141). And Mason also agreed that MMR password protects its computer network:

> Q:    And MMR does password protect its network, correct?

> A:    Correct.

> Q:    No one outside of MMR can get inside MMR's network without violating the law, correct?

> A:    Correct.

> Q:    So it is protected within MMR. With the MMR family, that's the only way you can get it, correct.

> A:    Yeah. I would say yes.

(*Id.* at 180-181).

When ISG approached Mason to talk about the case in advance of his deposition, it did not tell Mason that ISG employees had in fact taken documents from MMR that ISG then used in

16

violation of the Injunction Order. ISG did elect, however, to show Mason (a third party) the Job

Analysis Program that is subject to the Injunction Order and Contempt Order:

> Q:    Okay. And so what did they say about this lawsuit?
>
> A:    That is was occurring and what it was about?
>
> Q:    What did they say?
>
> A:    The statement as made about files, some files taken or whatever. Files taken, and I know the file structure, you know, is not copyright – well, only because I had just tried to do that, copyright some stuff, but the data on it, yes.
>
> Q:    Okay. And you know this isn't a copyright case, right?
>
> A:    Right. Right. It's the catalog – ultimately, the big fight is the catalog of information of their estimated use in my opinion.
>
> . . .
>
> Q:    Okay. Did they tell you that they had actually taken documents from MMR and used them at ISG?
>
> A:    No.
>
> . . .
>
> Q:    Did they talk about what documents were at issue?
>
> A:    The green sheets.
>
> Q:    Okay. And did they –
>
> A:    That was it.
>
> Q:    Did they show you a copy of it?
>
> A:    Of?
>
> Q:    The documents that are at issue, any documents. Did they show you any documents?
>
> A:    The only thing they showed me was theirs.
>
> Q:    They actually showed you an ISG estimating tool?
>
> A:    No.
>
> Q:    What did they show you?
>
> A:    They showed me some tracking program.
>
> Q:    So a JA tracking program?
>
> A:    Well, it's a lot more information than just on there?
>
> Q:    A job analysis? A job analysis?

A:      Correct. It's – it's not a job analysis. It's, I guess, a file that has the name JA in it, but it includes a lot more. It's a weekly progress report, but it's not titled that.

A:      Did they tell you the Judge told them they couldn't use that document anymore, that it was a derivative of MMR's document?

Mr. Stopler:  I'm going to object to that. I'm going to object to that because that isn't true, so you're assuming facts that are not quite right there, P.J.

Q:      Did they tell you that?

A:      They didn't tell me specifically what you said there. That was one of the ones they had a problem with.

Q:      Okay.

A:      I mean, I thought that's what this whole court thing was about, honestly.

Q:      So they showed you a document that is in dispute, right, that MMR is saying you can't use it basically in the lawsuit?

A:      Correct.

(*Id.* at 150-153). Mason had no difficulty identifying the file ISG stole, which ISG showed to him while recruiting him to testify as a fact witness, as belonging to MMR:

Q:      So ISG shows you – pulls up – who was it? Was it Chris Guidry, Kevin Alexander, or Jason Yates?

A:      I don't remember which one.

Q:      I'll just say one of them had a laptop and they pulled up what they called the JA analysis, correct?

A:      Correct. I assume that was the name.

Q:      And the one tab that they showed you was the progress report, the weekly progress report, right?

A:      Correct.

Q:      And there are several tabs across that Excel file?

A:      Which we did not look at.

Q:      But the one they showed you, you recognized as being basically MMR's correct?

Mr. Stopler: I'm going to object. That mischaracterizes. He said it's similar.

A:      Correct.

(*Id.* at 160-162). Nor did Mason have any difficulty recognizing that the stolen MMR Job Analysis is valuable — so much so that MMR restricted his access to it during his employment with MMR:

18

Q:     Okay. And you would agree that these job analysis programs, whatever you want to call them, JA programs, those are equally important in the E&I world, correct?

A:     Correct.

Q:     And so what ISG showed you was a very valuable tool, correct?

A:     The sheets that I saw –

Q:     Program, yeah, not just the sheets.

A:     I didn't look at the whole program, so I'm not going to answer that.

Q:     If you don't know, you don't know.

A:     Yeah, I don't know. I would have to take and go through the entire program and give you my opinion. *When I worked there last, I wasn't even allowed to get in it.* I got scolded for not doing them, but, yet, I didn't even have one I could do.

Q:     So MMR – they're so valuable at MMR that they wouldn't even let certain employees get into it, correct?

A:     Apparently not. And that was at the end of me leaving the company.

(*Id.* at 183-185) (emphasis added).

