UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| **MMR CONSTRUCTORS, INC.,** | **CIVIL ACTION NO.: 22-CV-267** |
| Plaintiff, | **JUDGE BRIAN A. JACKSON** |
| **VERSUS** | **MAGISTRATE JUDGE RICHARD L. BOURGEOIS, JR.** |
| **JB GROUP OF LA, LLC D/B/A INFRASTRUCTURE SOLUTIONS GROUP, et al.,** | |
| Defendants. | |

**************************************************************************

**REPLY MEMORANDUM OF LAW IN SUPPORT OF
MOTION TO DISSOLVE PRELIMINARY INJUNCTION**

Defendants JB Group of LA, LLC d/b/a Infrastructure Solutions Group, Jason Yates, and Travis Dardenne (collectively, "**ISG**") file this Reply Memorandum in Support of their Motion to Vacate the Preliminary Injunction ("**Vacate Motion**") based on newly discovered evidence. This motion is being filed contemporaneously with ISG's Motion for Sanctions ("**Sanctions Motion**").

**PRELIMINARY STATEMENT**

In what can best be described as an act of desperation in response to the neutral witnesses' testimony that gutted its case – the four depositions on which ISG's Vacate Motion is based – MMR opted to disregard the Louisiana Rules of Professional Conduct and Federal Rules of Civil Procedure (collectively, the "**Rules**") and play unfairly.[1] Just two weeks after those depositions,

[REDACTED]

---
[1] Local Civil Rule 83 of the Middle District of Louisiana adopts the Rules of Professional Conduct of the Louisiana State Bar Association.

1

███████. This in and of itself was wrong (*i.e.*, violating several of the Rules). But MMR did not stop there. Instead of obtaining Kraft's testimony through a noticed deposition, MMR took the deposition in secret, without providing notice to ISG. ████████████████████████████████

███████ such that ISG could not protect against the disclosure of privileged or confidential information, which did occur, or defend against false statements that MMR now seeks to impute to ISG. This, too, violated multiple Rules. Then MMR held onto this secret transcript for three months, waiting for the right opportunity to spring this manufactured "testimony" on ISG, rather than produce it as it was obligated to do. Attaching the deposition transcript to its opposition to the Vacate Motion and relying on Kraft's statements to defeat ISG's motion are the quintessential examples of sandbagging. In doing so, MMR trampled over its obligations under the Rules and the fact Kraft was represented by his personal counsel does not absolve MMR or its counsel, as described more fully in the Sanctions Motion.

ISG's Sanctions Motion is intended to hold MMR and its counsel accountable for these Rules violations. ISG incorporates by reference the facts and legal arguments set forth therein. At a minimum, the Court should disregard the unlawfully generated deposition transcript of Kraft cited throughout MMR's opposition.[2]

Regardless of this conjured up "testimony," MMR has no meaningful response to the newly obtained evidence that negates the trade secret protection MMR presented to the Court to obtain the injunction in the first place.

---

[2] The unusual procedural posture ISG has been placed in – having to respond to an unlawfully obtained piece of evidence in reply to its existing Vacate Motion – is solely a function of MMR's deliberate decision to only provide the secret deposition transcript in opposition to ISG's motion and not before, all in violation of multiple Rules.

**ARGUMENT**

MMR's opposition puts at issue the validity (or invalidity) of the secret Kraft deposition. Below is a summary of the authority set forth in ISG's Sanctions Motion, included here as a basis for the Court to strike the deposition from consideration of the Vacate Motion.

Putting aside the tainted Kraft testimony, what remains of MMR's response to the Vacate Motion are broad, unsupported characterizations of the newly developed testimony of former MMR employees based on cherry-picked quotes from their depositions that belie the substance of these witnesses' overall testimony. At best for MMR is that its opposition highlights the material fact disputes on whether its files qualify as trade secrets and whether MMR is at risk of irreparable injury. As set forth below, under these circumstances (again, assuming arguendo that the evidence is not overwhelmingly in ISG's favor) there is absolutely no basis to maintain the extreme remedy of an injunction.

