UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

MMR CONSTRUCTORS, INC.                                    CIVIL ACTION

VERSUS

JB GROUP OF LA, LLC, ET AL.                              NO. 22-00267-BAJ-RLB

## <u>RULING AND ORDER</u>

Before the Court is Defendants' **Motion To Dissolve Preliminary Injunction (Doc. 161) (the "Motion to Dissolve")** and **Motion For Sanctions (Doc. 185) (the "Motion for Sanctions") (collectively, the "Motions")**. The Court heard Oral Argument on the Motions, both of which are opposed, (Docs. 174, 188). For reasons provided below, Defendants' Motion to Dissolve will be denied, while the Motion for Sanctions will be granted in part and denied in part.

## I.    BACKGROUND

The factual background for this matter has been provided in several preceding Rulings and Orders. (*See* Docs. 7, 69, 145). In brief, this case involves Defendant JB Group of LA, LLC d/b/a Infrastructure Solutions Group ("ISG") hiring numerous employees from Plaintiff MMR Constructors, Inc. ("MMR"), and those hired employees bringing MMR's confidential business information and/or trade secrets with them. After the Court granted Plaintiff's request for a temporary restraining order, (Doc. 7), and preliminarily held that the facts as alleged in Plaintiff's Verified Complaint, (Doc. 1), supported a finding that the materials allegedly misappropriated by Defendants were trade secrets under the Defend Trade Secrets Act ("DTSA") and

the Louisiana Uniform Trade Secrets Act ("LUTSA"), Defendants opted to forego a preliminary injunction hearing and instead entered into the Stipulated Preliminary Injunction. (Doc. 23).

The Stipulated Preliminary Injunction enjoined Defendants from:

(1) Disclosing, disseminating, or using MMR's trade secrets and confidential business information, including, but not limited to, all such trade secrets and confidential business information that reside on any electronic storage device, cloud-based file repository or file-sharing account, and/or email account used by Mr. Heroman, or any other former MMR employee that now works for ISG, during their employment with MMR or in their possession, custody, or control during his employment with MMR or in his possession, custody, or control;

(2) Accessing, studying, copying, or taking notes about MMR's trade secrets and confidential business information, including, but not limited to, all such trade secrets and confidential business information that reside on any electronic storage device, cloud-based file repository or file-sharing account, and/or email account used by Mr. Heroman, or any other former MMR employee that now works for ISG, during their employment with MMR or in their possession, custody, or control;

(3) Destroying, altering, erasing, secreting, or failing to preserve any and all of MMR's trade secrets, business materials, property, proprietary information, confidential information, and/or any and all record or documents that may be relevant to this lawsuit; wherever located, and in whatever form, including but not limited to any document, email, report, software, files, electronic data, tangible evidence, financial records, and any and all communications between Mr. Heroman and any employee, member, investor, or consultant of ISG and its parent companies, subsidiaries and affiliates;

(4) Failing to return and/or to allow the remediation of (in accordance with the forensic protocol) the documents and information identified in the Verified Complaint, and any other documents or information identified through the forensic protocol, that contain MMR's trade secrets and confidential business information.

(Doc. 23). Roughly two years after the parties entered into the Stipulated Preliminary Injunction, the Court discovered that Defendants had failed to abide by the terms of the Stipulated Preliminary Injunction in a significant and material way, and

Defendants were held in contempt. (Doc. 145). The Court concluded in its Contempt Order that the complex nature and usage of the allegedly misappropriated trade secrets necessitated the appointment of a special master to monitor Defendants' compliance. (*Id.*). The Court appointed a special master to oversee a remediation protocol, whereby all of MMR's confidential business information was to be located and deleted from ISG's servers. (Doc. 147). The remediation protocol and special master appointment were done at Defendants' expense, given that both were only necessary because Defendants had failed to abide by the Stipulated Preliminary Injunction for an extended period of time. (Doc. 145).

However, the remediation protocol and the special master's fees are not insignificant, and Defendants now request that the Court revisit the bases for the Stipulated Preliminary Injunction so as to avoid payment of those fees. (Doc. 161-1 at p. 2). ISG is a relatively new company, and ISG's counsel has represented that the special master fees are damaging to the company's ability to stay financially afloat.[1]

For their Motion To Dissolve, Defendants principally take aim with the conclusion that MMR's pricing information found in their estimating tools, which are the "greensheets," "overhead sheets" or "top sheets," and "database," and the form of the estimating tools themselves, are trade secrets. In support of the effort to relitigate the Stipulated Preliminary Injunction, Defendants have procured the depositions of four new witnesses, who are and who testified in relevant part as follows.

---

[1] This fairness argument falls on somewhat deaf ears. It was Defendants' continued and entirely avoidable violations of the Stipulated Preliminary Injunction, **which Defendants themselves agreed to**, that necessitated the appointment of a special master.

### a. Russell Gaudin

Russell Gaudin is a former MMR employee who has worked in the electrical and instrumentation ("E&I") industry for twenty-nine years. (Doc. 161-5 at p. 3). In his career, Gaudin has also worked for Merit, ISC, and Excel, each of which are competitors of MMR. (*Id.* at pp. 3-4). While at MMR from 2016 to 2019, Gaudin strictly worked as a project coordinator in business development. (*Id.* at pp. 4, 8). He never had access to Plaintiff's estimating database, which he believed to contain "historical data" that was refined over time according to the success or failure of any particular job, or any other estimating software used by Plaintiff. (*Id.* at pp. 20, 31-34, 41). Gaudin was not involved with the creation of any of Plaintiff's estimate bids. (*Id.* at p. 8). Gaudin also did not have access to Plaintiff's project controls software, its timekeeping database, or its job analysis program. (*Id.* at p. 41). Asked whether he left MMR on his own terms or whether he was fired, Gaudin stated: "I don't know. That's a debate. I don't think there's still an answer on that." (Doc. 161-5 at p. 9). Relatedly, Gaudin acknowledged that the way in which he left MMR made him "pissed." (*Id.* at p. 43). Gaudin currently possesses an informal business relationship with ISG, and anticipates being paid for the work he is presently doing for the company. (*Id.* at p. 46).

Gaudin further testified that various competitors in the E&I space, including MMR, use similar or the same software/programs. (*Id.* at p. 5). Specifically, several

different E&I companies use Viewpoint in their business.[2] Gaudin also opined that companies in the E&I space use "regular publication stuff like the NECA Book that is for labor rates, and the phase coding system that comes from the master numerical system for construction" to start an estimate, and then take these values and "kind of massage[] it to fit them."[3] (*Id.*). This "massaging" is critical, and Gaudin testified that, in his experience, "less than five percent" of change orders to bid estimates are made according to NECA values alone. (*Id.* at pp. 13, 39). Gaudin believed that adjustments to the change orders for bid estimates are also based on institutional knowledge acquired from relevant employees in the E&I space, along with a variety of pricing elements that will necessarily be somewhat job dependent. (*Id.* at pp. 13-14 (job-specific pricing elements include the weather for the contemplated job, the location of the job site, etc.)).

Gaudin was directly questioned by counsel as to whether the estimating tools were proprietary. He believed that the form of the estimating tools at Excel, Merit, and ISC were not proprietary. (*Id.* at p. 16). Gaudin was then shown a stripped-down version of an estimating tool in use at ISG, which was allegedly misappropriated from Plaintiff. (*Id.* at p. 17). He commented that the estimating tool shown, which was ISG's equivalent to Plaintiff's greensheets, termed its "labor and material sheets," was dissimilar to the estimating tools he had seen at other E&I companies and had

---

[2] Viewpoint is a third-party platform that offers construction management project tools to its consumers. (Docs. 161-4 at p. 11, 161-5 at p. 5).

[3] NECA refers to the National Electrical Contractors Association, which publishes materials containing recommended pricing values for certain E&I work. (Doc. 161-5 at p. 5).

