UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| MMR CONSTRUCTORS, INC., | : | CIV. NO. 22-267 |
| | : | |
| Plaintiff, | : | |
| | : | |
| VERSUS | : | JUDGE BRIAN A. JACKSON |
| | : | |
| JB GROUP OF LA, LLC D/B/A | : | |
| INFRASTRUCTURE SOLUTIONS GROUP, | : | |
| ET AL. | : | MAGISTRATE JUDGE RICHARD L. |
| | : | BOURGEOIS, JR. |
| Defendants. | | |

## OPPOSITION TO MOTION TO COMPEL

Plaintiff MMR Constructors, Inc. ("MMR") files this Opposition in response to the *Motion to Compel Plaintiff's Discovery Responses and Production* (R. Doc. 208) filed by Defendants Jason Yates, Michael Lowe, Travis Dardenne, David Heroman, JB Group of LA, LLC ("ISG").

## PRELIMINARY STATEMENT

ISG's motion concerns discovery requests covering four categories: (1) measures taken to protect the confidentiality of MMR's business information; (2) MMR's alleged use of publicly-available information in estimating tools; (3) MMR's alleged possession of unidentified competitors' information and the disclosure of its own confidential information; and (4) MMR's internal communications that "relate to MMR's allegations in this lawsuit." For well over a year, MMR has made clear that these requests, as drafted, seek irrelevant information, lack specificity to enable a reasonable search, and/or are disproportional.

For largely those reasons, before ISG switched counsel, MMR and ISG reached an agreement on limitations for several discovery requests, according to which MMR produced responsive documents. No substantive meet-and-confer has taken place with ISG's new counsel following that agreement. MMR has continuously maintained, however, that if ISG could provide

1

some specifics about the information it seeks — rather than requiring an expensive fishing expedition — MMR would undertake a proportional search and produce any responsive documents.

For instance, on *September 12, 2022*, MMR responded to ISG's <u>Request for Production No. 34</u> of its *First Set of Requests for Production of Documents* that asked MMR to "[p]rovide a copy of all Documents reflecting or relating to the disclosure outside of MMR of any Greensheets." MMR made clear in its response that "MMR does not disclose its Greensheets outside of MMR as a matter of course, and to the extent Defendants believe otherwise or have information suggesting otherwise, MMR will conduct an inquiry and supplement its response." (R. Doc. 208-3 at 14). ISG provided no new information that would limit this request in a meaningful way and yet, two years later, ISG is now moving to compel MMR to conduct some undefined, disproportional search.

MMR has been open about the problems with ISG's discovery requests and indicated its willingness to conduct tailored searches if ISG provided reasonable and specific limitations. But ISG never did so. For this reason and as set forth in further detail below, the Court should deny ISG's motion.

## <u>BACKGROUND RELVANT TO DISCOVERY</u>

### *ISG's initial lead counsel*

ISG has taken several approaches to excuse its improper use of MMR's confidential information and trade secrets. ISG's prior lead counsel focused on two areas in discovery: (1) MMR's internal policies and procedures for protecting MMR's trade secrets and confidential business information, and (2) MMR's identification of the trade secrets and confidential information that ISG misappropriated. ISG even moved to stay discovery and its obligations under the Forensic Protocol until MMR fully identified the information at issue. *See* (R. Doc. 46). After

reviewing thousands of documents over the course nearly a year, MMR identified numerous documents that contained or comprised MMR's trade secrets and confidential business information. MMR also produced the documents demonstrating its efforts to safeguard the confidentiality of its protected information, as well as the available internal monitoring reports and external forensic reports relating to the individual defendants' (MMR's former employees who left to create and/or join ISG) improper computing activity.

From there, ISG focused on developing evidence that MMR employees had received business information from other competitors. After meet and confers with ISG's prior counsel, the parties agreed that MMR would produce documents relating to a single identified instance in which a competitor questioned whether a former employee still possessed information *after* joining MMR. Those documents were produced — which conclusively demonstrated that the competitor had no further concerns, given MMR's prompt investigation into the matter. Based on this agreement between counsel, that production put an end to this line of discovery.

ISG also brought up issued discovery seeking instances when MMR may have shared information with third parties, but MMR explained the basis of its objections and offered to limit its search to instances where ISG and the individual defendants believed such disclosure occurred. Considering the lack of a date restriction and the fact that MMR has thousands of employees, this was a reasonable compromise, as the individual defendants and other ISG employees were long-time employees of MMR. As such, ISG should have been able to point to some factual basis to support this request and, in so doing, narrow MMR's search. ISG, however, did not identify with reasonably particularity a single instance that could guide MMR's search.