The testimony of Russell Gaudin is no different.[12] Gaudin was formerly employed by MMR in business development. (R. Doc. 161-5 at 14-15, 20-21). As a business developer, Gaudin would receive bid packets (*i.e.*, invitations to bid a job) from customers that he would then send to MMR's estimating department. (*Id.* at 30-31, 45). Gaudin himself was *not involved* in creating numbers, including labor rates, in actual estimates. (*Id.*). He also *did not have access* to MMR's estimating tools or project controls tools like those at issue in this lawsuit. (*Id.* at 161, 167). As was the case with Hoover and Mason, however, Gaudin provided testimony in response to MMR's questions that is fatal to the Motion. For instance, Gaudin's testimony on the issue of MMR's stolen labor unit rates is a homerun for MMR:

Q:     And I think you had told us that the labor units was – were valuable information for a company in estimating the odd jobs, correct?

---

[12] ISG submitted Gaudin's deposition transcript as an exhibit to the motion (R. Doc. 161-5).

19

A:     Of course you can't estimate a job without labor units, yes.

Q:     Right. And a company over time will develop and refine their labor units to determine where they think they can make on a job, correct?

A:     Yes. The base units would adjust, yes.

Q:     And, you know, even though you were new in development and probably you use this information in business development, that a company like MMR had developed those labor unit measurements over a 30 year period, correct?

A:     Yes.

Q:      And that was valuable information for them?

A:     Yeah.

Q:     And that was confidential and proprietary information for them, correct?

Mr. Stopler: What are we talking about? Objection. Form.

A:      I assume it is. Like I said, I never signed anything for it, but, yes, I don't think anybody wants that information out.

Mr. Stopler:   I am going to just caution the witness not to speculate. If you have an answer –

Q:      Just based on your knowledge, and in particular your knowledge of working at MMR, okay.

Mr. Stopler:   But no assumptions.

A:     I don't know it to be proprietary.

Q:     Okay. So, when we spoke last week and you said that the labor unit information that MMR had wasn't confidential and proprietary, did we have a misunderstanding?

A:     I don't – sorry –

Mr. Stopler:   I am going to object to form.

A:     – I don't remember saying it was confidential or proprietary. I don't know of anything that has copyrights on it.

Q:     All right. But we are not talking about copyrights now. We are talking about information that MMR would develop for its bidding and its estimates, that would not be something that MMR would expect a competitor to steal, would it?

A:     Well, no, absolutely not.

Q:     Why is that?

A:      I mean, do you want somebody to take $5 out of your wallet. It's yours. I don't know how else to say it. I don't know. I mean, it's theirs, they come up with it, they want to keep it. They want to use it for their –

#102519284v16

Q:      Right. And they want to use it for their purposes to get a competitive advantage to get the jobs, right?

Mr. Stopler:   Objection to form. I don't even know what you are talking about.

A:      Yes.

Mr. Stopler:   What information are you talking about.

Mr. Magner:  I think he understands.

Mr. Stopler:   I think you just misled him because he needs to say yes or no.

A:      The labor rates in their estimating software that has evolved over time from day one where they learned on their own.

(*Id.* at 117-120). Gaudin further remarked on MMR's confidential labor unit rates as follows:

Q:      But you would know as a business development guy that you could rely on the MMR estimators to do a good job in bidding the job, right?

A:      Yes, one hundred percent. But how they bid it and what they use, I can't say that for sure.

Q:      All right. But you do know, in fact, they would use the labor units that they had developed over time?

A:      Yeah. I'm assuming – yes. They used the labor units that was in the system to get the basis of the estimate, yes.

Q:      All right. And if someone took that data with them without authority, without permission to another competitor, that would not have been proper, correct?

A:      I mean, are we talking morals? No. I don't think it's morally proper.

Q:      And it may not be legally proper from your understanding?

A:      Yeah.

(*Id.* at 127-128). Gaudin further explained the value of MMR's labor unit rates as follows:

Q:      And all of those different variables go into forming the labor unit for the particular task on the job, right?

A:      For the JA, yes.

Q:      Right. And then that becomes the guide to determine whether the company has been profitable on that job, right?

A:      Yes.

Q:      Okay. And the information that is developed to develop those labor units, that has value for all of these different companies, right?

A:      Of course.

#102519284v16

> Q:  Right. And that comes from experience and from the good contracts and the bad contracts, right?
>
> A:  Yes.
>
> Q:  And that's important information for a company to have and to keep to itself going forward as it does – as it bids on more and more jobs, right?
>
> A:  Sure. Yeah.