**I.   MMR VIOLATED SEVERAL RULES OF PROFESSIONAL CONDUCT**

███████████ is itself a violation of Louisiana Rule of Professional Conduct 3.4(b). That Rule prohibits a lawyer from offering "an inducement to a witness that is prohibited by law." La. Rules Prof'l Conduct R. 3.4(b). Cases within the Fifth Circuit spell out how MMR's counsel's conduct is prohibited by Rule 3.4(b). *See Dyll v. Adams*, 1997 WL 222918, at *2 (N.D. Tex. Apr. 28, 1997); *Elbaor v. Smith*, 845 S.W.2d 240, 247 n.14 (Tex. 1992) ("Rule 3.04(b) mandates that an attorney has an ethical duty to refrain from making a settlement contingent, in any way, on the testimony of a witness who was also a settling party.").

Taking the deposition of Kraft without the presence or consent of ISG's counsel violates Louisiana Rule of Professional Conduct 4.2(b), regardless of whether Kraft had his own personal

3

attorney in attendance. That subsection prohibits a lawyer from communicating about the subject of the representation with "a person the lawyer knows is presently a director, officer, **employee**, member, shareholder or other constituent of a **represented organization** and…whose act or omission in connection with the matter **may be imputed** to the organization." La. Rules Prof'l Conduct R. 4.2(b). MMR's counsel knew from Kraft's first deposition that he was an employee of ISG, that ISG was a represented organization, and Kraft's conduct could be imputed to ISG.

In addition to the Rule 3.4(b) and 4.2(b) violations, MMR's failure to include ISG in the secret deposition ████████████████████████ ████████████████ violates Louisiana Rule of Professional Conduct 3.4(a), which prohibits a lawyer from obstructing "another party's access to evidence "or from concealing "a document or other material having potential evidentiary value." Similarly, Rule 3.4(f) prohibits a lawyer from requesting "a person other than a client to refrain from voluntarily giving relevant information to another party." La. Rules Prof'l Conduct R. Rule 3.4(f). ████████████████ ████████████████████████

Further, Louisiana Rule of Professional Conduct 4.4(a) says a lawyer cannot obtain evidence that violates the legal rights of a third person (*e.g.*, ISG). Federal Rule of Civil Procedure 30(b) required MMR to turn over the deposition transcript to ISG, not hide it's every existence for months until MMR saw an opportunity to use it affirmatively. MMR's ambush cannot be harmonized with Rules 4.4(a) or FRCP 30(b). ████████████████ ████████████████.[3]

---

[3] MMR's attempt to relabel the deposition transcript as a declaration or affidavit – a tacit acknowledgment that a secret deposition is problematic – fails as a matter of law. *See Dunigan v. Mississippi Valley State Univ.*, 2020 WL 9606765, at *3 (N.D. Miss. Oct. 16, 2020); s*ee also Marin v. King*, 2015 WL 13651016, at *2 (D.N.M. Oct. 29, 2015) ("affidavits do not involve a sworn witness answering questions propounded by an attorney"), *aff'd*, 720 F. App'x 923, 932 (10th Cir. 2018) (a transcript of an interview with an attorney "does not at all resemble a traditional affidavit").

## II.     KRAFT'S TESTIMONY SHOULD BE STRICKEN

FRCP Rule 30(b) requires the party seeking a deposition to "give reasonable written notice to every other party." Obviously, that did not happen here. The Fifth Circuit has long precluded the use of any deposition that is not properly noticed. *See Mims v. Cent. Mfrs. Mut. Ins. Co.*, 178 F.2d 56, 59 (5th Cir. 1949); *Sanders v. Enter. Offshore Drilling LLC*, 2023 WL 8715833, at *2 (S.D. Tex. Dec. 18, 2023) ("It is patently unfair for a party to attempt to use a deposition transcript to impeach a witness when the deposition was taken without proper notice. Had Enterprise's counsel been at the November 8, 2023 deposition, he could have objected to improper questions and posed additional questions aimed at clearing up any ambiguities or confusion. Accordingly, it should come as no surprise that **the Fifth Circuit has, for the past 74 years, repeatedly held that depositions taken without proper notice are inadmissible**.") (citing *Matter of Baum*, 606 F.2d 592, 593 n.1 (5th Cir. 1979); *Mims v. Cent. Mfrs. Mut. Ins. Co.,* 178 F.2d 56, 59 (5th Cir. 1949) (emphasis added)); *see also Loucas G. Matsas Salvage & Towage Maritime Co. v. M/T/ Cold Spring I,* 1997 WL 102491 (E.D. La. Mar. 5, 1997), *aff'd* 1997 WL 102491 (E.D. La. Apr. 23, 1997) (granting motion to strike deposition testimony from record where witness was not properly sworn); *Federal Deposit Ins. Corp. v. Ernst & Young LLP*, 2023 WL 7189929, at *7 (E.D. La. Nov. 1, 2023) ("the Court reserves the right to strike deposition testimony … upon a showing that the testimony is prejudicial or otherwise impermissible.").