"a lot more stuff on it." (*Id.* at p. 18). However, Gaudin was also able to say that certain tabs within the labor and material sheet were similar to others that he has seen before. (*Id.* at pp. 18-19). Gaudin opined that, based on what he was shown by ISG, the form of the labor and material sheets were not proprietary, "[b]ecause it's the data that goes into it is what matters." (*Id.* at pp. 19-20). To that point, Gaudin stated that he "assume[d]" that the certain pricing units populating the estimating tools were proprietary, and that the pricing units were continuously refined to provide a competitive advantage for subsequent bid estimates. (*Id.* at p. 30). Gaudin further believed that this process of refinement leads to the value of a particular estimating tool that has not been updated to decrease over time. (*Id.* at p. 20). Despite this, Gaudin stated that the estimating tool would be a valuable tool for a competing company to "bump against," or to check their pricing values against the competition and revise where necessary. (*Id.* at p. 36). Gaudin further testified that the database values contained in the estimating tools would be valuable to a newly formed company. (*Id.* at p. 37).

Gaudin testified similarly as to overhead and top sheets, and opined that the values contained therein would be proprietary for the duration of the job to which the sheet corresponds to. (*Id.* at pp. 24-26). Gaudin offered these same opinions for the job analysis programs he saw at Excel, Merit, and ISC, and for each proposal log he saw at his various places of employment. (*Id.* at p. 27).

### b. Rob Mason

Rob Mason worked at MMR from 2011 to 2016, and from 2022 to 2023. (Doc. 161-4 at pp. 6-7). Mason was fired from MMR in 2023, and admitted to carrying a grudge against the company's "senior leadership on the east coast." (*Id.* at pp. 7-8). After Mason was fired from MMR, he was hired by Merit, and fired again after two weeks. (Doc. 161-6 at p. 7). Tracy Hollier, the president of Merit, opined that she did not believe Mason to be a reliable worker whatsoever. (*Id.*).

While at MMR, Mason worked in project management. (Doc. 161-4 at p. 5). From 2011 to 2016, Mason was responsible for several projects in South Carolina. (*Id.* at p. 6). This responsibility involved creating change orders for existing bid estimates. (*Id.*). Mason was not involved with the compiling of MMR's database, or with generating initial bid estimates. (*Id.* at pp. 7, 12). Mason did not know whether MMR used NECA rates in their database to generate estimates, and has "no idea how [MMR] built [its] database," but opined that a lot of E&I companies use NECA rates in some form. (*Id.* at pp. 12, 20, 44). Mason testified that at least some of the pricing data in MMR's database is "based on their company experience." (*Id.* at p. 16). However, this or other pricing data in MMR's database would be subject to semi-continuous refinement, and Mason believes that changes in material pricing or varying environmental factors would lead to a certain snapshot of the database in a particular greensheet to have minimal continuing value. (*Id.* at pp. 14-15).

When questioned as to whether the greensheet template in use at MMR was proprietary, Mason testified that he believed it was not. (*Id.* at pp. 17, 19). Regarding

7

the data in the greensheets, Mason stated that certain pricing data, like labor unit rates, would be proprietary if it were based on company experience. (*Id.* at p. 17). However, Mason further testified that that any proprietary pricing information would grow outdated and would lose value over the years. (*Id.* at pp. 30-31). To combat this, an employee of Plaintiff would routinely go in and update the company's database, especially if a particular job went poorly. (*Id.* at pp. 18-19).

According to Mason, access to Plaintiff's database could have helped ISG bid on jobs that were highly similar to the jobs that Plaintiff actually bid on, whether this bid occurred one month or ten months later. (*Id.* at p. 20). Mason did not know whether the data in an overhead or top sheet would be proprietary. (*Id.* at p. 31).

Mason offered additional opinions for the project control tools in use at MMR. He testified that, based on alleged statements from unidentified third parties, the timekeeper application in use at MMR was derivative of a project management program he built in his original stint with the company. (*Id.* at p. 25).

Finally, as to the security measures in place at MMR, Mason testified that he took a laptop from the company in 2016 and was not asked to return it. (*Id.* at p. 33). In his second term with MMR, he was not permitted access to any project control programs. (*Id.* at p. 55).

### c. Billy Hoover

Billy Hoover worked for MMR from 2011 to 2019 as a Senior Project Estimator. (Doc. 161-3 at p. 2). Hoover continued to serve in this role when he joined Merit. (*Id.*). He testified that, in his opinion, greensheets would not be considered confidential or

proprietary after the corresponding project is "bidded out." (*Id.* at p. 3). Like the other deponents, Hoover stated that job-specific pricing elements would alter the value of a greensheet that was created for a different job. (*Id.* at pp. 6-8). Hoover also opined that MMR's database from 2019 would "[n]ot really" have any value to him at Merit in 2022, because he "kn[ew] what rates should be based on [his] experience" and that "rates across the board don't change a whole lot." (*Id.* at p. 8). However, in Hoover's experience, Plaintiff never shared its greensheets or overhead sheets with clients. (*Id.* at p. 10).

Hoover also testified that he was "[s]omewhat" familiar with NECA, but he was unaware that NECA did not publish certain labor instrumentation rates. (*Id.* at p. 15). Those rates were apparently present in MMR's database, and Hoover understood those values to have been developed by MMR employee experience. (*Id.* at p. 16). Hoover did not know how MMR built its database, yet thought that it was developed by the company over time. (*Id.* at pp. 5, 14). Part of this development apparently included the introduction of special material prices from certain vendors, for which estimators would not adjust or alter. (*Id.* at p. 16). Other material pricing and equipment rental pricing was done on a per-job basis by soliciting bids. (*Id.* at pp. 5-6). Also, contradicting the testimony of some of the other deponents, Hoover did not believe that the labor unit rates in MMR's database would grow "stale" and lose value over time. (*Id.* at p. 9).

Hoover expressed familiarity with MMR's overhead sheets. (*Id.* at p. 19). While he did not believe the form to be confidential to Plaintiff, he did believe that the values

populating the sheets, like the amount of profit, overhead, cost of insurance, worker's compensation, or vehicle costs, would be confidential to the company. (*Id.* at p. 19).

Upon leaving MMR in 2019, Hoover testified that he did not conduct an exit interview with the company, and was not asked to return any of the company's files. (Id. at pp. 10-11).

### d. Tracy Hollier

Tracy Hollier is the President of Merit, a competitor of MMR and ISG. (Doc. 161-6 at p. 2). Merit is currently contemplating entering a contractual relationship with ISG. (*Id.* at pp. 10-11). She worked in the construction business for thirty years, primarily as an estimator. (*Id.* at p. 3).

Hollier testified that, in her opinion, greensheets are confidential and proprietary only while the corresponding bidding process is open. (*Id.* at pp. 3-4). She testified that her business would not be harmed if Merit's greensheets were released from previous projects. (*Id.* at p. 9). However, Hollier also testified that her company uses an off-the-shelf estimating software called Accubid for their bid estimates, and does not use or maintain any modified database that materially differs from NECA values. (*Id.* at pp. 8, 15). Like other deponents, Hollier stated that the pricing values that comprise their database changes significantly over time, and that pricing will be job-dependent in some respects. (*Id.* at p. 5). Hollier followed this testimony by stating that if MMR possessed Merit's database from previous years, the possession of this database would have no value because of those pricing changes. (*Id.* at p. 6).

10

Regarding the overhead or top sheets, Hollier offered a markedly different opinion. She stated that overhead sheets were confidential and proprietary, because they "disclose[] [her] competitiveness" because it has Merit's "internal burdens," i.e. medical costs, insurance costs, and other overhead components like employee costs and strategy. (*Id.* at p. 4). This information would still be beneficial to Merit's competitors at least a year afterwards. (*Id.*). Hollier also testified that the data within the job analysis program at Merit is proprietary for "[e]very reason in the book," because it "is the basis for the execution of the project from a financial perspective." (*Id.* at p. 16).

Hollier never worked for MMR, and had no knowledge about MMR's database or estimating programs. (*Id.* at pp. 10, 12).