3

***ISG's contempt and lead counsel's withdrawal***

In the midst of this discovery, on April 2, 2024, the Court held ISG in contempt for violating the consent Preliminary Injunction, with the written order issued on April 11, 2024. (R. Doc. 145). Shortly before the contempt hearing, ISG's first lead counsel withdrew from its representation of ISG, (R. Doc. 129), and the day after the contempt hearing, ISG filed a motion to add its new and current lead counsel. (R. Docs. 141-142).

Both the contempt and substitution of counsel impeded progress in discovery. Part of the contempt sanction was the appointment of a Special Master, who would have the authority to administer a Remediation & Monitoring Protocol. *See* (R. Doc. 145). Over the course of the next two months, ISG's and MMR's counsel met and conferred with the Special Master about the terms of an agreed Remediation & Monitoring Protocol, which the Court entered as an order. *See* (R. Docs. 155-156).

***ISG's new lead counsel takes a different discovery tack***

As the parties were negotiating the terms of the agreed upon Remediation & Monitoring Protocol, ISG's new lead counsel asked for an in-person meeting with MMR's in-house counsel and outside litigation counsel. That meeting took place on May 2, 2024, during which ISG's new lead counsel handed over copies of party discovery that was far out of bounds, as well as notices of subpoenas that would be sent to at least one of MMR's customers.

This led to more motion practice. On June 27, 2024, shortly after the Court adopted and approved the mutually negotiated *Agreed Remediation & Monitoring Protocol* as an order, the Court granted MMR's *Motion for Protective Order* and quashed the customer subpoena (and related party discovery requests), finding that "ISG is precluded from conducting further discovery

4

into MMR's handling of workplace injuries, MMR's bonus and compensation payments, and MMR's performance under the security camera maintenance with LSU." (R. Doc 160, p. 14).

### ISG's new counsel conducts depositions of former MMR employees without the need for additional documents from MMR

While the *Motion for Protective Order* was pending, ISG went forward with unilaterally set depositions of four third-party witnesses whom ISG had interviewed, on its own, beforehand: Russell Gaudin, Billy Hoover, Rob Mason, and Tracey Hollier. These individuals were not disclosed on ISG's *Initial Disclosures*, and their names had not come up in any discovery. In fact, MMR had never heard of, nor had any meaningful conduct with, Tracey Hollier, who was an individual who never even worked at MMR. ISG was able to conduct these depositions without any additional documents from MMR, and relied almost exclusively on their testimony in its attempt to dissolve the consent Preliminary Injunction. ISG's motion to dissolve and to eventually disqualify MMR's counsel then became a major focus of this litigation that prevented further discovery efforts. Relatedly, MMR learned that ISG was refusing to perform its obligations under the *Remediation & Monitoring Order*, which necessitated the filing of yet another motion for contempt/compel.

### ISG objects to extending discovery deadlines, then files this motion

MMR was in the process of making a supplemental production and was discussing with ISG's counsel an amendment to the Scheduling Order for the extension of discovery deadlines, given the delays that its motion practice caused. ISG, however, took the position that no such extension was needed and that discovery should be considered complete. This necessitated MMR's filing a motion to amend the scheduling order and to extend the discovery deadline. *See* (R. Doc. 206). After the Court granted the motion to amend the scheduling order and extend the discovery deadlines — but before the parties could discuss discovery and discovery-related issues — ISG

filed its motion. ISG has improperly used the filing of this motion to justify delaying depositions that MMR has requested for months, which is an issue MMR has separately raised in a letter to the Court via email seeking a status conference.

## ARGUMENT

ISG's motion focuses on four categories of discovery requests: (1) MMR's measures to protect the confidentiality of its business information; (2) the alleged use of publicly-available information in MMR's estimating tools; (3) MMR's alleged possession of unidentified competitors' information and the disclosure of its own confidential information; and (4) MMR's internal communications that "relate to MMR's allegations in this lawsuit."[1] MMR addresses each category in turn.

### 1. MMR's efforts to protect its own internal business information.

ISG asserts that one of its defenses is that "MMR did not take any steps to prevent its employees from leaving with MMR files." (R. Doc. 208-1 at 8). From the outset, MMR has identified and produced documents demonstrating the efforts it takes to safeguard its protected information. This includes the production of policies and agreements relating to MMR's confidential business information that _all MMR employees_ agree to be bound by — including those individually named as Defendants here. MMR also produced reports from its network software that monitors suspicious computing activity, like mass downloads to external storage device, as well as the external forensic reports that led to this suit's filing. MMR also produced verifications explaining how MMR's computing network, and devices connected to it, are password-protected,

---

[1] MMR notes at the outset that ISG's motion violates Local Rule 37 of this Court, which requires motions to compel to "quote verbatim each interrogatory, request for production, or request for admission to which the motion is addressed, followed immediately by the verbatim response or objection which provided thereto." ISG's failure to comply with Local Rule 37 complicates briefing on these issues and MMR's ability to respond to ISG's motion.