(*Id.* at 133-134). Gaudin also explained how knowing a competitor's labor unit rates and pricing can give an unfair advantage:

> A:   I understand we are talking about the labor unit on this sheet if it's competitive to have a number of someone else's.
>
> Q:  Right. And if you had that information for five thousand different line items from your competitor, you could then use that information to underbid them, right?
>
> A:  If I thought they were better than me, yes. If I thought I was better than them, I would throw it in the trash. I'm sorry, it's just  - - it just really is, and I don't mean to be so, but it really can be one way or the other.
>
> Q:  Depends on the circumstances?
>
> A:  One hundred percent, yes.
>
> Q:  All right. But if you had a sophisticated experienced contractor like MMR and a newly formed company have that information, that could provide a competitive advantage to them, right?
>
> A:  It would one hundred percent give them something to bump against and choose if they wanted to be more competitive in that, yes.

(*Id.* at 145-146).

Even the testimony from an executive of a competitor (who never worked at MMR) proved helpful for MMR.[13] Hollier is the president of Merit Electrical, which competes with MMR. (R. Doc. 161-6 at 7-8). She, for instance, agreed that Merit considers its own top sheet and overhead calculations as confidential and propriety:

> Q:  Okay. But I understood you to say that you consider your top sheet, your overhead calculations to be confidential and proprietary, correct?

---

[13] ISG submitted Hollier's deposition transcript as an exhibit to the motion. (R. Doc. 161-6).

Mr. Stopler:  Now I am going to object. I think that mischaracterizes. I think she said components within there, and that is what it was listed as.

Q:    All right. That's what I'm drilling down. Tell me what components in particular you would not want shared with competitors?

A:    My burdens, my insurance, my fringes, my overhead and profit, my contingencies, and my escalation strategies.

Q:    And by escalation strategies, what do you mean?

A:    I may put escalation on certain components of the bid.

(*Id.* at 35-36). And while Hollier testified, in general terms, what she believes constitutes general industry knowledge, she admitted *she knew nothing* about MMR's own estimating tools (and what might make them proprietary and valuable):

Q:    Okay. You've spoken in general terms in your perception of what industry practice is. Do you know how MMR developed its database?

A:     No. I do not.

Q:    Have you ever seen MMR's database?

A:    No. I have not.

Q:    Have you ever discussed with any of the principals or senior management of MMR how they developed their database?

A:    No, I have not.

(*Id.* at 45). She also admitted that: she has never worked for MMR; she knows nothing about its policies and procedures concerning confidential information; she does not know who developed MMR's database; and she does not know whether MMR has standard agreements with vendors related to rates and materials:

Q:    You have never worked for MMR, correct?

A:    Correct.

Q:    You don't know what their policies and procedures are concerning confidential and proprietary information, right?

A:    No. I do not.

Q:    Okay. You've never discussed that with anybody at MMR?

A:    No.

. . .

23

| Q: | Okay. Do you have any knowledge as to who developed MMR's database? |
|---|---|
| A: | No. I do not. |
| Q: | Do you know if they have any standard agreements, understandings with its vendors as to the rates for equipment and materials? |
| A: | I answered, but I will re-answer. No, I do not. |

(*Id.* at 50-51). Accordingly, Hollier's testimony concerning the confidential status of what ISG stole from MMR, and whether theft of that information can harm MMR, is rank speculation. That said, Hollier agreed, at a minimum, that it would be "wrong" for a Merit employee to share its profit and loss statements, balance sheets, and financial statements with a competitor. (*Id.* at 47-49) (stating, in part, "I would not want my P&L and my financial statements public as they are considered private – we don't even always submit financial statements to our clients . . . sometimes we don't even provide them when asked.").

In sum, this motion lacks any new, significant evidence that would warrant a change in the *status quo*. The testimony gathered from the third parties actually proves the opposite — namely that the Injunction Order was necessary in 2022 and remains necessary in 2024. It seems that ISG is now desperate to get out from under the consequences of its rampant contempt during that two-year period between the issuance of the agreed Injunction Order and the contempt finding. But ISG cannot demonstrate that any changes to the agreed Injunction Order or the contempt sanctions are warranted.

## **ARGUMENT**

After being temporarily restrained, ISG agreed to a consent injunction that it then violated for two years before being held in contempt. ISG has fallen well short of meeting its burden to demonstrate a *significant* change in fact or law that would, in effect, allow ISG to resume using information it indisputably stole. Because there is no such significant change, MMR remains likely to prevail on the merits of its claims and continues to face the threat of irreparable harm. Indeed, the most recently

24

gathered evidence bolsters the Court's decision to issue a temporary restraining order, grant the consent Injunction Order, and then find ISG in contempt.