The 10th Circuit in *Marin v. King* dealt with similar facts: as part of a settlement with certain individual defendants, Plaintiffs' counsel "conducted a deposition-like proceeding with these defendants, using exhibits and asking extensive questions to obtain evidence against the other defendants whose counsel was not noticed to be present and to rebut the facts asserted in Defendants' pending motions for summary judgment." 720 F. App'x 923, 931-32 (10th Cir. 2018).

5

The Fifth Circuit affirmed the trial court's order striking of the transcript of the improper deposition. *Id.* at 933. Thus, even without discussion of the Rules of Professional Conduct or the disclosure of privileged or confidential information, Fifth Circuit jurisprudence dictates that the secret deposition of Kraft cannot be used in this litigation, let alone in opposition to ISG's Vacate Motion.

Turning to the ethics violations, an appropriate sanction for what transpired here is the preclusion of Kraft as a witness altogether. For example, a violation of Rule 3.4(b) requires the exclusion of Kraft's testimony. "[O]ther courts have recognized that the proper sanction for the wrongful payment of fact witnesses is the exclusion of the tainted witnesses." *Rocheux Int'l of New Jersey v. U.S. Merchants Fin. Grp., Inc.*, 2009 WL 3246837, at *4 (D.N.J. Oct. 5, 2009) (excluding testimony); *Golden Door Jewelry Creations, Inc. v. Lloyds Underwriters Non-Marine Ass'n*, 865 F. Supp. 1516, 1526–1527 (S.D. Fla. 1994) (same), *aff'd in part*, 117 F.3d 1328 (11th Cir. 1997).

Similarly, violations of Rule 4.2 have led courts to suppress evidence, including sworn statements and trial testimony. In *University Patents, Inc. v. Kligman*, 737 F. Supp. 325, 329 (E.D. Pa. 1990), the court precluded "the defendants from introducing any information obtained through [counsel's] *ex parte* contacts with persons whose statements could bind [plaintiff] University." The court in *Camden v. State of Maryland*, 910 F. Supp. 1115 (D. Md. 1996) reached the same conclusion. Plaintiff's counsel had contacted a former employee of defendant and, like here, produced sworn testimony (in the *Camden* case, an affidavit) of the former employee where confidential and privileged information of defendant had been disclosed, including the "appraisal of the strength of [plaintiff's] case." *Id.* at 1118. The court found that plaintiff's counsel "knew or should have known that [the former employee] was extensively exposed to confidential

6

information." *Id*. at 1123. One concern was "the integrity of the justice system…unless a stand is taken against conduct of that sort occurred here." *Id.* The *Camden* court listed a number cases where courts have suppressed evidence when "faced with gains ill gotten because of impermissible contacts with employees." *Id.* The court suppressed the equivalent of Kraft's deposition "as well as any trial testimony" as an appropriate remedy. *Id.* at 1124; *see also Zachair, Ltd. v. Driggs*, 965 F. Supp. 741 (D. Md. 1997) (suppressing "wrongly obtained information" in violation of Rule 4.2).