### e. Kasey Kraft

Against the depositions outlined above, Plaintiff offered the sworn and transcribed interview of Kasey Kraft. (Doc. 174-1). Kraft was the head of the estimating team at ISG at the time of his interview, and had been recruited from MMR. (*Id.* at pp. 36-37). Prior to leaving MMR for ISG, Kraft was caught downloading numerous MMR files to take with him. (Doc. 1). He is a named Defendant in this suit.

Before the four witnesses above were deposed, Plaintiff requested to schedule Kraft's deposition. (Doc. 188-1). Defendants declined, and said that they would not allow Plaintiff to depose any of their employees prior to Plaintiff producing certain discovery materials and witnesses. (*Id.*). Kraft's personal attorney then reached out to Plaintiff independently to discuss the possibility of a settlement. (Doc. 188-2).

Kraft and Plaintiff reached a settlement agreement (the "Settlement Agreement") on June 24, 2024. (Doc. 197). Plaintiff would drop Kraft from the suit if he would give a transcribed confidential pre-deposition interview, followed by a deposition. (*Id.*). The Settlement Agreement stated that Kraft would not disclose any confidential information from his employment at ISG. (*Id.*). Additionally, the terms of the Settlement Agreement were to be kept confidential, although Kraft could inform other Defendants that the agreement required him to tell the truth in his interview/deposition. (*Id.*). Kraft was also permitted to disclose to Defendants that he had entered into a Settlement Agreement with Plaintiff. (*Id.*). No monetary payment was attached to the Settlement Agreement. (*Id.*). Plaintiff and Kraft did not disclose the transcribed interview, which was attended and documented by a court reporter, to Defendants prior to the filing of their Motion to Dissolve.

The interview went forward on June 26, 2024. (Doc. 174-1). Kraft was represented by his attorney at the interview. (*Id.*). In relevant respects, the interview transcript reads like a deposition, although no counsel ever objected to any line of questioning. (*See id.*). Therein, Kraft testified in MMR's favor in all respects. Kraft averred that MMR's materials were valuable, were confidential and proprietary, were taken, were not substantively changed, and continued to be used (because of their value) until the Court issued its Contempt Order. (*Id.* at pp. 9, 11, 27, 31-32).

Kraft also answered questions concerning ISG's business on several occasions. (*See, e.g., id.* at pp. 5, 7). ISG's counsel argue that some materials protected by attorney-client privilege was disclosed, and that other confidential ISG information

12

was disclosed by Kraft in violation of his confidentiality agreement with the company. The day after Kraft conducted this transcribed interview, he allegedly told other Defendants that he had settled with MMR and had spoken with MMR's attorneys. (Doc. 188 at p. 7).

The Court will not consider the transcribed interview of Kraft, for reasons given in Section III(b) of this Ruling and Order.

## II.    LEGAL STANDARD

The parties dispute the standard by which to review a request to dissolve a preliminary injunction. Defendants maintain that the standard for dissolving a preliminary injunction is found in Federal Rule of Civil Procedure 54(b), and that a preliminary injunction can be dissolved for "any reason" that the Court deems sufficient. (Doc. 161-1 (citing *Providence Title Co. v. Truly Title, Inc.*, 2021 WL 5003273 at *2-3 (E.D. Tex. Oct. 28, 2021))).

Plaintiff responds that motions to dissolve *stipulated* preliminary injunctions are governed by Federal Rule of Civil Procedure 60(b), and that Defendants need to show "a *significant change either in factual circumstances* or in law render[ing] continued enforcement detrimental to the public interest." *See Total Safety v. Knox*, No. 19-2718, 2019 U.S. Dist. LEXIS 219082, at *3-5 (S.D. Tex. Dec. 18, 2019) (emphasis in original). In Rule 60(b) motions: "[i]t is insufficient to show that the enjoined party would be "better off" if the injunction is lifted. The enjoined party must show "hardship so extreme and unexpected as to justify us in saying that they are the victims of oppression." *U.S. v. Swift & Co.,* 286 U.S. 106, 119 (1932); *see*

*also Valentine Sugars, Inc. v. Sudan,* 34 F.3d 320, 322 (5th Cir. 1994) (changes in business conditions from additional licensing not "new and unforeseen"); *Sec. & Exch. Comm'n v. Bryant,* No. 4:17-CV-00336, 2017 WL 4407953, at *2 (E.D. Tex. Oct. 4, 2017). A Rule 60(b) motion is "generally not favored and is properly granted only upon a showing of exceptional circumstances." *Marrero Pichardo v. Ashcroft,* 374 F.3d 46, 55 (2d Cir. 2004). "The burden of proof is on the party seeking relief from judgment." *Id.* at 55.

The weight of authority lies with Plaintiff. Courts, including some of those cited to in Defendants' Motion to Dissolve, generally require a significant change in factual circumstances to modify a stipulated or consent preliminary injunction. *See, e.g., Sulzer Mixpac AG v. DXM Co.,* No. 19 CIV. 9404 (LAP), 2022 WL 4280343, at *6 (S.D.N.Y. Sept. 15, 2022); *Fed. Trade Comm'n v. Kutzner,* No. SACV1600999BROAFMX, 2017 WL 5229182, at *4 (C.D. Cal. June 12, 2017), *aff'd sub nom. Fed. Trade Comm'n v. Marshall,* 781 F. App'x 599 (9th Cir. 2019); *Bryant,* 2017 WL 4407953, at *2; *ICEE Distributors, Inc. v. J&J Snack Foods Corp.,* 445 F.3d 841, 850 (5th Cir. 2006) ("Modification of an injunction is appropriate when the legal or factual circumstances justifying the injunction have changed," and, absent this change, modification to an injunction is inappropriate). The Court will therefore require Defendants to show a significant change in factual circumstances to consider dissolving the Stipulated Preliminary Injunction.[4]

_____

[4] One practical implication of applying this standard is that the Court will not consider Defendant Jason Yates's statement that he had Plaintiff's consent to use its estimating tools at ISG, since these factual circumstances allegedly existed prior to Yates, the president of ISG, and other Defendants forgoing the preliminary injunction hearing and entering into the

Some courts have commented that this standard applies because stipulated preliminary injunctions are essentially consent decrees. *See, e.g., Valpak Direct Mktg. Sys., Inc. v. Hyde*, No. 8:06-CV-347-T-26EAJ, 2006 WL 1982877, at *2 (M.D. Fla. July 13, 2006); *Chase v. Town of Ocean City, Md.*, No. CIV.A. ELH-11-1771, 2015 WL 4993583, at *5 (D. Md. Aug. 19, 2015); *Fed. Trade Comm'n v. Enforma Nat. Prods., Inc.*, 362 F.3d 1204, 1218 (9th Cir. 2004) (discussing the issue at length and equating a consent decree to a stipulated preliminary injunction, "which is essentially a proposed injunction that reflects a temporary settlement"); *Columbia River Advisors, LLC v. MKT & Assocs., LLC*, No. 3:24-CV-05696-LK, 2024 WL 4188968, at *2 (W.D. Wash. Sept. 13, 2024) (collecting cases).

## III.   ANALYSIS

### a.  Motion To Dissolve

Defendants move to dissolve the Stipulated Preliminary Injunction because in their view and, as explained above, the depositions of Hoover, Gaudin, Mason, and Hollier have given new bases for the Court to conclude that the allegedly misappropriated materials are not trade secrets because: "(1) they are generally known to the relevant public or readily ascertainable through proper means; (2) [they] have no independent economic value; and (3) MMR did not take reasonable steps to protect them." (Doc. 161-1 at p. 15). The Court addresses each argument in the

---

Stipulated Preliminary Injunction. However, the Court notes that even if the Rule 54(b) standard did apply, Yates's declaration that ISG had permission to use MMR's materials, in contradiction to the sworn allegations contained in the verified Complaint and provided approximately two years after the fact, would hold little to no weight with the Court.

following.