#103408291v2

require two factor authentication to gain access when not connected to a MMR secured network, and are setup such that only individuals within MMR have access.[2]

ISG identifies two interrogatories that it claims go to this defense. The first is <u>Interrogatory No. 7</u>, which asks MMR to:

> Please Identify any employees who have left MMR's employment, from 2021 forward, by the employee position, employee name, and date, the stated reasons for leaving, and the individuals' next employer(s) after MMR.

MMR's objections should be sustained, as this interrogatory is not proportional to the needs of the case. The reason why *<u>every employee's</u>* employment ended during this period is completely irrelevant to ISG's purported defense to MMR's data theft claims, and the burden of collecting this information for a four-year period far outweighs any relevance that the information could possibly have.[3]

The second interrogatory ISG claims relates to this defense is <u>Amended Interrogatory No. 18</u>, which asks MMR to:

> Identify and Describe each instance in which MMR ensured that MMR information was deleted from any employee-owned device such as mobile phones, external hard drives, and/or other storage devices for any who left any time after 2017.

Again, MMR stands on its objections to this Amended Interrogatory and further points out that it already explained the efforts that MMR's IT personnel take (beyond the policies and procedures in place that requires the return of property and the protection of MMR's information) to ensure that former employees no longer have access to MMR's information upon their departure. In

---

[2] Notably, the third parties ISG deposed who were formerly employed by MMR—Russell Gaudin, Billy Hoover, Rob Mason—all agreed that MMR has such policies and that they knew MMR's information should not be shared with competitors.

[3] When evaluating the proportionality of this request, it must be noted that ***thousands*** of employees are separated from MMR each year (many of whom are then rehired when new jobs begin).

#103408291v2

response to Amended Interrogatory No. 17, MMR also identified specific instances where MMR took additional actions (as it did here) when learning facts that suggested its protected information had been misappropriated. *See* (R. Doc. 208-4 at 6-7). MMR provided proportional interrogatory responses to these interrogatories.

ISG also proffers three requests for production of documents that purportedly relate to this defense. In Request For Production No. 8 of ISG's *Fifth Set of Requests for Production of Documents*, ISG asks MMR to produce:

> The contract or engagement letter with the HR Firm, or documents reflecting the scope of the HR Firm's engagement.

And in Request For Production No. 9 of ISG's *Fifth Set of Requests for Production of Documents*, ISG asks MMR to produce:

> Any reports or documents reflecting the results of the HR Firm's engagement.

As MMR stated in response, even if MMR had hired an "HR Firm" for services related to its employee policies, neither the "contract," "engagement letter," nor "report" would be relevant to ISG's purported defense. And, as MMR's counsel has explained on several occasions, MMR did not hire any "HR Firm." Any assistance with the drafting, editing, or implementation of company policies would have been through MMR's employment attorneys, and all such communications — even if relevant — would be subject to attorney-client privilege. Regardless, what matters is that MMR has reasonable policies in place to protect its confidential business information, and its employees (including all individually named defendants) were subject to those policies — all of which have been produced.

The remaining document request purportedly related ISG's reasonable efforts defense is Request For Production No. 19 of ISG's *Third Set of Requests for Production of Documents*, which asks MMR to produce:

> Documents or communications concerning any exit interview of the
> Former MMR Employees.

In response, MMR reiterated that it does not have a standardized "exit interview" and that the exit process is handled on a supervisor-by-supervisor basis, during which company equipment is collected and good-byes are said. Further, MMR disclosed what it has done in instances — like the one here — where MMR has learned of improper conduct. Finally, MMR has produced the personnel files for the named Defendants, which would include any written documentation relating to the exit process. At this stage, MMR has nothing further to produce, but (as MMR has told ISG's counsel on multiple occasions) ISG is free to depose supervisors if it believes there are relevant questions to ask about what was said to the named Defendants (or other MMR departing employees) during the exit process.