## I.    ISG fails to cite the applicable standard.

ISG misstates the standard applicable to its Motion. *See Total Safety v. Knox*, No. 19-2718, 2019 U.S. Dist. LEXIS 219082, at *3-5 (S.D. Tex. Dec. 18, 2019) (specifically addressing the proper standard to review a request for vacating or modifying a preliminary injunction, including, in that case, a consent preliminary injunction). Because the motion seeks to dissolve the Injunction Order, which has been in effect with the parties' consent, the Court must apply Rule 60(b)(5). *Id*. "By this Rule, a party can request 'a court to modify or vacate a judgment or order *if a significant change* either in factual conditions or in law renders continued enforcement detrimental to the public interest." *See id*. (quotation omitted) (emphasis added). "Such heightened standard is also in line with other persuasive, considered, and neutral authority." *Id*. (citing Wright, Miller & Kane, *Federal Practice and Procedure* § 2863 (3d ed)) ("Because the standard is an exacting one, *many applications for relief on this ground are denied*.") (emphasis added). *See also SEC v. Bryant,* No. 17-336, 2017 U.S. Dist. LEXIS 164691, at *7 (E.D. Tex. Oct. 4, 2017) (refusing to modify a consent injunction in the absence of any "changed circumstances or additional facts not previously available to the Court" and instructing that, "[i]n moving a court to dissolve a preliminary injunction it previously entered, the moving party must make a strong evidentiary showing" and "show hardship so extreme and unexpected as to justify us in saying that they are the victims of oppression") (quotations omitted).[14]

---

[14] But even under the standard ISG suggests should apply, (R. Doc. 161-1, 12-13), ISG would not be entitled to dissolving the consent Injunction Order because it did not offer any evidence ("new" or old, "significant" or not, and whether previously unavailable or not) to warrant changing the *status quo* that it agreed to maintain.

#102519284v16

**II.    There has been no "significant" change in factual conditions supporting the Court's decisions that MMR is likely to prevail on the merits.**

The Court can quickly dispose of the motion, because ISG has not met its heavy burden to demonstrate a "*significant*" change in factual conditions or law to warrant a modification or dissolution of the parties' consent injunction. *See Total Safety*, 2019 U.S. Dist. LEXIS 219082, at *3-5; *see Bryant,* 2017 U.S. Dist. LEXIS 164691, at *7. ISG essentially asks the Court to reverse its findings that MMR is likely to prevail on the merits. But ISG does not present the Court with a single, significant change in factual conditions to justify the relief it requests.[15] This is unsurprising. If the contempt hearing demonstrated anything, it is that ISG cannot be trusted to engage in fair competition without supervision from the Court. *See PNC Bank, NA v 2013 Travis Oak Creek GP LLC*, No. 17-584, 2018 U.S. Dist. LEXIS 224851, at *7 (W.D. Tex. 2018) (noting that, under Rule 60, "the key question is whether the objective of the preliminary injunction is still being served").

Rather than present the Court with new, previously unavailable, significant facts, ISG simply argues on the merits to undermine the Court's prior findings that MMR is likely to prevail. Specifically, ISG attacks whether the information at issue — which was indisputably stolen from MMR — is confidential and/or qualifies as trade secrets. ISG does so, however, without being able to offer any new "smoking gun" that undermines MMR's theory of its case. A review of two things bears this out: (i) the sworn testimony of ISG's subject matter experts and (ii) the omitted testimony from the third-party deponents. ISG simply falls short of what is necessary to grant relief under Rule 60(b)(5), and it must instead wait until a full trial to resolve fact issues that it removed from

---

[15] Second-guessing a consent injunction is not a ground for dissolving an injunction. *See id.* ("But here, Knox voluntarily agreed to the preliminary injunction in the first instance, which avoided establishing any factual predicate as to underlying conduct and circumstances. That Knox may have reconsidered the wisdom of her agreement does not convince the Court that justice requires reconsideration of the very injunction to which she agreed.").

contention when it voluntarily agreed to a consent injunction. *See id.* ("Which of these contentions is true goes to the heart of the parties' dispute, *and the Court does not resolve it here*. In the meantime, the preliminary injunction—again, being the *agreed* preliminary injunction—*will continue to preserve the status quo until that final determination on the merits*.") (emphasis added).

### A.    ISG's subject matter experts confirm that injunctive relief is still necessary.

The Court need not look to the third-party testimony to decide whether ISG can demonstrate a "significant" change. Its own subject matter expert acknowledge that MMR is likely to succeed on the merits. Kraft — ISG's Director of Estimating — provided a sworn statement that guts ISG's argument. Contrary to what ISG presents in its Motion, Kraft confirmed that MMR's information is valuable and subject to reasonable measures of protection, which exposes why ISG surreptitiously stole it to begin with. Specifically, Kraft confirmed the following:

- ISG was using MMR's confidential business information before the injunction;

- ISG tried to conceal its use of MMR's confidential business information after the injunction;

- ISG continued to use, and obtain business from the use of, MMR's confidential business information;

- The information and documents at issue belong to MMR, are confidential, and are valuable; and

- ISG needed this confidential business information to launch itself as a start-up company in this industry.