### III.     MMR CITES THE WRONG STANDARD FOR VACATING INJUNCTIONS

MMR contends that the Court "must apply Rule 60(b)(5)" in determining MMR's motion to dissolve the Court's interlocutory order-granting a preliminary injunction. (ECF 174 at 25). In reaching this conclusion, MMR cites to two outdated Texas cases. The first is *Total Safety v. Knox*, 2019 WL 6894683, at *1-3 (S.D. Tex. Dec. 18, 2019), which was superseded by *Shafer v. Sanchez*, 2023 WL 11649641, at *2-3 (S.D. Tex. Nov. 27, 2023), *report and recommendation adopted*, 2024 WL 1434441 (S.D. Tex. Apr. 3, 2024) (plaintiff's motion for reconsideration of the court's prior order granting a preliminary injunction relief is "governed by the flexible standard set forth in Federal Rules of Civil Procedure 54(b)."). The second is *Sec. & Exch. Comm'n v. Bryant*, 2017 WL 4407953, at *3 (E.D. Tex. Oct. 4, 2017), which was superseded by *Providence Title Co. v. Truly Title, Inc.*, 2021 WL 5003273, at *3 (E.D. Tex. Oct. 28, 2021) (the court applied the "Rule 54(b) standard" to "reconsider its preliminary injunction."). Most important is the Louisiana federal court's determination in *Joiner v. Lewis*, 2024 WL 3617001, at *1 (E.D. La. Aug. 1, 2024), that Rule 54(b) governs motions for reconsideration of a preliminary injunction order and not the higher standard of Rule 60.

What MMR's opposition does not address is that, regardless of the standard of proof, the existence of one or more material issues of fact defeats the issuance of a preliminary injunction.

7

This is because a material issue of fact negates the very heavy burden of demonstrating a clear likelihood of success on the merits, a fundamental requirement for an injunction. *See Creel v. City of Baton Rouge/Par. of E. Baton Rouge*, 2021 WL 856710, at *3 (M.D. La. Mar. 8, 2021). "Courts have consistently held that preliminary injunctions are not appropriate in cases permeated with factual disputes." *Goodman v. Dell Publ'g Co.*, 1995 WL 301380, at *2 (E.D. La. May 15, 1995). In *Van Nortrick v. Lavespere*, this Court denied a prisoner's motion for a preliminary injunction, finding: "While Plaintiff has presented evidence indicating that he might win at a trial on the merits, there are too many unresolved issues of fact and medical expert opinion to conclude on the record before it that there is a [']substantial likelihood['] of success so as to warrant a preliminary injunction." 2019 WL 852121, at *5 (M.D. La. Feb. 22, 2019). The Fifth Circuit stated that "[c]ourts are more cautious about invoking the extraordinary remedy of a preliminary injunction where critical facts are in dispute." *Marshall Durbin Farms, Inc. v. Nat'l Farmers Org., Inc.*, 446 F.2d 353, 358 (5th Cir. 1971). In *Goodman v. Dell Publ'g Co.*, the court stated the following: "[w]here issues of fact are involved, the drastic remedy of preliminary injunction should not be granted until the facts have been tested out in the crucible of oral examination and cross-examination." 1995 WL 301380, at *2 (E.D. La. May 15, 1995), *citing Cement Enamel Dev., Inc. v. Cement Enamel of New York, Inc.*, 186 F. Supp. 803, 804 (S.D.N.Y. 1960). As set forth below, MMR's opposition highlights rather than negates the material factual issues in dispute.

### IV.    MMR CANNOT ESTABLISH LIKELIHOOD OF SUCCESS

Regardless of the conjured-up Kraft deposition, MMR does not offer much by way of substance in response to the evidence presented with ISG's Vacate Motion. In its opposition, MMR attempts to color the Court's view by focusing on the prior contempt findings (though totally irrelevant to the Vacate Motion) and suggesting that ISG "stole" MMR's files (a contested fact).

8

*See* ECF 174. MMR also attempts to reframe the legal issue of whether its files have any extrinsic value outside of MMR to whether MMR would want its files shared with competitors. *See id* at 28-31. With respect to value, MMR deliberately blurs the timing of that question to suggest that its files maintain its value over time when the record establishes that the opposite is true. *Id* at 30-31. At bottom, MMR's opposition underscores that there are material facts in dispute and, as described above, an injunction may not be based on contested facts. Below, each of MMR's tactics for overcoming damning evidence is easily dispatched.

### a. MMR Attempts to Misdirect the Court by Focusing on Contempt

MMR spends several pages of its opposition brief on the Court's prior findings of contempt simply to paint ISG in a bad light, presumably hoping that the Court's ire from those rulings will color its decision on the Vacate Motion. MMR's brief refers to "ISG's blatant and utter inability to comply with the Injunction Order for two years" (ECF 174 at 3), and argues that "for over two years, ISG continued its unlawful and anti-competitive use of MMR's protected information" (*Id*. at 4). The suggestion is that ISG has been a repeat bad actor over a long period of time.