### i. Generally Known to the Relevant Public or Readily Ascertainable through Proper Means

Defendants argue that the forms and formats of Plaintiff's estimating tools are not proprietary according to the new depositions. (*Id.*). Plaintiff appears to waive this issue for present purposes. (Doc. 175 at p. 30).

Despite this, the Court finds that Defendants have not presented significant new facts that merit revisiting the bases for the Stipulated Preliminary Injunction as regarding the estimating tools. That is because regardless of the proprietary status of the forms of the estimating tools, all witnesses agree that those forms pull from Plaintiff's database in some way—and no witness presented by Defendant had any knowledge as to how this database was developed and/or what the database is composed of. (*See* Docs. 161-3, 161-4, 161-5, 161-6). Moving past this lack of personal knowledge, the speculation offered by Hoover, Mason, and Gaudin of the values in Plaintiff's database were conflicted. Each assumed that the values in the database were in some way derivative of NECA values, but Hoover, Mason, and Gaudin each also believed that the database was based on Plaintiff's historical data and process of refinement. (Docs. 161-3 at p. 14, 161-4 at p. 16, 161-5 at p. 20). Furthermore, Hoover, the only deponent who worked in estimating at MMR, testified that certain values in the database were not offered by NECA or were based on MMR's business relationship with certain vendors, and that the special pricing resulting from these relationships was proprietary and confidential. (Doc. 161-3 at pp. 8, 16). Additionally, no argument was offered that the data populating MMR's overhead sheets was

publicly available or readily ascertainable.

As to the project control tools, Defendants argue that Plaintiff's materials are generally available because they are created using a third-party software called Viewpoint. (Doc. 161-1 at p. 11). Against this, Plaintiff notes that Ben Huffman, ISG's then head of project controls, testified that the project controls databases, such as the job analysis program, the timekeeper application, and the "Bible," which is a proposal tracking software, that he built for ISG were based on MMR templates were proprietary, were not solely built in Viewpoint, were custom-built, and could not be found outside of MMR. (Docs. 119-7 at pp. 25, 31, 36, 119-8 at pp. 31, 39-40). The Court finds Huffman's testimony to be persuasive, as he has the most personal knowledge of project control systems of any of the offered witnesses.

Defendants respond to this testimony by raising the same arguments put forth in their opposition to Plaintiff's motion for contempt, and argue that none of the project control systems built by Huffman are presently in use at ISG. (Doc. 161-1 at p. 11). For the same reasons offered in the Court's Contempt Order, (Doc. 145 at p. 13), these arguments are ineffective. The Court therefore concludes that Defendants have not presented significant new facts showing that Plaintiff's project control systems were generally known or readily ascertainable through proper means.

Defendants next take aim at the confidential status of the customer list that Defendant David Heroman allegedly took from Plaintiff. (Doc. 161-1 at p. 9-10). Defendants argue that this list is not confidential or proprietary, despite it clearly being defined as such in the confidentiality agreement Plaintiff requires each

employee to sign, (*see* Doc. 1-4 at p. 1), and despite Plaintiff averring that its customer list is not publicly available or ascertainable in its original Verified Complaint, (Doc. 1 at p. 17). Defendants argue that because Plaintiff advertises its completed projects on its websites, and because Hollier testified that she generally did not believe customer lists to be proprietary, (Doc. 161-6 at p. 16), the customer list was generally known or readily ascertainable through proper means. The new facts offered by Defendants do not convince the Court that the Stipulated Preliminary Injunction should be revisited as respecting Plaintiff's customer list, since Defendants have offered no new facts showing that a list of Plaintiff's current or contemplated customers, as opposed to those whose project has been completed, is generally known to the relevant public or was readily ascertainable through proper means.

However, the *plain language* of neither Stipulated Preliminary Injunction nor Plaintiff's form confidentiality agreement purport to apply to the personal business contacts of employees departing from the company. (*See* Docs. 1-4, 23). This reading of Plaintiff's confidentiality agreement is buoyed by the testimonies of Gaudin, Mason, and Hoover, who each stated that Plaintiff did not request that they keep no personal business contacts from their time with the company before the filing of Plaintiff's Verified Complaint, and that such action was, to their knowledge, entirely permissible and expected. (Docs. 161-3 at p. 11, 161-4 at pp. 31-32, 161-5 at p. 26). The difference between personal business contacts and a confidential customer list is in the existence of a relationship between the employee and the listed customer or contact. *See, e.g., Weighing & Control Servs., Inc. v. Williams*, No. CIV.A. 88-5211,

18

1989 WL 6011, at *2 (E.D. La. Jan. 24, 1989) ("Louisiana courts have consistently declined to issue an injunction [under LUTSA] against a former employee's solicitation of customers when the former employee relied on his memory and did not have a list."); *L & B Transp., LLC v. Busby*, No. CIV A 06-310FJPSCR, 2008 WL 4845103, at *5 (M.D. La. Feb. 12, 2008) (employee's confidentiality agreement with former employer was not breached when he did not take a customer list, and solicited former employer's customers from personal memory); *Ozburn-Hessey Logistics, LLC v. 721 Logistics, LLC*, 40 F. Supp. 3d 437, 452 (E.D. Pa. 2014) (under Pennsylvania law, customer lists can qualify for trade-secret protection, but "[a]n employee's personal business contacts, although made while in plaintiff's employ, are not plaintiff's trade secrets."); *cf. Pure Air Daigle, LLC v. Stagg*, No. 6:16-CV-01322, 2017 WL 4158851, at *3 (W.D. La. Sept. 15, 2017) (copying confidential customer lists can be a breach of fiduciary duty under Louisiana law, but it is *not* a breach for "former employees to solicit the clients of their former employers as long as they do so based on their memory, experience, or personal contacts.").

Plaintiff averred that Heroman took a confidential customer list, and Defendants passed on the opportunity to combat this allegation in a preliminary injunction hearing. Absent any significant new factual allegations, which were not available to Defendants prior to the decision to enter the Stipulated Preliminary Injunction, that this was not, in fact, what Heroman took from Plaintiff, the Court has no reason to dissolve the Stipulated Preliminary Injunction on this ground. That being said, both parties are instructed that the Stipulated Preliminary Injunction

does not apply to the personal business contacts of former MMR employees.[5]

### ii. Independent Economic Value

Defendants next argue that the testimonies of Gaudin, Mason, Hoover, and Hollier establish that the estimating tools allegedly taken from Plaintiff have no independent economic value because the data within the tools is three to four years old, because there are certain pricing factors that are job-specific, and because any estimate arising from these tools is revised by estimators in their usual course of business. (Doc. 161-1 at pp. 17-19).

In making these arguments Defendants conflate the witnesses testimony as between overhead sheets and greensheets. (*See id.* at p. 8 ("each of the deponents testified uniformly. . . the figures in the overhead top/green sheets have no value for subsequent bids or jobs.")). The witnesses were anything but uniform on the value of an overhead sheet after a bid is closed out. (*See* Doc. 161-6 at p. 4 (disclosure of an overhead sheet would, in Hollier's opinion, disclose her competitiveness and would benefit Merit's competitors up to at least a year after the overhead sheet was prepared)). Even assuming *arguendo* that Hoover, Mason, and Gaudin were in agreement with Hollier as to the value of the overhead sheets, which they were not, (*compare* Doc. 161-5 at pp. 24-26 *with* 161-3 at p. 19), the Court finds, after reviewing the transcripts, that the weight of Hoover, Mason, Gaudin, and Hollier's testimonies favor Plaintiff's case as to the value of the overhead sheets.

---

[5] The Court takes up Defendants' argument about Plaintiff's supposed failure to satisfy the test set forth in *Guy Carpenter & Co. v. Provenzale*, 334 F.3d 459, 467 (5th Cir. 2003), for their customer list in Section III(a)(iii) below.