**2. Use of publicly available data.**

ISG next argues that MMR's database within its estimating tools simply incorporates "publicly available data from a subscription service offered by the National Electrical Contractors Association ('NECA')." ISG points to select deposition testimony of two third-party witnesses, but both admitted that they have no personal knowledge about how MMR built and modified the database within its estimating tools.[4] For instance, Billy Hoover specifically testified that MMR was not using NECA units while he was employed there and had to "assume" how MMR built its estimating tools:

> Q:    And did – did MMR use NECA when you were there?
>
> A:    Not – I mean, no, because they had their database built,
>        which I assume was built from NECA rates, I don't know

---

[4] ISG cites to the deposition of third-party witnesses, Russell Gaudin and Billy Hoover. Those deposition transcripts are available at R. Doc. 161-5 and R. Doc. 161-3 respectively. In denying ISG's motion to dissolve the preliminary injunction, Judge Jackson specifically noted that these witnesses had no personal knowledge about how MMR built its database within its estimating tools. *See* (R. Doc. 212).

> that for sure. I don't recall ever actually going to source the
> NECA book when I was there.

(R. Doc. 161-3, *Hoover Dep. Tr.* at 19:2-14). Further, after speculating about how a company

would initially develop its labor unit rates — which for a company like MMR would have been

over 30 years ago — Russell Gaudin testified that a contractor's labor unit rates used to develop

competitive bids is based on historical experience within the industry (not a publicly available

subscription) and has unique value for that contractor:

> Q:     And all those different variables go into forming the labor
>        unit for the particular task on the job, right?
>
> A:     For the JA, yes.
>
> Q:     Right. And then that becomes the guide to determine
>        whether the company has been profitable on that job right,
>        right?
>
> A:     Yes.
>
> Q:     Okay. And the information that is developed to develop
>        those labor units, that has value for all of those different
>        companies, right?
>
> A:     Of course.
>
> Q:     Right. And that comes from the experience and from the
>        good contracts and the contracts, right?
>
> A:     Yes.
>
> Q:     And that's important information for a company to have
>        and to keep to itself going forward as it does — as it bids
>        on more and more jobs, right?
>
> A:     Sure. Yeah.

(R. Doc. 161-5, *Gaudin Dep. Tr.*at  133-134). Mr. Hoover also agreed:

> Q:     But the database itself, the information in the database, all of
>        that information was developed by MMR over time with
>        their experience, would you agree with that?
>
> A:     Yes.

. . .

Q:    You would agree, Mr. Hoover, that MMR would not want its database – green sheet database copied and pasted into a different – in creating a different database for a competitor. Would you agree with that?

A:    Yes.

(R. Doc. 161-3, *Hoover Dep. Tr.* at 55:5-12). In fact, Mr. Hoover identified a current MMR employee who was instrumental in building MMR's estimating tools who could *actually* explain how MMR built and modified the database within its estimating tools, which is not surprising because MMR was already using its estimating tools before Hoover even became an MMR employee:

Q:    Do you know that Darryl Clark is the individual that built the green sheet database for MMR?

A:    I had assumed that, but I did not know that for sure.

Q:    Okay. Would you agree that Mr. Clark is in a better position to testify about what was actually utilized to come up with the MMR database?

A:    Yes.

. . .

Q:    When you arrived at MMR, they already had a full database in place, correct?

A:    Yes.

(R. Doc. 161-3, *Hoover Dep. Tr.* at 52:10-19). And, as MMR has repeatedly told ISG, Mr. Clark and other MMR employees who were *actually* involved in building and developing MMR's estimating will explain why and how its database is unique and is not available through a subscription like the NECA manual.

ISG, nevertheless, insists on a fishing expedition, asking MMR in <u>Request for Production No. 5</u> of ISG's *Second Set of Requests for Production of Documents* to:

> Provide a copy of all Documents referencing, concerning, or relating to National Electrical Contractors Association ("NECA") unit rates and/or NECA labor rates.

This request includes no date limitation or custodian scope and would require MMR to search across its entire computing network for, and then produce, "all Documents" that contain the acronym "NECA." Seemingly recognizing the disproportional nature of this request, ISG admits that it tried to limit the request to documents "relating to any comparison or analysis of NECA unit rates by MMR between January 1, 2020 and December 31, 2021." (R. Doc. 208-1). But, as explained on several occasions, MMR does not conduct analyses or comparisons when a new NECA manual comes out and did not do so within this timeframe.