Further, Kraft's statements comport with the testimony of ISG's Director of Project Controls, Ben Huffman, who also testified that the documents at issue were confidential, proprietary, and valuable: including MMR's estimating tools (Green Sheets, Overhead and Top Sheets), Job Analysis Program, and project control databases. *See* (R. Docs. 119-7, 119-8). His testimony was set forth in the contempt motion, which was not refuted by ISG. No testimony from any third-party

#102519284v16

deponent — especially ones that have no personal knowledge about the facts of this case — can change these facts. On this basis alone, the Court should deny the motion, as a named defendant and ISG's subject matter experts admit the information that was confidential, proprietary, valuable, and improperly used by ISG.

**B.    The testimony from third-party deponents adds no significant facts  to conclude otherwise (and, if anything, bolsters MMR's case).**

ISG next tries to convince the Court that MMR has no information protectable under trade secret law or Louisiana's Unfair Trade Practices Act. Though ISG breaks its arguments into several subparts, it essentially argues two things: _first_, that the categories of information are not proprietary and, _second_, that MMR did not take reasonable measures to protect such information. Both arguments are meritless — according to members of ISG's own subject matter experts — and according to the third party deponents that ISG relies on.

**1.    The information at issue is proprietary and valuable.**

ISG's arguments relating to the value and proprietary nature of the information would fail even if the Court were to set aside the testimony from ISG's subject matter experts. The Court can simply look to ISG's course of conduct before and after the injunction was issued. Even in the face of an agreed Injunction Order, with the threat of contempt for violations, ISG continued to use the stolen information. This was no accident. ISG could not develop the tools that MMR had been creating for thirty years and knew that these tools were necessary to obtain business and to sustain ISG's own business. As the evidence and Kraft confirmed, ISG essentially launched its business with the use of MMR's confidential business information:





(Ex. 2 at 107-08). ISG cannot offer the testimony of third-party deponents to refute these undisputed facts. None have been employed at ISG, and none can testify to the reasons why ISG was using MMR's information _before_ and _after_ the agreed Injunction Order. Further, these third-party deponents are not reliable for a specific reason: not a single one was shown _any_ of the documents at issue during their depositions. Whereas MMR provided the Court with representative examples (under seal) of the stolen and misused information, as well as testimony about those examples, ISG cannot provide any countervailing testimony from these third-party deponents because they were _never_ shown, nor asked questions about, MMR's trade secrets. Instead, ISG merely asked these third-party deponents for their _personal opinions_ about general industry issues — not the specific aspects of the documents at issue that make them so valuable to MMR's success (and why ISG persisted in continuing to use them in the face of an Injunction Order).

Further, ISG mischaracterizes the reasons that MMR (and ISG's subject matter experts) consider the information at issue to be so valuable. _First,_ ISG argues about the "form and formulas" of MMR's estimating tools. But is not the form or operations of the Excel spreadsheets that are the important part: it is the substantive databases of accumulated knowledge relating to labor units, efficiencies, and costs that these "forms and formulas" pull from. That is what was so valuable and alluring to ISG — that accumulated history of knowledge that comprised the database that is included in MMR's estimating tools. Though ISG does not cite this testimony, the third-party witnesses acknowledge this fact. Hoover testified that MMR "built its own database" that should not be "copied and pasted" by a competitor (R. Doc. 161-3 at 50-51, 56), and Guadin testified MMR's labor units in its database were "refine[d]" over a thirty-year period and were "confidential

and proprietary." (R. Doc. 161-5 at 117-20). ISG simply misses the point. It is not the "form and formulas"; it is the database of accumulated knowledge that is so important and valuable.

*Second*, ISG tries to argue that this database of accumulated knowledge is "not proprietary" because it is "three to four years old." But that argument ignores the facts. As Kraft, Hoover, and Gaudin testified, this database of accumulated knowledge is what is so valuable. And the database is the product of decades of experience and investment by MMR. Further, the Court can simply look at what ISG did with this database: it used the database when it started in 2021, continued to use it as the Temporary Restraining Order and agreed Injunction Order was issued, and continued to use it for two years until the Court issued the contempt sanctions on April 11, 2024. The database is not stale simply because it was stolen in 2021 and 2022, as it incorporates thirty years of learned experience in this specific industry. Tellingly, ISG supports this argument with testimony from Hollier — a person who has never been employed by MMR and has never seen MMR's estimating tools. In addition, her company, Merit Electrical, uses an off-the-shelf product (Accubid) for estimating, so her understanding of what MMR uses and why it is valuable would be nothing but speculation. The Court, however, can look to ISG on the issue of whether it believed the estimating tools were outdated — as ISG would still be using them today if the Court had not held it in contempt earlier this year. This is why the Court ordered ISG to meet and confer with MMR on all estimating work to ensure that MMR's estimating tools were not being used.