There are two problems with this. *First*, it is wholly irrelevant to whether MMR's information qualifies as protectable trade secrets, the question raised by ISG's Vacate Motion.[4] And *second*, while irrelevant to whether the injunction should be vacated, MMR's characterization is also a total overreach and the subject of a contested record.

As the Court may recall, ISG was held in contempt because of the act of a single employee, Ben Huffman, who unbeknownst to anyone else at ISG copied certain formulas from MMR's green

---

[4] As "evidence" in support of the injunction MMR cites to "supporting declarations from a forensic expert, Michael Saunders; from MMR's Chief Information Officer, Marcel Lalonde; and MMR Senior Vice President, John Clouatre." ECF 174 at 4. Other than LaLonde affirming two paragraphs in MMR's complaint regarding steps to protect information, these declarations all relate to ISG's possession of MMR files and ISG's compliance with the injunction order and not the questions raised by ISG's Vacate Motion.

9

sheet when he was tasked with creating a new iteration of the (widely used throughout the industry) green sheet. In its opposition, MMR makes the completely false statement that "ISG directed Huffman to manually copy and paste MMR's business information." ECF 174 at 7-8. ███████████████████████████████████████████████████████████████████████ Huffman himself admitted that he had not told anyone at ISG about what he had done prior to his deposition. ECF 119-7 at 27:2-14 (in response to MMR's counsel question on how Huffman built an access database at ISG, he testified "from scratch"); *Id* at 140:17-19 ("Q: Who have you told that you have the MMR database on your computer? A: No one."). Jason Yates submitted a declaration in which he said "I, and ISG, had no knowledge that Mr. Huffman used any of alleged MMR documents in creating the new ISG documents." (ECF 130-1 at 3). Huffman told Yates that "he created them from scratch." *Id*. at 3-4. MMR's claim that ISG directed Huffman is simply not faithful to the record.

Similarly inconsistent is MMR's characterization of what Huffman actually did. On the one hand, MMR takes great issue with ISG in its opposition for using the labor and material sheets that Huffman created during the period of the injunction. ECF 174 at 8-15. On the other hand, MMR downplays the importance of the formulas actually Huffman copied and pasted. "It is not the form or operations of the Excel spreadsheets that are the important part." *Id*. at 29. This is because each of the neutral witnesses themselves minimize the importance of the formulas contained in the estimating tool spreadsheets. Hence, MMR had to concede, based on the newly developed testimony of the neutrals, that the formulas within its green sheet are not proprietary. Further, MMR ignores the testimony from its former employee Rob Mason, who testified that while employed by MMR he did exactly what Huffman did – using a competitor's template to

10

copy certain formulas in creating a database for MMR because it was easier and more efficient to do so. ECF 161-4 at 102-03.

Once past the smokescreen of contempt, MMR's opposition attempts to rebut the neutrals' testimony about the lack of value of the data in MMR's estimating spreadsheets. MMR's opposition argues (like it did before) that its Excel spreadsheet of labor rates (to which MMR refers as a database) is highly valuable because it contains approximately 5,000 lines of codes. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Mason said the same thing: "Nowadays, most people who have been doing this long, kind of know off the top of their heads the numbers to use." ECF 161-4 at 46. Hoover testified that he "was at MMR for eight or nine years. I know what their rates are, but, you know, you go somewhere else and most of the rates in the system are basically the same." ECF 161-3 at 32.

MMR also argues that its green sheet is highly valuable because "of accumulated knowledge relating to labor units" over a thirty-year period. ECF 174 at 29. MMR conveniently chose to ignore the testimony of each of the neutral witnesses that the database is both based on NECA rates and is nothing more than a starting point for experienced estimators. ECF 161-4 at 178-79. These two factors render the database mostly valueless. MMR had no answer to this point.[5]

Whether MMR's data has any extrinsic value outside of MMR and whether what Huffman did was out of the ordinary or industry practice are issues for the trier of fact to decide. The record is contested on these points.