Regarding the greensheets, the testimonies of Hoover, Gaudin, Mason, and Hollier were more aligned. Each testified that certain pricing elements were inherently subject to change based on global economic factors, along with job specific facts, and that it is common in the E&I industry to change any bid estimate before submission to the potential customer according to the assigned estimator's experience. Despite this, the Court finds that Defendants have failed to present new facts sufficient for the Court to consider dissolving the Stipulated Preliminary Injunction.

That is because, even accepting all of the above, the testimonies of Defendants' witnesses revealed that Plaintiff's database, which is accessible through prior greensheets, (1) contained confidential business information that would not be subject to continual change, (see Doc. 161-3 at p. 16 (testifying to Plaintiff's special vendor pricing)), (2) was built using historical data that was refined over time according to Plaintiff's successes and failures, and contained pricing data that potentially would not be subject to change, (see id. at p. 9 (discussing labor unit rates)),[6] (3) had pricing data for certain material instrumentation that was not publicly available, (see id. at pp. 15-16 (stating that Plaintiff's database had pricing information for material instrumentation that was not available through NECA)),

---

[6] Defendants respond to this testimony by noting that even if labor unit rates are temporally stable, they are likely not stable across jobs. However, this response does not adequately address the competitive advantage that Defendants allegedly gained, because on an individual level each of the labor unit rates in a certain greensheet has potential value, and because, in the aggregate, Defendants could locate, from the thousands of files allegedly taken from Plaintiff, which include Plaintiff's estimating tools and bids for two entire years, a submitted bid that is similar to the sought-after contract. (Doc. 53 at p. 3).

and (4) were still the basis, even if altered later in the process, for any submitted bid estimate.

Additionally, the testimonies of Defendants' witnesses were conflicting in some respects, (*compare* Doc. 161-5 at pp. 36-37 *with* Doc. 161-6 at p. 6; *compare* Doc. 161-3 at p. 9 *with* Doc. 161-6 at p. 5), and the persuasiveness of the statements were undercut by the respective deponent's lack of relevant knowledge of Plaintiff's pricing database, which is the actual item at issue. For example, Hollier testified that Merit would not be harmed if someone took her company's greensheet for a completed bid to Plaintiff. However, Merit does not possess a custom database like Plaintiff, which is why when she was questioned as to how one could acquire Merit's database she responded, "[c]all Accubid and get it." (Doc. 161-6 at p. 8). As to Plaintiff's database, Hollier had never worked for the company, and could not opine as to what the database comprises. (*Id.* at p. 10).

Accordingly, the Court concludes that Defendants have not presented significant new facts that warrant dissolution of the Stipulated Preliminary Injunction as to the value of Plaintiff's estimating tools.[7]

Defendants later in their Motion to Dissolve repurpose the arguments addressed above against the existence of irreparable harm. The Court dispatches this repurposed argument with the analysis provided above.

---

[7] As a general matter, the Court notes that the broad argument offered by Defendants that so much time has passed between the facts alleged in the operative Complaint, (Doc. 53), and now that the allegedly misappropriated materials have no value is weakened by Defendants' admissions in the contempt proceedings that ISG used Plaintiff's materials well into 2024.

Defendants did not offer any argument as to the independent economic value of the project control systems or customer lists, and so the Court does not address those items here.

### iii.  Reasonable Steps

Finally, Defendants take up the sword once more to contest the adequacy of Plaintiff's efforts to protect its disputed materials. The bases for this challenge are that Hoover, Gaudin, and Mason testified that Plaintiff: (1) did not password protect individual files, (2) did not instruct its employees on how to cooperate with its confidentiality agreement, (3) did not conduct exit interviews or request the return of its materials, and (4) allowed Mason to keep his company laptop in 2016. (Doc. 161-1 at pp. 21-24).

The Court again concludes that the offered depositions do not warrant revisitation of the Stipulated Preliminary Injunction as to Plaintiff's security measures. Hoover, Gaudin, and Mason did not offer testimony challenging Plaintiff's assertion, made in its Verified Complaint, that it password protected its network, which was one of the alleged facts relied upon by the Court in its ruling on Plaintiff's TRO motion. (*See* Docs. 1 at p. 7, 7 at p. 9). Further, while Hoover, Gaudin, and Mason testified that Plaintiff did not password protect individual files, this testimony is undercut by the additional testimony from Mason and Gaudin, both of whom did not work in estimating with Plaintiff, that the company restricted them from accessing certain estimating tools or project control systems. (Docs. 161-4 at p. 32 (Mason restricted from accessing certain files in 2023), 161-5 at p. 161-5 at pp. 20, 41 (Gaudin

restricted from accessing certain files, including estimating materials, in 2019)).

As to Plaintiff's efforts to instruct its employees on the terms and requirements of the confidentiality agreement, the Court is similarly unpersuaded by Defendants' arguments. The Court assumes that each signatory to the confidentiality agreement has read its terms, *Tetlow v. Loyola Univ. of New Orleans*, 483 So. 2d 1242, 1244 (La. Ct. App.) ("One who signs a contract is presumed to know its terms"), *writ denied*, 488 So. 2d 689 (La. 1986), and the confidentiality agreement, which Plaintiff allegedly required every employee to sign, (Doc. 1 at p. 6), plainly identifies the material that Plaintiff considers to be confidential and a trade secret:

> During and after the term of his employment, the EMPLOYEE agrees to hold as confidential all knowledge and information he has acquired in connection with his/her employment with MMR, and which is not otherwise generally available to the public or third parties, ***including but not limited to customer lists, financial information, pricing information, marketing material, technical data, drawings, memoranda, notes, programs, electronic gear, personnel records, policies, other items, and papers and reproductions (all of which is deemed "Confidential" and a trade secret)*** thereof relating the business of MMR.

(Doc. 1-4 at p. 1 (emphasis added)). Even moving past this notice, Hoover and Gaudin each testified that, to their understanding, taking Plaintiff's estimating tools and project control systems would be wrong. (*See* Docs. 161-3 at pp. 12-13, 161-5 at pp. 35-36). This understanding is in accord with Plaintiff's Business Code of Ethics and Rules of Conduct, mandatory agreements that each employee of Plaintiff must also sign and abide by. (*See* Docs. 1-2 at p. 2, 1-3 at p. 2).

As to the lack of exit interviews and Plaintiff's alleged failure to request the

return of its materials, the Court begins by examining the latter. Hoover and Gaudin testified that each did not keep any of Plaintiff's materials after they left the company. (Docs. 161-3 at p. 13, 161-5 at p. 43). Mason did not either in his latter stint with Plaintiff, although he did keep a laptop belonging to Plaintiff in 2016. (Doc. 161-4 at pp. 33, 45-46). It is unclear what confidential information was located on or was able to be accessed through this laptop, if any, given that the one program definitively identified on the laptop was a program that was constructed by Mason in his spare time. (*Id.* at pp. 33, 55). Due to this absence of alleged fact, along with the approximate five-year period in between this event and those that form the basis of Plaintiff's operative Complaint, (Doc. 53), the Court cannot determine whether Plaintiff allowing Mason to keep the company's laptop is a fact that weighs in favor of Plaintiff or Defendants. Absent such facts, the Court has no reason to dissolve the Stipulated Preliminary Injunction.

Additionally, Plaintiff alleged that it employs a data loss prevention software in its initial verified Complaint. (Doc. 1 at p. 7). Plaintiff allegedly failing to ask for the return of its materials from Hoover and Gaudin when neither took any materials, and when this was presumably confirmed by Plaintiff's data loss prevention software, is not a sufficient basis for the Court to conclude that Plaintiff did not take reasonable efforts to maintain the confidentiality of its materials.