In fact, MMR's database is based on an accumulation of trial-and-error experience, lessons learned when installations take longer or are more efficient than the relied-upon labor units at bid time, and general know-how acquired over MMR's thirty years of work within the E&I construction industry. Further, ISG already has the documents needed to make such a comparison. ISG misappropriated MMR's estimating tools that contain its confidential database and that were used by MMR in 2020 and 2021, and ISG continued to use those estimating tools, as the Court already found when holding ISG in contempt for violating the *Preliminary Injunction*. (R. Doc. 145 at 3-4, 7)[5] If ISG hopes to prove that MMR's database is a copy of a publicly available NECA manual, it can easily conduct its own comparison to try to make that point. Requiring MMR to

---

[5] The Court clarified: "At his deposition, Huffman testified that, despite the Court's Preliminary Injunction having been in place for nearly two years, several estimating tools and management programs in use at ISG were identical to, and were built from, equivalent tools and programs by MMR. . . . ISG does not contest that Huffman used MMR's estimating tools and programs to build materials for ISG. . . . Here, it is clear that ISG is in contempt of the Court's May 22, 2022 Preliminary Injunction. The Court has informed ISG that the estimating tools allegedly stolen from MMR qualify as trade secrets on numerous occasions. (Docs. 7, 69). ISG does not contest that its L&M sheets and its Overhead Top Sheets, each of which are estimating tools and each of which were used by ISG after the entry of the Preliminary Injunction, were built from precedent MMR materials that Huffman either retained from his employment with MMR or was sent from other former MMR employees. (Doc. 130 at p. 8). On this basis alone, the Court could hold ISG in contempt." (R. Doc. 145 at 3-4, 7).

#103408291v2

essentially search its entire computing network for the term "NECA," without any temporal or custodian limitation, is not proportional to the needs of the case.

### 3. Disclosure of trade secrets

For this category of discovery requests, ISG's new counsel attempts to reverse an agreement between MMR's counsel and ISG's initial lead counsel, and, in so doing, another extensive search for irrelevant documents. ISG's initial lead counsel served discovery asking for documents showing that MMR allegedly misappropriated other competitors' business information. MMR objected to these requests for numerous reasons but, as a compromise, agreed to produce documents relating to the one instance ISG specifically identified where a competitor (ISC Constructors) believed that one of its former employees, whom MMR had hired, was improperly in possession of company data. MMR produced the relevant communications that demonstrated ISC Constructors determined that MMR had taken its concerns seriously, had investigated their concerns, and adequately determined that the former employee was not in possession of such information. This response resolved that category of discovery, as ISG and the individually-named defendants (all of whom were long-time MMR employees) could not identify any other instance of MMR allegedly possessing a competitor's confidential business information. Nevertheless, ISG's new counsel insists that MMR go on another limitless fishing expedition. For instance, Request for Production No. 41 of ISG's *First Set of Requests for Production of Documents* states:

> For each category of information you contend any Defendant
> misappropriated, produce Documents reflecting or relating to Your
> possession, use, or disclosure of such category of information from
> Your competitor.

In this lawsuit, MMR is not accused of misappropriating any competitor's information, and MMR has already produced the documents relating to the one instance ISG specifically identified. Aside

from being previously resolved among the parties' counsel, the discovery is not relevant and is not proportional to the needs of the case.

The remaining discovery in this category is disproportional. ISG has asked — with a temporal scope of twenty years[6] — for all instances that MMR may have shared its trade secrets and confidential business information. This is far too broad, as some documents must be exchanged with customers. The best way to explain this is to take each category, one-by-one, that is listed in Request for Production No. 14 of ISG's *Second Set of Requests for Production of Documents*:[7]

- ***Estimating Tools* (green sheets/oht sheets):** Absent extremely limited situations (such as when a client needs to know the quantity of a certain type of material that MMR has included in its proposals, but not the associated labor units or labor hours associated with such materials), MMR does not share its estimating tools with anyone. MMR has made this clear on numerous occasions. ISG is essentially asking MMR to search its entire computing network to prove this negative — even though Defendant Kasey Kraft, the former MMR estimator whom ISG hired, testified that he *never* shared these documents outside of MMR. If ISG and the individual defendants were aware of some instance of MMR's estimating tools being shared outside the company, MMR would search the relevant custodian's documents — as MMR's has made clear. ISG, however, has never offered any specifics for such a search.[8] In fact, Ben Huffman — MMR's former Project Controls Director and now ISG's Project Controls Director — testified that there was "nowhere" where one could obtain MMR's estimating tools publicly. (R. Doc. 119-7, *Huffman Dep. Tr.* 79:3-14) (Q: MMR doesn't publish their unit rates anywhere, correct? A: Correct . . . Q:

---

[6] For instance, the only temporal limitation for Request for Production No. 14 of ISG's *Second Set of Requests for Production* is "the date when any of the Defendants commenced employment with MMR, through the present." Defendant Jason Yates commenced employment with MMR in December 2004 — twenty years ago.

[7] ISG also references *Request for Production No. 34* of ISG's *First Set of Requests for Production* that are encompassed by *Request for Production No. 14*, as it asks MMR to "[p]rovide a copy of all Documents reflecting or relating to the disclosure outside of MMR of any Greensheets." Similarly, ISG references *Amended Interrogatory No. 4*, which suffers from the same problems as *Request for Production No. 14*.