*Third*, ISG tries to argue that pricing information is not helpful on a forward-looking basis. But that of course ignores testimony from the third parties on which ISG relies. Hoover specifically testified that pricing information was confidential and proprietary. (R. Doc. 161-3 at 46-48, 64-66). Further, it is a matter of simple logic to know that a company (MMR) does not want a competitor (ISG) to know the pricing it is able to secure on bids. *Fourth*, ISG argues that the

quintessential example of a trade secret (a customer list) cannot be a trade secret. Defendant David Heroman downloaded a customer list from MMR's computing network —which was password protected — and then imported that customer list into ISG's computing network. No third-party testimony can somehow absolve this conduct and permit ISG to use that list.

*Fifth*, ISG argues that it should be allowed to use the project control tools and databases that Huffman misappropriated because they are not "proprietary." This argument is frivolous. Huffman testified that the project control tools and databases that he worked on at MMR and then used to create replicas at ISG were custom to MMR and could not be found in public. The Court relied on this testimony and examples filed under seal to hold ISG in contempt. There is no testimony that could possibly be offered to change the Court's findings. Indeed, one of the third-party deponents (Mason) testified that the project control tools were so valuable and important to MMR that MMR did not even provide Mason with access to them. (R. Doc. 161-4 at 183-85). This argument is not a serious one: MMR's project controls tools and databases are unique to MMR, were built by MMR, are confidential, and are extremely valuable.

### 2.    MMR took "reasonable measures."

Next, ISG tries to argue that MMR will not prevail because it did not take "reasonable measures" to protect the confidentiality of the information. ISG concedes that, based on MMR's verified pleadings, the Court already "found that MMR made reasonable efforts to maintain the secrecy of MMR Materials by 'requiring employees to sign agreements and acknowledge policies protecting the confidentiality of the information; password protecting that information; and monitoring transfer of confidential information through data loss preservation software.'"[16] (R.

---

[16]  The TRO cites Unif. Trade Secrets Act § 1(4)(ii) comments to support this finding concerning reasonable measures, which is fully supported by the weight of the jurisprudence. *See Certain Underwriters at Lloyd's London v. Jupiter Managing Gen. Agency, Inc.*, No. 20-1037, 2022 U.S. Dist. LEXIS 83330, at *1-2 (M.D. Tenn. May 9, 2022) (finding efforts reasonable where plaintiff alleged that it designated information confidential, required disputes

Doc. 161-1, at 21) (citing TRO, 9-10). Nothing learned in discovery casts doubt on these points.[17]

ISG does not and cannot contest that MMR password protected its _entire computer system_. Thus, to access files that were not, themselves, password protected, a user still had to have an MMR account with a designated login and password; and MMR implemented monitoring software as a safeguard to protect against the internal misappropriation of documents.[18]

Previously cited testimony from ISG's own third-party witnesses also demonstrates that MMR restricted access of certain documents — like estimating tools — to employees who needed access to them. These witnesses even testified, as set forth above, that they did not need special instruction to know they should not steal information belonging to their employer, including, for example, estimating tools. This testimony is consistent with the Court's own application of basic logic to the facts of this case:

---

to take place in confidential arbitration, and limited access on a need-to-know basis); _Trans-Radial Sols., LLC v. Burlington Med., LLC_, No. 18-656, 2019 U.S. Dist. LEXIS 131711, at *16 (E.D. Va. Aug. 5, 2019) (allegation of restricting access and disclosing information to defendants only on a need-to-know basis sufficient to survive motion to dismiss); _HTS, Inc. v. Boley_, 954 F. Supp. 2d 927, 944 (D. Ariz. 2013) (allegations that secrets were password protected and accessible only to certain employees sufficient); _Harsco Corp. v. Piontek_, No. 07-0633, 2008 U.S. Dist. LEXIS 17104, at *8 (M.D. Tenn. Mar. 5, 2008) (code of conduct requiring confidentiality for employees, imposition of confidentiality agreements in purchase orders, and use of physical obstructions to block the protected machinery from visitors in the building sufficient for preliminary injunction); _Phoenix Process Equip. Co. v. Capital Equip. & Trading Corp._, No. 16-024, 2022 U.S. Dist. LEXIS 178723, at *23-24 (W.D. Ky. Sept. 30, 2022) (deeming evidence of need-to-know policy and password protection, among other measures, sufficient to surpass summary judgment).