---

[5] MMR made an argument out of whole cloth to suggest its files had value: "the fact that ISG wants to go back to using MMR's information speaks volumes about the value of what ISG misappropriated." ECF 174 at 5. ISG has purchased and is using an entirely different estimating platform called Accubid and, consequently, has no intention of using any files that could potentially be based on any MMR files. The purpose for moving to vacate the injunction is two-fold: (i) there is no basis for it factually or legally; and (ii) ISG should not have to possibly incur up to a million dollars in forensic consulting fees scrubbing its computers, servers, cloud-based platforms, cell phones and emails of anything potentially related to MMR. *See* Fonacier Declaration to Reply.

### b. MMR's Repeated References to "Stolen" Files is Contested

Just like it did with the contempt orders, MMR tries to paint ISG in a negative light by repeatedly referring to ISG's possession of MMR documents as "stolen" (ECF 174 at 2, 3, 5, 8, 10, 11, 18, 19, 26, 28, 30) or the "information ISG stole" (*Id.* at 10, 18, 24, 27, 36), sometimes multiple times on the same page of its brief. The problem with MMR's characterization is that it is untrue. Jason Yates has already testified that the hard drive he took with him when he left MMR, the uncontested source of MMR documents at ISG, was something MMR allowed him to take to ISG. ECF 161-1 at 15; ECF 130 at 8; *also* ECF 130-1 ¶ 23. At best for MMR, this is a contested issue of fact and certainly not something on which an injunction may be based. *See* Section III and IV *supra*.

### c. MMR's Focus on Expectations About Confidentiality is Misplaced

In response to the neutral witnesses each testifying that MMR's estimating tools had no value outside of a particular customer's bidding process, MMR asked each witness on cross whether employers like MMR and its competitors would expect employees to keep company files confidential. The answer is obviously in the affirmative. No employer wants its files shared outside the company walls. MMR's opposition quoted Hoover's testimony on this point. ECF 174 at 11-12. At a superficial level, this point seems plausible. However, the inquiry under the applicable trade secret law is not about expectations but about whether the information in the hands of a competitor has value. On this point, each of the witnesses uniformly torpedoed MMR's point (to steal a phrase from MMR's brief). *See*, *e.g.*, ECF 161-6 21-23. Tracy Hollier from Merit, a competitor of MMR and ISG, summed it up best in response to a question from MMR's counsel:

> Q:   So, what if MMR or ISG called and said, could I have your bidding materials from the last project that you bid for Exxon or Dow or whomever?
>
> A:   I would not provide it to them if asked, but if they had it[,] it would not hurt my business.

*Id*. at 32-33.

### d. MMR Deliberately Asked Vague Questions About Timing of Disclosure

MMR tried to overcome this damaging testimony about the lack of value of its information by deliberately asking questions that were vague as to the timing of the disclosure of its files to a competitor. This is because each of the neutral witnesses testified that the reason the MMR files ISG had in its possession had very little value was because the information contained therein was outdated. Pricing and rates change for each project based on many fact-specific variables, so pricing and rates from one project could not be utilized in a subsequent project. (ECF 161-1 at 8-9). The witnesses explained that as soon as a customer awarded a contract and closed its bidding process, the information each competitor submitted was rendered effectively moot. *Id*. at 5, 8-9. Hoover, like other witnesses, testified that it does not matter if a competitor saw his bid after the bid on the project was awarded. ECF 161-3 at 78:10-16.

> Q: If I had access to your -- to Merit's labor unit rate and material pricing from 2019 from a fixed point in time, would that be of any value to me if I'm at MMR in 2022, say three ·years later?
>
> A.· No.
>
> Q.· What about '23, 2023?
>
> A.· No.
>
> Q.· All right. I was just asking you if I had access to your database for material pricing and labor unit -- labor unit rates from, say, 2019, would that -- and I took that and I went to MMR, would that be of any value to me in 2024?
>
> A.· No.

ECF 161-6 at 22-23.

On cross examination, MMR asked the witnesses whether each would want to share "your potential bid to competitors" (ECF 174 at 12) without specifying the timing of sharing such a bid. Obviously, no one would share a bid with a competitor while competing on that bid. Over objection

13

regarding timing, MMR obtained a favorable answer to an unclear question; this is the line of testimony MMR presented to the Court on pages 12-13 of its opposition brief.