Regarding Defendants' former point that Plaintiff failed to conduct exit interviews, this alleged fact does not erase or overwhelm the protective measures that were put in place by Plaintiff, and does not require that this Court find as such. *See*

*Balearia Caribbean, Corp. v. Calvo*, No. 16-23300-CIV, 2018 WL 6261497, at \*4 (S.D. Fla. Aug. 22, 2018) (plaintiff failing to conduct exit interviews was insufficient basis, given other protective measures, to find that plaintiff did not exercise reasonable efforts to protect its trade secrets); *Vendavo, Inc. v. Long*, 397 F. Supp. 3d 1115, 1138 (N.D. Ill. 2019) (plaintiff granted injunctive relief for misappropriation of trade secrets despite failing to conduct exit interview or request return of materials when relevant ex-employee signed a confidentiality agreement); *Cont'l Grp., Inc. v. KW Prop. Mgmt., LLC*, 622 F. Supp. 2d 1357, 1377 (S.D. Fla. 2009), *order clarified*, No. 09-60202-CV-COHN, 2009 WL 3644475 (S.D. Fla. Oct. 30, 2009) (same).

As to Defendants' contention that the confidentiality agreement, standing alone, does not demonstrate a reasonable effort from Plaintiff to maintain its trade secrets, the Court responds with its prior analysis, (Doc. 7 at pp. 9-10 (citing Unif. Trade Secrets Act § 1(4)(ii) cmts.)), undisturbed by any of Defendants witnesses, that Plaintiff's Confidentiality Agreement does not stand alone. Rather, Plaintiff's confidentiality agreement was buttressed by Plaintiff password-protecting its network, limiting employee access to certain confidential business information, and deploying a data loss prevention software to monitor the transfer of its confidential information. These measures were sufficient support for the Court's consideration of the TRO. *See Brown & Root Indus. Servs., LLC v. Brown*, No. CV 21-291-JWD-SDJ, 2022 WL 4492087, at \*9 (M.D. La. Sept. 9, 2022), *report and recommendation adopted*, No. CV 21-291-JWD-SDJ, 2022 WL 4490136 (M.D. La. Sept. 27, 2022) (plaintiffs password protecting their materials, requiring that employees sign

confidentiality agreements, and restricting access to confidential information were reasonable measures); *see AirFacts, Inc. v. de Amezaga*, 909 F.3d 84, 97 (4th Cir. 2018) ("[plaintiff] took reasonable steps to maintain [its materials] secrecy. . . [plaintiff] required all employees to sign confidentiality agreements, installed monitoring software on every computer to track employees' actions, and specifically protected the [materials] by giving only "a few" employees access.").

Additionally, because Plaintiff employed these measures, and because customer lists were clearly identified by the terms of Plaintiff's confidentiality agreement, the Court concludes that the first two elements of the *Guy Carpenter* test are satisfied. *See* 334 F.3d at 467 (three factors include: "(1) what steps, if any, an employer has taken to maintain the confidentiality of a customer list; (2) whether a departing employee acknowledges that the customer list is confidential; and (3) whether the content of the list is readily ascertainable."). The Court has been provided no additional testimony on the third element of the *Guy Carpenter* test, and Plaintiff alleged in its Verified Complaint that the content of its customer lists was not readily ascertainable. (Doc. 1 at pp. 5-6). There is therefore no basis to revisit the Stipulated Preliminary Injunction's application to Plaintiff's customer lists.

In summation, the Court's TRO was followed by Defendants' voluntary entry into the Stipulated Preliminary Injunction, and Defendants have not, as shown above, provided significant new facts that persuade the Court towards dissolution.

### b. Motion For Sanctions

The Court now turns to Defendants' Motion For Sanctions. (Doc. 185). Readers

will note the conspicuous absence of Kraft's transcribed interview in the Court's analysis above. The Court, as mentioned previously and for the reasons below, will grant Defendants' Motion for Sanctions in part, and Kraft's transcribed interview will be stricken from the record. The Court first identifies the rule potentially violated by Plaintiff in taking the transcribed interview of Kraft without providing notice to other Defendants, and then adjudicates Defendants' request to disqualify Plaintiff's counsel.

### i. Rules of Professional Conduct

Defendants argue that Plaintiff violated an array of rules of professional conduct for their conduct concerning Kraft, and that disqualification is potentially necessary. Each of the rules is provided in pertinent part below.

ABA Model Rule 4.2: "[i]n representing a client, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so."

Louisiana Rule of Professional Conduct ("LRPC") 4.2:

Unless the lawyer has the consent of the other lawyer or is authorized to do so by law or a court order, a lawyer in representing a client shall not communicate about the subject of the representation with:

(a) a person the lawyer knows to be represented by another lawyer in the matter; or
(b) a person the lawyer knows is presently a director, officer, employee, member, shareholder or other constituent of a represented organization and

> (1) who supervises, directs or regularly consults with the organization's lawyer concerning the matter;

(2) who has the authority to obligate the organization with respect to the matter; or

(3) whose act or omission in connection with the matter may be imputed to the organization for purposes of civil or criminal liability.

LRPC 3.4(a): "A lawyer shall not: [] unlawfully obstruct another party's access to evidence or unlawfully alter, destroy or conceal a document or other material having potential evidentiary value. A lawyer shall not counsel or assist another person to do any such act."

LRPC 3.4(b): "A lawyer shall not . . . falsify evidence, counsel or assist a witness to testify falsely, or offer an inducement to a witness that is prohibited by law."

LRPC 3.4(f):

[A lawyer shall not] request a person other than a client to refrain from voluntarily giving relevant information to another party unless: (1) the person is a relative or an employee or other agent of a client, and (2) the lawyer reasonably believes that the person's interests will not be adversely affected by refraining from giving such information.

LRPC 4.4(a): "(a) In representing a client, a lawyer shall not use means that have no substantial purpose other than to embarrass, delay, or burden a third person, or use methods of obtaining evidence that violate legal rights of such a person."

### ii. Alleged Violations

Defendants submit that Plaintiff violated each of the rules of professional conduct identified above. (Doc. 185-1 at pp. 9-13).

For LRPC and ABA Rule 4.2, Defendants contend that Plaintiff violated its duty to not communicate with Kraft, an employee of ISG who could obligate and

29

expose the company to liability with respect to the lawsuit, without ISG's counsel present. (*Id.* at p. 10).

Regarding LRPC 3.4(a), (b), and (f), Defendants argue that Plaintiff unlawfully concealed Kraft's interview transcript for three months, that Defendants offered an inducement to Kraft to procure his interview that is prohibited by law, and that the confidentiality provision in Kraft's Settlement Agreement wrongfully obligated Kraft to not give other Defendants relevant information. (*Id.* at p. 13).

Defendants finally argue that Plaintiff violated LRPC 4.4(a) and Federal Rule of Civil Procedure 30(b). Defendants assert that Plaintiff's counsel neglecting to send the transcript of Kraft's interview was violative of ISG's legal rights, as set forth in Federal Rule of Civil Procedure 30(b), which obligates parties to give notice for proposed deponents and, according to Defendants, turn over the transcript. (*Id.* at p. 13).

For these alleged violations, Defendants request that the Court strike the transcribed interview and bar Kraft from further testimony. (*Id.* at p. 15). Defendants state that only the preclusion of Kraft as a witness cures the ethics violation relating to the testimony "induced" by the settlement agreement. (*Id.*). In the alternative, Defendants request that the Court disqualify Plaintiff's counsel. (*Id.* at p. 16).

Plaintiff responds that it violated no professional rules of conduct. For LRPC 4.2 and ABA Rule 4.2, Plaintiff argues that the presence of Kraft's attorney renders both rules inapplicable. (Doc. 188 at p. 10).

As to LRPC 3.4(b), Plaintiff responds by stating that conditioning a settlement on taking a deposition is not an inducement that is prohibited by law. Plaintiff notes that Defendants' cases in support of its claims to this point concern when would-be deponents were offered monetary compensation for testimony—an inapposite factual circumstance to the one at issue here. (*Id.* at p. 12). Further, Plaintiff argues that the only case cited by Defendants in support of barring Kraft from testifying whatsoever that did not concern actual payment of a witness in some form was *Dyll v. Adams*, which involved a communication requesting *useful*, as opposed to merely *truthful*, testimony. (*Id.* at p. 16 (citing 1997 U.S. Dist. LEXIS 24694, at *2-3 (N.D. Tex. Apr. 28, 1997)). Plaintiff also argues that Defendants' argument, taken to its logical conclusion, would make the commonplace practice in criminal matters of offering reduced sentences for testifying against one's codefendants a wrongful act. (Doc. 188 at p. 17).