[8] Interestingly, ISG states that "former employees now with ISG know: (i) that documents responsive to Request No. 34[, a request for disclosure of MMR's estimating tools,] at MMR; (ii) the names of MMR employees who shared pricing and bidding information with industry participants outside of MMR; and "the names of those outside of MMR who received such MMR information." (R. Doc. 208-1 at 8). However, ISG has not provided any of this specific information that could make the requests proportional — and still does not do so in this motion.

And you know of nowhere where you can publicly get that information, correct? . . . MMR's greens sheets and the unit rates in their green sheets? A: As far as I know, no.).

- **_Customer Bids/Proposal/Estimates_**:  All customer bids and proposals — by their nature — must be exchanged with customers, who are "outside MMR." So, to satisfy this request, MMR would need to produce "all" bids and proposals it ever sent to a customer. This is entirely too broad and is not proportional to the needs of the case. But what is important, here, is that MMR's bids all include "confidentiality" language, indicating that the documents are not to be shared or used beyond MMR's relationship with that customer. Indeed, ISG misappropriated numerous bids and proposals to customers — all of which contain the "confidentiality" language included. Accordingly, producing more examples of bids/proposals shared with MMR's customers is not relevant or proportional, as there is no factual dispute that MMR must share these documents with its customers and those documents contain express "Confidentiality" language.[9] *See   Phillips v. Frey*, 20 F.3d 623, 629 (5th Cir. 1994) (recognizing trade secrets remain protected when disclosed under an "express or implied contractual or confidential relationship"); *Bihm v. Deca Sys., Inc*., No. 2016-0356 (La. App. 1 Cir. 08/08/17), 226 So. 3d 466, 471 (same*); Bureau Veritas Commodities & Trade, Inc. v. Nanoo,* 2021 U.S. Dist. LEXIS 99497, at *10 (E.D. La. May 26, 2021) (recognizing "confidentiality disclaimers on emails" as one of the reasonable efforts taken to protect the information); *see also* La. Rev. Stat. Ann. § 51:1431 (Comment (f)) ("The courts do not require that extreme and unduly expensive procedures be taken to protect trade secrets against flagrant industrial espionage. *See E.I. du Pont de Nemours & Co., Inc. v. Christopher, supra.* It follows that reasonable use of a trade secret including **_controlled disclosure_** to employees and licensees is consistent with the requirement of relative secrecy.") (emphasis added).

- **_Job Analysis Program_**:  As with MMR's Estimating Tools, its proprietary Job Analysis Program is also not shared outside MMR. Indeed, Ben Huffman testified that this is a "valuable" projects control tool that is proprietary to MMR. Indeed, Mr. Huffman confirmed his description of this internal, project controls gram in a document that he helped author: "MMR Constructors, Inc. uses a **_custom system_** for job analysis. This system tracks overall project percent complete, percent complete by cost code, productivity, manhours remaining, manhours spent, and quantity installed. **_This program assists management_** in showing areas that may need improvement as the project progresses. The program **_provides the client_**

---

[9] MMR is providing customer bid/proposal that was misappropriated by ISG, as Exhibit 1, filed under seal. The language states: "The information in this proposal contains **CONFIDENTIAL** and/or **PRIVILEGED** information. The disclosure, distribution, or unauthorized use of the contents of this proposal by anyone other than the intended user is **STRICTLY PROHIBITED**."

with several ***up-to-date report***."[10] MMR does not disclose this program to third parties. So, like the estimating tools, ISG is demanding that MMR launch a fishing expedition — one that spans numerous years — to essentially prove a negative. However, as with the estimating tools, MMR told ISG that, if it were aware of an instance when this happened, then MMR would conduct a search to locate such documentation. ISG, however, has not done so to date, and therefore ISG has not provided MMR with any limitation to cure this disproportionate request.

- ***Reports from Job Analysis Program***: Unlike the Job Analysis Program itself, reports from it are provided to a customer as part of the unique services that MMR is able to provide. There is no factual dispute about that. This reporting is an essential part of MMR's business offering, and there will a plethora of these types of reports (such as "s-curves") provided to customers within the same express or implied confidential customer relationship as the bid documents. Indeed, ISG and the individual defendants misappropriated a number of these documents from MMR's system. But those misappropriated documents are the "relevant" documents — not "all" examples of MMR conducting its ordinary business with its customers year after year after year. What ISG already has in possession in terms of reports generated from MMR's Job Analysis Program ends the proportionality inquiry — as MMR will readily concede that it shares reporting from MMR's Job Analysis Program. Indeed, that is one of the main and valuable functions of the proprietary program.