[17] At best, ISG cites third-party testimony that MMR did not password protect **specific files** ISG also complains that MMR did not adequately designate or instruct on confidential information, used a confidentiality agreement that was somehow insufficient, and/or did not conduct exit interviews. (R. Doc. 161-1, at 20-24). But none of these allegations, even if true, require a finding, as a matter of law, that MMR did not reasonably protect the information at issue. _See_ note 8, _supra_. Furthermore, the individual defendants, all of whom were former employees of MMR, were knowledgeable about these aspects of this case, which they now complain about in the Motion, _when MMR first filed it_. The third-party witnesses did not provide any new "significant" facts related to MMR's reasonable measures to protect its trade secrets. Again, ISG just relies on the third-party witnesses' testimony to point to factual disputes that have existed, and it does so by ignoring key facts and/or by mischaracterizing their testimony. This does not give rise to a "significant change" in circumstance that warrants relief.

[18] ISG's gripe, (R. Doc. 161-1, at 12, 21), that there has been no testimony about MMR using data-loss prevention software ignores, again, that allegations in MMR's complaint are verified (and have since been corroborated by other fact witnesses, including, with respect to use of data-loss prevention software, David Heroman). MMR did not have to present a witness at an injunction hearing to testify about this fact because ISG, wisely, agreed to a consent injunction given the weight of the evidence against it. That said, ISG was free to press forward with a deposition of an MMR witness on this point, but it has elected not to do so, opting instead to depose third-party witnesses with no direct personal knowledge of the facts at issue in this case.

#102519284v16

The Court. So wait. Mr. Yates – And I want to make sure. I don't want to mischaracterize your argument. You're arguing to me that Mr. Yates was not aware after he transitioned over to ISG that he could not – he could not any longer use MMR's proprietary software? Did it really have to take MMR to say *oh, you can't use our software that you had been using when you were employed with us?* Was there –did MMR – are you suggesting that MMR should have put him on notice or made a formal request: *don't use our property?*

(Ex. 1 at 20) (emphasis added). Common sense, of course, dictates the answer to the Court's question is "no," which is consistent with the testimony of ISG's four third-party witnesses, all of whom knew not to take, give, or use, for a competitor, information belonging to their employer. And while ISG may nit-pick the language of MMR's confidentiality agreement,[19] it cannot seriously dispute that MMR required its employees to execute one, which militates in favor of finding that MMR took reasonable measures to protect its proprietary information.[20]

Considering the foregoing and given the individual defendants' length of service and their positions within MMR, ISG's argument concerning reasonable measures related to "exit interviews" strains credulity. The law does not require "exit interviews" to protect information under LUTSA or the DTSA, and, regardless, MMR has explained that it confronts employees for whom reasonable suspicion exists of misconduct, and it then protects its information, if necessary,

---

[19] The existence of a confidentiality agreement is not a dispositive requirement. *See N. Miss. Med. Ctr., Inc. v. Quartiz Techs.*, 2023 U.S. Dist. LEXIS 176176, at * 4 (N.D. Miss. Sept. 30, 2023) ("Contrary to NMMC's contention, however, courts do not uniformly require the execution of a confidentiality agreement to prove the existence of a trade secret. Instead, many courts acknowledge that a confidentiality agreement is just one reasonable measure a party may implement to keep its information secret."). Of course, MMR did, in fact, use a confidentiality agreement, yet ISG complains that it was somehow a "blanket and generalized" one and therefore insufficient. (R. Doc. 161-1, 22-23). However, ISG's reliance on *Furukawa Elec. N. Am., Inc. v. Sterlite Optical Techs., Ltd.*, No. 02-2149, 2008 U.S. Dist. LEXIS 138120, at *11-12 (N.D. Ga. Jan. 30, 2008) to advance this argument does not withstand scrutiny. In *Furukawa*, the court indicated "[i]information that [was] widely distributed to employees without proper controls" may not qualify as a trade secret. *Id*. The facts in this case are starkly different, as this Court already found.

[20] ISG's reliance on *Rx.com v. Hruska*, No. 05-4148, 2006 U.S. Dist. LEXIS 63953, at *10-14 (S.D. Tex. Sept. 7, 2006) is misplaced. (R. Doc. 161-1, at 24). In that case, a former employee of Rx.com retained, *inter-alia*, sixty-eight emails that he later shared with attorneys of a party adverse to Rx.com in litigation. *Rx.com*, 2006 U.S. Dist. LEXIS 63953, at *10-11. Notably, the former employee *had permission* to retain the emails at issue, and, more importantly, the emails were all *exchanged with a third-party* who was under no explicit or implied duty of confidentiality. *Id*. at *13. The facts in *Rx.com* are so different from that facts in this case that its findings are of little, if any, import here.

33

through litigation (as it has done in this case at great expense). Ultimately, ISG's focus on the highly fact-intensive inquiry of whether reasonable measures were taken to protect the information at issue does not warrant dissolving the injunction.

*      *      *

Ultimately, ISG has fallen well short of shouldering its burden to dissolve the agreed Injunction Order. ISG has failed to produce any new, significant evidence to demonstrate that MMR is not likely to prevail on its theft-of-information claims.