At best for MMR, this is a contested issue of fact and certainly not something on which an injunction may be based. *See* Section III and IV *supra*.

### e. The Neutral Witnesses Did Not Need to See MMR's Estimating Tools

MMR argues that its former employees "lacked any personal knowledge" about the propriety of the estimating tools at issue. ECF 174 at 2. MMR complains that these witnesses "were not even shown MMR's trade secrets during their depositions." *Id*. Consequently, MMR argues that "these third-party deponents are not reliable for a specific reason: not a single one was show <u>any</u> of the documents at issue during their depositions." *Id*. at 29. This contention is intellectually dishonest.

At the initial non-party deposition MMR objected to ISG showing the deponent, former MMR employee Russell Gaudin, an ISG labor and material sheet on the ground that the document was "derivative of MMR's proprietary confidential trade secrets. We think that is improper. We think that should not happen. My colleague, Mr. Kee, is currently contacting the court to obtain relief here and to obtain protection." EFC 161-5 at 7. MMR's counsel threatened ISG's counsel: "we think it puts ISG at further risk in being held in further contempt of court." *Id*. at 8. MMR's opposition failed to mention that it objected to showing any of these neutral witnesses, even former MMR employees, any estimating tools or other files MMR claimed were derivative of MMR files. In other words, MMR created the very scenario with which it now takes issue. It was obvious at the time that MMR was attempting to unfairly prevent ISG from defending itself against trade secret claims; MMR's opposition brief reinforces MMR's strategy.

ISG was able to overcome MMR's baseless objection because all the witnesses were familiar with the estimating tools at issue, especially because three of the witnesses were former MMR employees and did not need to see specific examples. ECF 161-4 at 64-66, ECF 161-3 at 73-74. MMR tries to blunt Hoover's testimony by claiming that he "is trying to do business with ISG." ECF 174 at 11. However, MMR did not provide a cite to Hoover's testimony for this proposition, presumably because Hoover did not testify that he was trying to do business with ISG.

### f. Whether MMR Protected its Files is a Contested Fact

MMR buries in footnotes the testimony of the neutral witnesses that called into question whether MMR took reasonable steps to protect its files. ECF 174 at 32. These witnesses testified that MMR did not: (i) password protect individual files; (ii) train its employees on confidentiality; (iii) conduct exit interviews; or (iv) otherwise police the materials its employees took with them upon leaving MMR's employ. ECF 161-1. In MMR's own words, "ISG just relies on the third-party witnesses' testimony to point to factual disputes that have existed." ECF 174 at 32. Exactly.[6]

### CONCLUSION

For the above reasons, ISG respectfully requests that this Court grant its Motion to Vacate the Preliminary Injunction.

Respectfully submitted,
**DUNLAP FIORE LLC**

/s/ Jennifer A. Fiore
Jennifer A. Fiore (Bar # 28038)
Erin G. Fonacier (Bar # 33861)
6700 Jefferson Hwy, Building #2
Baton Rouge, LA 70806

---

[6] MMR argues that "none of these allegations, even if true, require a finding, as a matter of law, that MMR did not reasonably protect the information at issue." (ECF 174 at 32). This erroneously shifts the burden of proof to ISG and imposes a summary judgment standard rather than an injunction standard. It is MMR's burden to demonstrate it has satisfied all elements for injunction. *See Mississippi Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 622 (5th Cir. 1985).

Telephone: 225-282-0660
Facsimile: 225-282-0680
jfiore@dunlapfiore.com
efonacier@dunlapfiore.com

**SEIDEN LAW LLP**

/s/ Michael T. Stolper
Michael T. Stolper (Admitted Pro Hac Vice)
Xintong Zhang (Admitted Pro Hac Vice)
322 Eighth Avenue, Suite 1200
New York, NY 10001
Telephone: 212-337-3502
mstolper@seidenlaw.com
xzhang@seidenlaw.com

*Attorneys for JB Group of LA, LLC d/b/a Infrastructure Solutions Group, Jason Yates, and Travis Dardenne*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing was filed electronically with the Clerk of Court using the CM/ECF system, which will send notice to all counsel on this 1st day of October 2024.

/s/ Jennifer A. Fiore
Jennifer A. Fiore