Finally, Plaintiff contends Defendants' arguments for violations to LRPC 3.4(a), (f), and 4.4(a). For Rule 3.4(a), Plaintiff asserts that holding on to the interview transcript for three months is not an unlawful concealment, and was within Plaintiff's rights as the transcript was its work product. For Rule 3.4(f), Plaintiff argues that it never requested Kraft to hold off on giving relevant information to Defendants. (*Id.* at p. 20). Rather, Plaintiff states that it allowed Kraft to disclose the existence of the settlement agreement and his interview to other named Defendants. (*Id.*). Lastly, Plaintiff contends that LRPC 4.4 is not violated because Plaintiff explicitly requested

31

that Kraft not provide them with any privileged material, and because the interview transcript is not a deposition. (*Id.* at p. 21).

By the plain language of the rules, Plaintiff did not violate ABA Model Rule 4.2, LRPC 3.4(f), or LRPC 4.4(a). ABA Model Rule 4.2 was not triggered because Kraft was represented by his own counsel, LRPC 3.4(f) was not violated because the terms of the Settlement Agreement did not prevent Kraft from stating that he had entered into a settlement agreement with Plaintiff, or that he had spoken with Plaintiff, and LRPC 4.4(a) was not violated because the Court concludes, based on the discussion below, that the Settlement Agreement was not a method of obtaining evidence that violated other Defendants' rights.

Defendants strenuously urge the Court to find that Plaintiff violated LRPC 3.4(b), because, in Defendants' view, the Settlement Agreement was an inducement to Kraft that was prohibited by law. The Court disagrees.

Defendants have offered no persuasive caselaw in support of their argument that Plaintiff offering to settle their claims against Kraft in exchange for his truthful testimony, without conditioning this offer on the content of Kraft's testimony and without offering any other sort of compensation, is an inducement that was prohibited by law. To the contrary, the Settlement Agreement merely reiterates the obligation Kraft assumed once he was deposed—an eventuality that all parties agree was going to come to pass.

Defendants argue that several statements by Plaintiff's counsel in the interview with Kraft indicate that Kraft's dismissal was based on the content of his

testimony. (Doc. 185-1 at pp. 4-5). The Court is unconvinced. The Settlement Agreement was executed prior to the interview, (Docs. 174-1, 189-1), and may not, by its terms, be rescinded should Kraft fail to testify favorably. Kraft was and is represented by capable counsel, who, in the event Kraft failed or fails to testify to the benefit of Plaintiff, will still seek to enforce the Settlement Agreement (and will likely be successful in doing so).

Defendants' strongest arguments that counsel for Plaintiff violated their ethical and legal obligations are found in LRPC 4.2(b), in LRPC 3.4(a), and in Federal Rule of Civil Procedure 30. LRPC 4.2(b) is potentially triggered by Plaintiff speaking with Kraft without other Defendants being present when Kraft's testimony, as an employee of ISG, could impute liability to the company. (Doc. 185-1 at p. 11).

Defendants are correct on this issue. Plaintiff communicating with Kraft at length in a transcribed interview without notifying ISG was, at the very least, contrary to notions of fair play.

Plaintiff argues that the comments to ABA Rule 4.2, upon which LRPC 4.2(b) was originally based, indicate that the rule was not intended to apply when the contacted individual is represented by counsel, whether that counsel be the constituent's personal representation or the organization's. (Doc. 188 at p. 10). Defendants respond that LRPC 4.2 differs substantially from ABA Rule 4.2, and that Louisiana intentionally did not incorporate the language upon which Plaintiff relies. (Doc. 194 at pp. 4-5). The Court concludes that Defendants have the stronger argument, because of the purposes underlying Rule 4.2.

33

"The dual purposes behind Rule 4.2 are to prevent disclosure of attorney/client communications and to protect the party from 'liability-creating' statements elicited by a skilled opposing attorney." *Jenkins v. Wal-Mart Stores, Inc.*, 956 F. Supp. 695, 696 (W.D. La. 1997). Both purposes were potentially frustrated by Plaintiff's actions. First, ISG's exclusion from Kraft's interview with Plaintiff offered no protection to the disclosure of any attorney/client communications that Kraft conducted or was privy to with ISG's counsel.[8] Fortunately, Kraft's personal counsel and Plaintiff's counsel were cognizant of this risk, and repeatedly instructed Kraft against this type of disclosure. (Doc. 174-1 at pp. 2, 27). Second, as Defendants note, ISG and other named Defendants were not afforded an opportunity to protect against the disclosure of liability-creating statements by Kraft.

Having concluded that the purpose behind LRPC 4.2(b) may have been compromised, the question before the Court becomes what action will "balance the scales." *In re Shell Oil Refinery*, 143 F.R.D. 105, 109 (E.D. La.), *amended on reconsideration in part*, No. CIV. A. 88-1935, 1992 WL 275426 (E.D. La. Sept. 29, 1992), *and amended*, 144 F.R.D. 73 (E.D. La. 1992).[9] The Court concludes that,

---

[8] The Court does not address ISG's arguments about alleged breaches to Kraft's confidentiality agreement because the Court is solely concerned with the dispute between Plaintiff and Defendants, and not with ISG's "internal problems" with its employees. *See In re Shell Oil Refinery*, 143 F.R.D. 105, 108 (E.D. La.), *amended on reconsideration in part*, No. CIV. A. 88-1935, 1992 WL 275426 (E.D. La. Sept. 29, 1992), *and amended*, 144 F.R.D. 73 (E.D. La. 1992).

[9] This being said, and having not conducted an evidentiary hearing on the issue of whether LRPC 4.2(b) was violated, the Court expressly declines to make a definitive finding on the issue of whether Plaintiff breached LRPC 4.2(b). The Court also draws short of making such a finding because, as noted below, satisfactory remedies are available to promote fair play—those being the striking of Kraft's transcribed interview and the other actions outlined below.

because Kraft has not been tainted as a witness and because no privileged information was disclosed in his transcribed interview, the appropriate action is to strike Kraft's transcribed interview from the record, to mandate that Plaintiff include other named Defendants on any further communications with Kraft and his personal counsel, and to tax the costs associated with Kraft's eventual deposition against Plaintiff. *See id.* (preventing further *ex parte* communication with relevant employee, but not any communication whatsoever); *see Fisher v. Town of Boyce*, 2017-470 (La. App. 3 Cir. 9/6/17), 250 So. 3d 904, 911, *writ denied*, 2017-1705 (La. 12/5/17), 231 So. 3d 629 (upholding trial court ruling that struck affidavit of an organization's officer, created by improper contact with opposing counsel, but did not bar the officer from further testimony); *cf. Jenkins*, 956 F. Supp. at 697 (requiring no *ex parte* communications with defendant's current employees).

Defendants argue that in several instances Kraft did, in fact, disclose information protected by the attorney-client privilege because Plaintiff asked Kraft for his opinion on how other Defendants were approaching the lawsuit and about the actions of other Defendants prior to and after the entry of various rulings by the Court. (Doc. 185-1 at pp. 6-7). The Court has reviewed the transcribed interview, and disagrees. Kraft never disclosed any communications that he had with other named Defendants' counsel, nor any communications between other named Defendants and their counsel. (*See* Doc. 174-1). The portions of the interview transcript identified by Defendants as privileged, without any supporting authority whatsoever for this conclusion, (*see* Doc. 185-1 at pp. 6-7), do not change the opinion of the Court.