- ***Timekeeping Program***: Again, like MMR's Job Analysis Program, Mr. Huffman confirmed that this was an internal, proprietary tool that MMR developed internally. He specifically agreed with the description in MMR's *Project Controls Plan* that he helped author: "MMR . . . uses ***a custom database system*** to handle timekeeping. This program allows for tracking of employee attendance, work orders, areas worked, equipment, vendor invoices, and billing invoices. ***Each system is tailored to specific needs of the project***." Again, this internal propriety database was not shared outside MMR. And, again, ISG is demanding that MMR launch a fishing expedition to prove this negative. MMR told ISG that, if it were aware of an instance when this happened, then MMR would conduct a search to locate such documentation. ISG, however, has not done so.

- ***Reports from the Timekeeping Program***: As with reports from the Job Analysis Program, MMR will share timekeeping reports with its customers. Indeed, this is largely how MMR gets paid by its customers and is able to demonstrate the manhours and equipment time expended. There is no dispute that MMR shared documents from its Timekeeping Program with its customers, and ISG misappropriated numerous examples of such

---

[10] A copy of MMR's *Project Controls Plan* is being file under seal as Exhibit 2.

documents. What ISG already has in possession in terms of timekeeping reports generated from MMR's Timekeeping Program ends the proportionality inquiry — as MMR will readily concede that it shares timekeeping reporting within (at the very least) an implied confidential relationship with its customers. There is simply no need for MMR to produce "all" such documents shared with customers over a twenty-year period.

- ***Employee Handbook***: MMR's employment attorneys helped MMR develop its employee handbook. ISG would not be entitled to documents exchanged between MMR and its counsel. Further, this is not a document that MMR puts into the public domain, though it may have shared portions of it with a customer if asked to do so. To the extent shared, it would have been within a one-on-one relationship with its customer. Again, if ISG believes there was some specific instance where this occurred, MMR would track that down and produce those documents, if they existed. ISG has failed to identify any such instance.

- ***Safety and QA/QC Manuals and Plans***: MMR has an internal Safety and QA/QC Manuals and Plans that comprises years of experience within the E&I Construction industry. MMR does not put these manuals and plans into the public domain; however, as with its Employee Handbook, MMR may have shared portions of its manual with customers if asked. To the extent shared, it would have been within a one-on-one relationship with its customer. Again, if ISG believes there was some specific instance where this occurred, MMR would run that to ground and produce such documents, if they existed. ISG has failed to identify any such instance.

In sum, the documents requested can be broken into two groups: the first group, those internal documents that MMR does not share outside MMR, and the second group, those that MMR admittedly share with customers as a necessary part of conducting business. For the first group, ISG's requests are not proportionally drafted, and ISG has refused to provide the reasonable limitations that MMR offered. For the second group, there is no reason for MMR to produce anything more than what ISG already has in its possession, as MMR admits it shared those types of documents with its customers and producing more examples will not tend to prove or disprove any fact in dispute.

**4. Internal communications.**

The final category is a sweeping one. In <u>Request for Production No. 1</u> of ISG's *Sixth Set of Requests for Production of Documents*, ISG requests entire:

> Forensic copies of the cellphone and computers used by Kevin
> Alexander during his employment with MMR.

This an entirely disproportional request. Entire forensic copies of an MMR-issued cellphone and computer would include thousands and thousands of documents and communications that had nothing to do with whether ISG and the other named defendants misappropriated MMR's protected information. In fact, even for ISG devices that were subject to forensic examinations because they contained MMR's trade secrets, MMR did not receive entire forensic copies of those devices to do as it pleased. Rather, MMR only received certain documents that contained a search term that the parties agreed would likely retrieve misappropriated information. Nevertheless, to give ISG a sampling (as ISG indicated it should search "ISG" and "Yates"), MMR is producing communications from the cellphone that MMR issued to Mr. Alexander that contain the term "ISG" or were exchanged with Mr. Yates. ISG will see for itself that there are not any discussions about ISG, other than Mr. Alexander exchanging text messages with what appears to be an accountant — shortly after MMR filed suit on April 25, 2022 — about gathering invoices and numbers relating to his side-company "Stateline Partners" doing business with ISG.

Equally problematic are the broad and vague requests in <u>Request for Production No. 14</u> of ISG's *First Set of Requests for Production of Documents* ask MMR to:

> [p]roduce the Documents and Communications that James B.
> "Pepper" Rutland exchanged with MMR employees that relate to
> Your allegations in the lawsuit.