## III.    ISG's irreparable harm argument fails.

ISG briefly argues that MMR cannot establish irreparable harm even though the Court has already determined otherwise. (*Id.*, 24-25). ISG misstates the facts and the law to reach its conclusions, which stand in stark contrast to findings the Court has already made, statements from ISG's third-party deponents, and statements from its own subject matter experts.

As an initial matter, ISG overlooks  how irreparable harm is analyzed in cases concerning trade secrets and unfair competition. *See H&E Equip. Servs. v. Harley*, No. 22-103, 2022 U.S. Dist. LEXIS 31781, at *14-17 & n. 54 (M.D. La. Feb. 23, 2022) (declining to address whether irreparable harm should be presumed but finding that "loss of business's customers and damage to [a plaintiff's] goodwill are widely recognized as injures incapable of ascertainment in monetary terms and may thus be irreparable."); *Aspen Tech., Inc. v. M3 Tech., Inc.*, 569 F. App'x 259, 273 (5th Cir. 2014) (quotation omitted) (affirming a finding of irreparable harm "based on evidence that M3 had been 'making use of Aspen[]'s information from the inception of its business[.]'"); *Advanced Logistics, LLC v. Comeaux*, 11-1228 (La. App. 3 Cir. 03/07/12), 86 So. 3d 105, 108 (affirming injunction in a trade secret case and weighing that misappropriation creates the substantial threat of irreparable injury, and that the injunction only prohibits the restricted party

34

from engaging in unlawful acts). The Court correctly applied the jurisprudence evaluating irreparable harm in this context. *See* (R. Doc. 7, TRO, at 10-12 & n. 2) ("Both the United States Congress and the Louisiana legislature recognize that irreparable injury arises from the misappropriation of trade secrets. It is clear under the DTSA and LUTSA, that even the threat of misappropriation may be enjoined."). ISG ignores that this Court correctly analyzed this element, under the correct jurisprudence, and that ISG continued to cause such harm for two years after the injunction was entered

The substance of ISG's argument is otherwise tied up in a merits-based discussion of whether information at issue is "outdated" and/or "non-confidential." (R. Doc. 161-1 at 24-25). This contention — like ISG's other insufficient merits-based arguments — is not based on any new "significant" change that has taken place since ISG voluntarily agreed to the Injunction Order. Even ignoring this fatal flaw, logic dictates that MMR's estimating tools and databases are certainly not "outdated" because, if they were, ISG would not be desperately trying to regain the ability to use them (and MMR would not still be using them in its own business operations). And, at risk of belaboring the point, the third-party deponents confirmed that the information at issue is valuable and confidential. Considering the foregoing, the Court was correct to find a risk of irreparable harm, which is common in cases involving theft of confidential information and trade secrets and unfair competition. *See H&E Equip. Servs.*, 2022 U.S. Dist. LEXIS 31781, at *14-17 & n. 54; *Aspen Tech., Inc.*, 569 F. App'x at 273; *Advanced Logistics, LLC*, 86 So. 3d at 108. No basis exists to allow ISG to escape the Injunction Order it voluntarily entered based on the irreparable harm aspect of this case — especially because it took a finding of contempt to finally force ISG to attempt to engage in fair competition.

## CONCLUSION

Because of the overwhelming evidence against it, ISG agreed to the very consent Injunction Order that it now, in an about-face turn, seeks to dissolve. But as the contempt hearing laid bare, the injunction is necessary to prevent misuse of MMR's protected information and to preserve the *status quo* until a full trial is held. ISG has not met its burden to demonstrate a *new, significant* change in fact or law to reach the opposition conclusion, which, if reached, would only enable ISG, in a manner contrary to the public interest, to resume using information it indisputably stole from MMR. For all the foregoing reasons, the Court should deny the Motion.

Respectfully submitted:

*/s/ P.J. Kee*
P.J. Kee (La. Bar No. 34860)
Thomas P. Hubert (La. Bar No. 19625)
Michael W. Magner (La. Bar No. 01206)
Jacob J. Pritt (La. Bar No. 38872)
Michael A. Foley (La. Bar No. 35774)
Jason A. Culotta (La. Bar No. 35731)
Connor H. Fields (La. Bar No. 39880)
JONES WALKER, LLP
201 St. Charles Avenue - 50th Floor
New Orleans, Louisiana  70170-5100
Telephone:  (504) 582-8230
Facsimile:  (504) 589-8230
Email:  pkee@joneswalker.com
***Counsel for MMR Constructors, Inc.***

#102519284v16

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing was served through the Court's pacer e-filing system on September 9, 2024.

*/s/ P.J. Kee*
P.J. Kee

#102519284v16