Defendants also argue that the work-product privilege was breached because Kraft was questioned as to what role Defendant Yates had in the litigation. This argument significantly mischaracterizes the work-product privilege. "The work-product doctrine 'insulates a lawyer's research, analysis of legal theories, mental impressions, notes, and memoranda of witnesses' statements from an opposing counsel's inquiries.'" *Adams v. Mem'l Hermann*, 973 F.3d 343, 349 (5th Cir. 2020) (quoting *Dunn v. State Farm Fire & Cas. Co.*, 927 F.2d 869, 875 (5th Cir. 1991)). "It protects materials prepared in anticipation of litigation, whether those materials were prepared by the attorney or by agents of the attorney." *Id.* (citing *In re Grand Jury Proceedings*, 601 F.2d 162, 171 (5th Cir. 1979)). The privilege does not extend to the mental impressions or observations of Kraft as to Defendant Yates's level of involvement in this dispute, and Defendants again offered no authority in support of this conclusion.

Defendants also contest that Plaintiff sought or obtained attorney-client privileged information through its questioning of Kraft regarding the reason for ISG adopting new estimating tools, any communications amongst ISG staff regarding use of the estimating tools after the entry of the Stipulated Preliminary Injunction, the seriousness with which ISG took the Stipulated Preliminary Injunction, the effect of the Court's Contempt Order, and communications that ISG had with its employees about the Contempt Order. (Doc. 185-1 at pp. 6-9).

"For a communication to be protected under the [attorney-client] privilege, the proponent 'must prove: (1) that he made a *confidential* communication; (2) to a lawyer

or his subordinate; (3) for the primary purpose of securing either a legal opinion or legal services, or assistance in some legal proceeding.'" *Equal Emp. Opportunity Comm'n v. BDO USA, L.L.P.*, 876 F.3d 690, 695 (5th Cir. 2017) (quoting *United States v. Robinson*, 121 F.3d 971, 974 (5th Cir. 1997)) (emphasis in original). "Determining the applicability of the privilege is a 'highly fact-specific' inquiry, and the party asserting the privilege bears the burden of proof." *Id.* (quoting *Stoffels v. SBC Commc'ns, Inc.*, 263 F.R.D. 406, 411 (W.D. Tex. 2009)). Further, since application of the attorney-client privilege has the effect of withholding relevant information from the fact-finder, "it is interpreted narrowly so as to 'appl[y] only where necessary to achieve its purpose.'" *Id.* (quoting *Robinson*, 121 F.3d at 974). Despite bearing the burden of proof that the identified portions of Kraft's interview were violative of other Defendants' attorney-client privilege, Defendants offer only general argument that the actions of ISG and other named Defendants, or the communications of the same to ISG's non-lawyer employees, were improperly disclosed. Mindful of this Court's duty to apply the attorney-client privilege narrowly, the Court concludes that Defendants have failed to carry their burden and holds that no information protected by attorney-client privilege was disclosed.

To the extent Defendants argue that these identified portions of Kraft's interview were also violative of work-product privilege, they are twice mistaken. The only materials identified in the above were the updated estimating tools, (Docs. 185-1 at p. 7, 174-1 at p. 11), and those estimating tools were not "created by [ISG's] attorney or by agents of [ISG's] attorney," *Adams*, 973 F.3d at 349, but rather were

constructed by ISG's employees in response to the Court's initial Order, followed immediately by Defendants' voluntary commitment, requiring the company to do so. (*See* Docs. 7, 23).

In arriving at the conclusions above, and as in *In re Shell Oil Refinery*, the Court draws short of any definitive finding that Plaintiff violated LRPC 4.2(b). *See* 143 F.R.D. at 108 (E.D. La. 1992). Instead, the Court finds that Plaintiff's conduct may have compromised the purpose, if not the letter, of LRPC 4.2(b), and thereby notions of fair play, and that for this conduct the appropriate actions are limited to those set forth above. Moreover, because the Court finds as such and because it has sufficiently "balanced the scales," a conclusion as to whether LRPC 3.4(a) or Federal Rule of Civil Procedure 30 were violated by Plaintiff's same conduct is not necessary.

### iii. Disqualification of Counsel

The U.S. Court of Appeals for the Fifth Circuit has held that "disqualification cases are governed by state and national ethical standards adopted by the Court." *Nguyen v. La. State Bd. of Cosmetology*, 2014 WL 6801797, at *1 (M.D. La. Dec. 2, 2014) (citing *FDIC v. U.S. Fire Ins. Co.*, 50 F.3d 1304, 1311-12 (5th Cir. 1995)). "At least four ethical standards should be consulted in a district court's consideration of disqualification issues: (1) the local rules of the district; (2) the American Bar Association's (ABA's) Model Rules of Professional Conduct; (3) the state rules of conduct; and (4) the ABA's Model Code." *Id.* "Notwithstanding the fundamental importance of safeguarding popular confidence in the integrity of the legal system, attorney disqualification . . . is a sanction that must not be imposed cavalierly." *Id.*

"All of the facts particular to a case must be considered, in the context of the relevant ethical criteria and with meticulous deference to the litigant's rights." *Id.*

Defendants have cited to multiple cases in which disqualification of an attorney was ordered. (Doc. 185-1 at pp. 16-19 (citing *Papanicolaou v. Chase Manhattan Bank, N.A.*, 720 F. Supp. 1080 (S.D.N.Y. 1989); *Fed. Deposit Ins. Corp. v. Ernst & Young LLP*, No. CV 20-1259, 2023 WL 4027886, (E.D. La. June 15, 2023); *Patel v. 7-Eleven, Inc.*, 2015 WL 9701133, (C.D. Cal. Apr. 14, 2015); *Zachair, Ltd. v. Driggs*, 965 F. Supp. 741 (D. Md. 1997), *aff'd*, 141 F.3d 1162 (4th Cir. 1998))). None of the cases are similar to the facts before the Court, and the Court will exercise its discretion to deny Defendants' disqualification request.

In brief, *Papanicolaou* involved conversations between defense counsel and an unrepresented opposing party, 720 F. Supp. at 1083, whereas here Kraft was represented by his personal attorney, *Ernst & Young LLP* involved counsel viewing documents they were not supposed to view and having those documents in their possession for a number of years, 2023 WL 4027886, at *4, *Patel* involved a deposed individual that was provided actual compensation in exchange for his testimony, 2015 WL 9701133, at *7, and *Zachair* involved a transcribed interview with defendants' former general counsel, with whom the other defendants possessed an attorney-client relationship, 965 F. Supp. at 753.[10] The Court is convinced that disqualification of

---

[10] Defendants offered two additional cases after Oral Argument, one that was cited in *Zachair*, which was *MMR/Wallace Power & Indus., Inc. v. Thames Assocs.*, 764 F. Supp. 712, 714 (D. Conn. 1991), and another case cited to in *Thames Assocs.*, which was *Am. Prot. Ins. Co. v. MGM Grand Hotel-Las Vegas, Inc.*, No. CV-LV-82-26-HDM, 1986 WL 57464, at *1 (D.

Plaintiff's counsel is not warranted given the facts before it, the interest that Plaintiff has in maintaining the attorney of its choice, *Burford v. Cargill, Inc.*, No. CIV.A. 05-0283, 2009 WL 2381328, at *19 (W.D. La. July 30, 2009), and that the interests of justice are served by the actions imposed in the previous section of this Ruling and Order.

## IV.    CONCLUSION

Accordingly,

**IT IS ORDERED** that Defendants' **Motion To Dissolve Preliminary Injunction (Doc. 161)** be and is hereby **DENIED.**

**IT IS FURTHER ORDERED** that Defendants' **Motion For Sanctions (Doc. 185)** be and is hereby **GRANTED IN PART** and **DENIED IN PART**. The Clerk of Court shall **STRIKE** Kraft's transcribed interview, (Doc. 174-2), from the record. The parties shall meet and confer to schedule Kraft's deposition, and all associated costs and fees shall be apportioned to Plaintiff. Plaintiff shall not engage in further communications with Kraft without ISG's presence.

Baton Rouge, Louisiana, this 18th day of December, 2024

**JUDGE BRIAN A. JACKSON**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

---

Nev. Mar. 11, 1986). The Court is similarly unpersuaded by the applicability of both cases to the present facts.