Mr. Rutland did not send communications about the lawsuit or what MMR was alleging to MMR's employees, and Mr. Rutland did not become aware of the alleged misconduct until there was a

#103408291v2

reasonable anticipation about litigation. Mr. Rutland was kept abreast of the allegations and MMR's investigation into the alleged misconduct through MMR's counsel.

The same is true for John Clouatre, who is the subject of an identical discovery request, Request for Production No. 13 of ISG's *First Set of Requests for Production of Documents*. MMR's counsel clarified this during meet and confers with ISG's initial lead counsel, yet ISG's new lead counsel is now posturing as if this trade secret case — which, by its nature, is focused on the tortious acts of the defendants — is like "any commercial dispute" where a "party's communications about that dispute are highly relevant." But this theft-of-information case is not like a typical commercial dispute. MMR received indications that a former employee had misappropriated information and immediately acted in consultation with MMR's counsel. The fact that the misconduct was so extensive, resulting in the production[11] of numerous documents from ISG's systems, does not mean that MMR must have had an equal number of communications about the alleged misconduct.

ISG's basis for seeking information in the remaining discovery request — Request for Production No. 1 of ISG's *First Set of Requests for Production of Documents* that seeks alleged communications between MMR's in-house counsel, Matt Welborn, and Defendant Jason Yates — is that "ISG's founder Jason Yates testified that while he was employed at MMR he had exchanged emails with MMR's in-house counsel Matt Welborn about ISG." (R. Doc. 208-1 at 3). But that mischaracterizes Mr. Yates's testimony. Mr. Yates merely testified that he had "invested" in ISG (at the time a DOT company) and that, in early 2021 (a year before the litigation), he "actually

---

[11] ISG has, without question, had to produce more documents than MMR given ISG's obligations under the consent Preliminary Injunction and the Forensic Protocol. But that asymmetry, in and of itself, is not grounds to find that MMR must now respond to ISG's overbroad and disproportional discovery. ISG forgets that no allegations exist that MMR misappropriated information belonging ISG. Meanwhile, forensic evidence and testimony from ISG's own employees has conclusively demonstrated that ISG misappropriated MMR's protected information, which is exactly why the discovery burden on ISG has been greater.

brought a contract that has Matt's comments, had him look at it on that job, which was Causeway or Bone or one of them." That is the extent of Mr. Yates's testimony on this point. He does not testify that he told Mr. Welborn that ISG was using MMR's stolen estimating tools or other trade secrets to perform work on behalf of ISG — he only states that he brought a contract draft to Mr. Welborn while Mr. Yates was still working at MMR in 2021 to protect an investment:

> Q:    You're saying that was ISG's first job and then you brought a copy of the contract to MMR –
>
> A:    I was working for MMR. The DOT work was noncompetitive with MMR. I had invested in it, so I was making sure my investment was protected.
>
> Q:    Okay. This is – so at this point, at the time of the first job – that ISG did, you were still employed by MMR but had an investment in ISG?
>
> A:    That is correct.

There is no basis from Mr. Yates's testimony to even suggest that MMR's executive team was aware that he intended to use MMR's trade secrets for the benefit of ISG, yet ISG argues that purported communications between Mr. Yates and Mr. Welborn "will prove" that Mr. Welborn was aware of Mr. Yates's use of MMR's trade secrets. While Mr. Welborn will readily agree that Mr. Yates brought a contract to his attention under the guise that Mr. Yates was merely seeking to protect an investment, there are no communications to produce that in any way suggest that Mr. Welborn was aware that Mr. Yates had used and was intending to launch ISG from the use of MMR's trade secrets, as MMR has explained. Nevertheless, MMR's supplemental production will include the communication between Mr. Yates and Mr. Welborn.

## **CONCLUSION**

ISG's discovery requests seek irrelevant information or are disproportional. For the discovery requests that could be limited through reasonable and specific parameters, ISG has failed

to offer any, and has waited, in some cases, nearly two years to now ask the Court to compel a response from MMR. The Court should deny ISG's motion to compel.

Respectfully submitted:

*/s/ P.J. Kee*
P.J. Kee (La. Bar No. 34860)
Thomas P. Hubert (La. Bar No. 19625)
Jacob J. Pritt (La. Bar No. 38872)
Michael A. Foley (La. Bar No. 35774)
Jones Walker LLP
201 St. Charles Avenue - 50th Floor
New Orleans, Louisiana  70170-5100
Telephone:  (504) 582-8000
Facsimile:  (504) 589-8230
Email:  pkee@joneswalker.com
**Counsel for MMR Constructors, Inc.**

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served through the Court's pacer e-filing system on December 30, 2024.

*/s/ P.J. Kee*
P.J. Kee

21